**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE RC2 CORP. TOY LEAD PAINT PRODUCTS LIABILITY LITIGATION** | Case No. 07-cv-7184<br><br>MDL No. 1893<br><br>JUDGE LEINENWEBER |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF EMERGENCY MOTION
FOR PRELIMINARY INJUNCTION PURSUANT TO THE ALL WRITS ACT**

## TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ......................................................................................................... 1

II.  FACTUAL BACKGROUND ....................................................................................... 4

    A.  Procedural History of the MDL Proceeding ..................................................... 4

    B.  Procedural History of *Barrett v. RC2* ............................................................. 6

    C.  The Purported Settlement Agreement in *Barrett* ............................................ 7

        1.  The *Barrett* Settlement purports to release but provides no consideration for medical monitoring or blood lead testing claims ............ 7

        2.  Class members that purchased 60% of the Recalled Toys will receive *no* consideration under the Settlement ............................................ 8

            a.  Class members who returned their Toys in the recalls are not entitled to any consideration ................................................ 9

            b.  Class members that own less than 40% of the Thomas Toys *may* be eligible for a cash refund ........................................... 9

            c.  Maximum of two $15.00 coupons for Learning Curve's online store where consumers will have to spend an average of $35.67 plus shipping costs upwards of $6.95 to purchase a new Thomas Toy ......................................................... 10

            d.  RC2 purports to settle for the same relief otherwise offered under the CPSC Recalls ............................................................. 11

        3.  The Cy Pres Fund is De Minimis ............................................................ 11

        4.  The vague injunctive relief provisions mimic what RC2 told Congress it was doing two months before the *Barrett* case was filed ....... 11

        5.  The Agreement releases claims of business entities despite lack of adequate class representative ................................................................ 13

        6.  The Fox guarding the hen house:  the designated claims administer is RC2's Chief Operating Officer ........................................................... 14

        7.  The Pay-Off: Attorneys' Fees and Costs .................................................. 14

III.  ARGUMENT ............................................................................................................ 16

A.    Legal Standards For Issuance of Injunctions Pursuant to the All
Writs Act ........................................................................................................... 16

B.    As An MDL Transferee Court, this Court Can and Should Enjoin
RC2 from Seeking Final Approval of the Proposed *Barrett* Settlement ............. 17

C.    Defendants' Reverse Auction Requires An Injunction ........................................ 20

D.    The Class Action Fairness Act of 2005 Was Supposed to Prevent
Backroom Sham Settlements Like That Proposed in *Barrett* .............................. 22

IV.    CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

**PAGE**

### CASES

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997)..................................................................................13

*Clement v. American Honda Fin. Corp.,*
    176 F.R.D. 15 (D. Conn. 1997)..................................................................10

*In re Diet Drugs Prod. Liab. Litig.,*
    282 F.3d 220 (3d Cir. 2002).................................................................16, 17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995)........................................................................10

*Hillman v. Webley,*
    115 F.3d 1461 (10th Cir. 1997) ................................................................17

*Kamilewicz v. Bank of Boston Corp.,*
    100 F.3d 1348 (7th Cir. 1996) ..................................................................22

*In re Lease Oil Antitrust Litig. (No. II),*
    48 F. Supp. 2d 699 (S.D. Tex. 1998) .............................................16, 19, 20

*In re Managed Care Litig.,*
    236 F. Supp. 2d 1336 (S.D. Fla. 2002) .....................................................18

*Mars Steel  Corp. v. Continental Ill. Nat'l Bank & Trust Co.,*
    834 F.2d 677 (7th Cir. 1987) ....................................................................21

*Newby v. Enron Corp.,*
    302 F.3d 295 (5th Cir. 2002) ....................................................................17

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1990)..................................................................................21

*Reynolds v. Benefit Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) ....................................................................21

*Single Premium Deferred Annuities Ins. Litig.,*
    770 F.2d 328 (2d Cir. 1985)......................................................................17

*Synfuel Techs., Inc. v. DHL Express (USA) Inc.*,
     463 F.3d 646 (7th Cir. 2006) ........................................................................14

*United States v. New York Tel. Co.*,
     434 U.S. 159 (1977)......................................................................................17

*Winkler v. Eli Lilly & Co.*,
     101 F.3d 1196 (7th Cir. 1996) ................................................................16, 17

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
     No. 4:03-md-01559-FJG, 2003 U.S. Dist. LEXIS 26070 (W.D. Mo. Dec. 22,
     2003) ...............................................................................................................19

*Yeagley v. Wells Fargo & Co.*,
     No. 05-03403, 2008 U.S. Dist. LEXIS 5040 (N.D. Cal. Jan. 18, 2008)...........14

## STATUTES

28 U.S.C. § 1332............................................................................................................23

28 U.S.C. § 1407..............................................................................................................2

28 U.S.C. § 1712..............................................................................................14, 15, 16

28 U.S.C. § 1651............................................................................................................16

28 U.S.C. § 2283............................................................................................................16

Pub. L. 109-2, § 2(a)(3)(A), 119 Stat. 4......................................................................14

## MISCELLANEOUS

C.R. Leslie, *The Need to Study Coupon Settlements in Class Action Litigation*,
     18 Geo. J. Legal Ethics 1395 (2005)...........................................................10

*Jack C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action,* 95 Colum.
     L. Rev. 1343, 1370-73 (1995).....................................................................21

## I.    INTRODUCTION

Defendants RC2 Corporation and Learning Curve Brand, Inc. (collectively, "RC2") recklessly placed 1.7 million lead-painted Thomas and Friends Wooden Railway Toys ("Thomas Toys") into the hands of children.  They now seek to avoid responsibility for their actions by arranging a collusive settlement of almost no value to the Class which they injured.

Plaintiffs in this MDL Litigation thus seek an injunction under the All Writs Act barring RC2 from proceeding with a grossly inadequate class action settlement of their claims in the Circuit Court of Cook County.  The proposed settlement is the product of a secret "reverse auction" of the type courts disfavor.  If granted final approval, the Illinois state court settlement will extinguish the claims transferred to and centralized before this Court by the Judicial Panel on Multi-District Litigation ("JPML") for little to no value.

Neither RC2 nor the Plaintiff in *Barrett, et al. v. RC2 Corp.,* Case No. CH 20924 (Cir. Ct. Cook County, Ill.) provided any notice to this Court or the MDL Plaintiffs of their Motion For Preliminary Approval presented for hearing on January 22, 2008.[1]  Instead, the MDL Plaintiffs learned that a preliminary approval order had been entered by the state court on January 22, 2008 from the media.  The collusive settlement, if it were to receive final approval from the state court, could have the effect of ending further proceedings in this matter.  A stay by this Court will protect this Court's jurisdiction over the claims transferred to it by order of the JPML.  Failure on the part of the Court to grant the requested relief will mean that this MDL proceeding will be resolved in a county court in Illinois with no prior connection to this litigation.

Charges of collusion and Defendants' use of the reverse auction process are easily asserted and rarely substantiated.  But here the facts speak for themselves.  Defendants never advised this Court nor the JPML of the existence of the *Barrett* proceeding (pending since August 2007), nor that coordination of all actions before this Court were unwarranted. In fact,

---

[1] *See* Declaration of Elizabeth A. Fegan ("Fegan Decl."), ¶ 2, Exs. 1-3 (*Barrett* Complaint, Memorandum In Support of Preliminary Approval, Settlement Agreement, respectively).  Hereinafter all Exhibit references unless otherwise indicated are attached to the Fegan Decl.

Defendants specifically advocated for the transfer of almost 20 proceedings to this venue generally and to Your Honor specifically.  Once the initial cases were consolidated before this Court and in the midst of intense briefing on a motion to dismiss, the service of Requests to Admit on Defendants, and the exchange of discovery, Defendants solicited a settlement demand from Interim Lead Counsel.[2]  Just two days after Interim Lead Counsel made their second formal demand on Defendants, Plaintiffs' counsel in *Barrett*, apparently with the consent of Defendants, reserved the domain name www.thomastrainsettlement.com, which is now being used to tout the inadequate settlement in *Barrett*.  Fegan Decl., ¶ 11, Ex. 15.  The Motion For Preliminary Approval of the Settlement in *Barrett* is the first item to appear on the docket (other than the filing of the Complaint and the scheduling of an initial case management conference).  *See* Exs. 4, 21.

The *Barrett* Plaintiff was fully aware of this MDL action, but his counsel chose to conceal their negotiations from counsel in the MDL action until ***after*** they obtained preliminary approval from the state court.  Similarly, RC2 was urging this Court and the JPML to transfer and consolidate all federal court actions to Judge Leinenweber, arguing this Court was the proper forum for resolution of the Thomas Toys litigation, while at the same time colluding with plaintiff's counsel in *Barrett* to settle the MDL litigation in a state court action in Illinois.

The proposed state court settlement is a "claims made" settlement that offers little to no value to most Class members.  Specifically, the Settlement Agreement does not protect the interests of the Class for the following non-exhaustive list of reasons:

        a.      While the Settlement Agreement releases "any and all *class* claims which it may have for personal injury (including claims for medical monitoring whether as a claim or

---

[2] On August 29, 2007, this Court appointed three law firms (Hagens Berman Sobol Shapiro LLP, Kaplan Fox LLP, and Price Waicukauski & Riley LLC) as "Interim Co-Lead Counsel on behalf of the Class," with the specific charge of responsibility for conducting the litigation and the "conduct of settlement negotiations on behalf of plaintiffs." *See* Ex. 13 (Order Appointing Interim Lead Counsel for the Putative Class).  Notably, nothing in the Lead Counsel Order or MDL Order extinguishes the appointment, authority or responsibilities of Interim Lead Counsel upon consolidation and transfer of the MDL cases pursuant to 28 U.S.C. § 1407.

an element of damages)," *see* Ex. 3 (*Barrett* Settlement Agreement ¶ XI.C (emphasis in original)); it does not provide any recovery for medical monitoring or the costs to administer blood tests for children who may have ingested dangerous amounts of lead from playing with the toys nor compensate parents for the exposure of a toxic substance to their children.[3]

b.      Class members who complied with the recalls and already returned their toys to Defendants are not entitled to compensation. Ex. 3 (Settlement Agreement at 13-16). On information and belief, Class members that own more than 60 percent of the Recalled Toys are thus excluded from receiving ***any*** compensation under the Settlement Agreement. *See* Ex. 16.

c.      Class members who no longer possess Recalled Toys due to destruction or disposal are entitled to a maximum of two coupons or credits in the amount of $15.00 for the purchase of toys from RC2's website. However, between 46 and 80 percent of the "value" of the coupons will be dissipated by shipping costs, which are not covered by Defendants. Moreover, the average price of the Thomas Toys on the website is $35.67.[4] Accordingly, the coupons are nothing more than a savvy marketing campaign that will benefit only Defendants.

d.      The Class is defined to include business entities and releases claims of business entities despite the fact that Mr. Barrett is an individual person that is not adequate to represent the interests of business entities. Mr. Barrett's inadequacy is demonstrated by the lack of fair, adequate and reasonable consideration for the release of business entities' claims.

e.      RC2 represented to Congress that it had adopted the points set forth as the injunctive relief provisions in the Settlement Agreement two months before *Barrett* was filed.

---

[3] *See* Ex. 25 (Plaintiffs' Second Amended Consolidated Complaint ("SAC"), ¶¶ 131-35 (pleading a medical monitoring count and alleging that the Federal "Plaintiffs' children and the children of the Class have been significantly exposed to a known hazardous substance," that "[t]he cost of diagnostic blood testing is necessary to detect a possible injury" and that "Plaintiffs and the Class are entitled to recover the costs of a diagnostic blood lead testing")).

[4] The median price of the Toys on the website is $19.99 (this means that 50% of Thomas Toys are cheaper than this price, while 50% are more expensive), and the mode price is $19.99 (this means that a toy at $19.99 is the most frequently occurring price) – not to mention that the cost of shipping is between $5.95 and $17.95. Fegan Decl., ¶¶ 4-5.

- 3 -

For their willingness to settle on RC2's terms, plaintiff's counsel in *Barrett* stand to collect a fee of $2.9 million.

RC2 supported centralization and transfer to this Court pursuant to 28 U.S.C. § 1407. Having sought and obtained the benefits of transfer to a single federal court, and drawn upon the resources and experience of this Court in managing this litigation, RC2 should not be permitted to forum shop and "game the system" by end-running this Court's jurisdiction.  Moreover, Plaintiffs and their counsel in this MDL action, who have played by the rules, diligently prosecuted this litigation on the merits, and participated in good faith in settlement negotiations at RC2's request, should not be penalized for refusing to enter a settlement that would provide little relief to the Class they represent.

To implement the Illinois state court action, the parties in *Barrett*, propose to e-mail notice to the Class on February 11, 2008.  If this Court grants the relief requested by this Motion, the Court's stay will take effect before notice issues, conserving the resources of the parties and protecting Class members from the confusion and delay that this state court settlement of federal MDL claims is likely to engender.

## II.     FACTUAL BACKGROUND

### A.     Procedural History of the MDL Proceeding

On June 13, 2007, the Consumer Product Safety Commission ("CPSC") issued a recall of approximately 1.5 million Thomas & Friends Wooden Railway Toys because the toys contained lead paint that exceeded the lawful consumer product safety standard.  As part of the recall, Defendant RC2 offered consumers with recalled toys a replacement toy and a "premium" (free) toy.  On September 26, 2007, RC2 announced a further recall of five additional Thomas & Friends Wooden Railway items due to unsafe levels of lead paint.  *See* Exs. 17, 28.

As a result, nearly 20 federal lawsuits were filed throughout the country by consumers against RC2 alleging various causes of action and facts related to RC2's sale of Thomas Toys that were painted with lead-based paint.  RC2 advocated before the Judicial Panel on

Multidistrict Litigation for an order consolidating these various actions. Ex. 6. As a result, on December 19, 2007, the Judicial Panel ordered the consolidation of these actions and their transfer to this Court as MDL Docket No. 1893. *See* Ex. 6 (MDL Transfer Order) ("It is therefore Ordered that . . . the actions . . . pending . . . outside the Northern District of Illinois are transferred to the Northern District of Illinois."). As a result of this transfer, Plaintiffs in this action filed a Second Amended Consolidated Class Action Complaint ("SAC") (Dkt. No. 65) on November 11, 2007, against RC2. *See* Ex. 25.

The SAC alleged, among other things, causes of action for violations of the various states' consumer protection laws, breach of the implied warranties, negligence, product liability and medical monitoring. The SAC specifically sought relief in the forms of the purchase prices of the defective products as well as the costs of blood lead testing for the children exposed to the lead paint on the Thomas Toys, because lead-based paint is a well known toxin.

Defendants filed a motion to dismiss, which is now fully briefed and awaiting ruling. Further, the parties have engaged in extensive discovery discussions, the exchange of documents, the negotiation of a protective order, service of notice of depositions, and requests to admit. The parties engaged in numerous in-person and telephonic "meet and confers," focusing on the large amount of electronic discovery that would need to take place as well as the scope of depositions pursuant to Fed. R. Civ. P. 30(b)(6). Fegan Decl., ¶ 6.

Moreover, on October 12, 2007, Defendants formalized prior settlement discussions with the MDL Plaintiffs and solicited a written settlement proposal from Interim Lead Counsel in the MDL. Fegan Decl., ¶ 7. As a result, Interim Lead Counsel sent a letter to Defendants on October 17, 2007, setting forth an outline of the forms of relief that would have to be provided to the Class in exchange for a broad release. Interim Lead Counsel further suggested that the parties choose a mediator and set a date for mediation. *Id*. at ¶ 8. In response, Defendants requested a more formalized proposal that included a specific monetary demand. The parties agreed that Defendants would provide Plaintiffs expedited responses to certain data requests so that Plaintiffs could make an informed demand. That data was provided on November 21, 2007.

- 5 -

*Id*. at ¶ 9.  After extensive analysis of that data, Interim Lead Counsel made a formal monetary demand on December 10, 2007.  The MDL settlement demand, unlike the relief in the proposed state court settlement, included a full refund by Defendants as well as payment for blood lead testing for the children exposed to the toxic paint.  Defendants never responded to that letter. Fegan Decl., ¶ 10.  Accordingly, the MDL Plaintiffs continued to aggressively litigate this matter.

**B.    Procedural History of *Barrett v. RC2***

The *Barrett* Complaint was filed in August 2007.  *See* Ex. 1.  While the *Barrett* parties allege that over the next two months they agreed to share informal discovery (Ex. 2, at 3-4), the docket for the case reveals no motion practice, no answer nor any discovery skirmishes (Ex. 21). Nor in their Motion For Preliminary Approval do the *Barrett* parties ever state that any meaningful discovery has actually taken place.  *See* Ex. 2 (stating "the plaintiffs in the respective state cases ***agreed to make themselves available*** for depositions and agreed to provide any other relevant information requested by Defendants"; "Defendant ***made available thousands of pages of documents***, including internal test results, correspondence with the government about all phases of the recalls, including timelines, the customer complaints that triggered the initial recall, and product pricing information." (emphasis added)).

Ultimately, the *Barrett* parties reached a Settlement Agreement on a date uncertain. Ex. 3.  The Parties claim to have engaged in "all discovery necessary" to adequately evaluate the claims available to the Class in less than three months.  *Id*. at 2.  The docket reveals only that the Settlement Agreement was presented to the Illinois state court on January 22, 2008 for preliminary approval, and approval was granted.  Initially, the parties presented a handwritten approval order to the Court, but subsequently submitted a typed order to close the gaps.  *See* Ex. 5.

**C.      The Purported Settlement Agreement in *Barrett***

Although press releases issued by State plaintiffs' Counsel claim that Defendants agreed to pay $30 million to settle a nationwide class-action lawsuit, nothing in the settlement requires Defendants to pay any minimum dollar amount.  Indeed, the Settlement Agreement is silent on the dollar value Defendants have committed to the Settlement.  Unless Defendants have committed to refund each consumer of the 1.7 million Recalled Toys at least $20.00 USD/per toy, which it clearly ***has not*** agreed to – ***the settlement's value has been grossly exaggerated.***

Moreover, on or about January 22, 2008, RC2 issued a Report on Form 8-K concerning the settlement.  Ex. 29.  The Company noted that it "expects to record in the 2007 financial results, a charge in the range of ***$3.5 million to $4.5 million, net of tax, to cover estimated additional replacement costs or refunds, donations, notice charges, claims administration and legal fees related to this settlement***."  *Id*. at 1 (emphasis added).  As set forth herein, the attorneys' fees requested by State plaintiffs' Counsel are $2.9 million and the cy-pres donation is $100,000.[5]  Therefore, Defendants appear to anticipate paying between just $500,000 to $1.5 million on the "Cash Reimbursement Program" and "Toy Exchange Program."

**1.      The *Barrett* Settlement purports to release but provides no consideration for medical monitoring or blood lead testing claims**

Significantly, the *Barrett* settlement outright ignores that the Class members are entitled to medical monitoring and the cost of lead testing.  *See* Ex. 27 (Corrected Plaintiffs' Response In Opposition To Motion To Dismiss). There is no form of any relief provided for these types of claims under the Settlement.  Yet, the Agreement's definition of "Settled Claim" states in part:

> Settled Claim means any claim, liability, right, demand, suit,
> matter, obligation, damage, loss or cost (including the cost of
> mediation), action or cause of action, of every kind and description
> that the Releasing Party has or may have, including assigned
> claims whether known or unknown, asserted or unasserted, latent
> or patent, that is, has been, could reasonably have been or in the
> future might reasonably be asserted by the Releasing Party either
> in the Action or in any other action or proceeding in this Court or

_____

[5] It is unclear if the $3.5 million to $4.5 million estimation includes defense counsel's attorneys fees.  If so, clearly the settlement value is virtually zero.

- 7 -

any other court or forum, regardless of legal theory and regardless of the type or amount of relief or damages claimed, against any of the Released Parties arising from or in any way relating to the manufacture, distribution, handling or touching or contact of any kind, and marketing or use (including playing with or storing) of the Settlement Toy Product. Without limiting the generality of the foregoing, Settled Claim shall include, with regard to the foregoing subject matter: ….

(1)    any class, group, collective or individual claim for any breach or violation of any federal or state statute, case law, common law or other law;

(4)    any claim arising from or in any way related to the design, manufacture, production, sale, promotion or distribution of the Settlement Toy Products by Defendant or retailers selling such products;

(5)    *any claim for damages, injunctive relief, class damages or relief, medical monitoring (whether as a claim or a form of damages)*, penalties, punitive damages, exemplary damages, or any claim for damages based upon any multiplication or enhancement of compensatory damages associated with the above; and

(6)    *any class claim for personal injury, including but not limited to claims for medical monitoring* whether as a claim or damages or remedy for a claim.

Ex. 3 at 7-8 (emphasis added). Further, each Class member is required, as a condition of receiving an award, to sign and deliver a Release as part of the Claim Form. *Id.* at 22. The Release is broad and includes "claims for medical monitoring whether as a claim or an element of damages." *Id.* at 22-23.

### 2.    Class members that purchased 60% of the Recalled Toys will receive *no* consideration under the Settlement

The settlement is a claims-made program (unlike that proposed by the MDL Plaintiffs, which required the a guaranteed common fund to be set up by Defendants against which Class members would file claims). Consumers who already returned their Recalled Toys to RC2, which comprises owners of more than 60 percent of the Toys, are ***not*** entitled to ***any*** relief under the Settlement Agreement. Ex. 16. Class members who still possess Recalled Toys may submit a claim for a cash refund or replacement toys by July 7, 2008. Class members who no longer possess Recalled Toys may submit a claim form, with supporting documentation, for a cash

- 8 -

refund or a coupon/credit.  Thus, through the purported settlement, RC2 was able to spin its
misconduct to suit its own financial interest.

> **a.    Class members who returned their Toys in the recalls are not entitled to any consideration**

The Settlement Agreement specifically excludes Class members who already returned
their Recalled Toys by stating, "Class Members who have already returned recalled Settlement
Toy Products and received replacement product in the recall process are not eligible for the Toy
Exchange Program."  Ex. 3 at 14-15.  Yet, some of the replacement products were themselves
tainted with lead paint.  Ex. 28.  Moreover, replacement products were not delivered in new
condition. In fact, replacement products arrived without original packaging, wrapped in bubble
wrap, and were chipped, repainted and otherwise in an unusable condition.  Ex. 32 (Affidavit of
John O'Leary In Support of Plaintiffs' Motion For A Preliminary Injunction).

> **b.    Class members that own less than 40% of the Thomas Toys *may* be eligible for a cash refund**

Class members who still possess Recalled Toys are entitled to a refund for the actual
price paid only if they submit a claim form and have proof of purchase.  Ex. 3 at 13.  If a Class
member is unable to provide proof of the purchase price paid, he or she shall be paid the
suggested retail price of the Toy.  *Id*. at 13-14.  Owners of less than 40% of the recalled Toys are
eligible for this option.  Ex. 16.

Class members who no longer possess Recalled Toys due to destruction or disposal are
entitled to a cash refund only if they submit a claim form and have proof of purchase.  If a Class
member simply transferred ownership of the toys to someone else, they are not entitled to a cash
refund.  In order to obtain a refund under these circumstances, Class members must submit a
claim form, proof of purchase, and an affidavit.  Relief is further capped at two Settlement Toy
Products per household.  Ex. 3 (Settlement Agreement at 15).

- 9 -

      **c.**      **Maximum of two $15.00 coupons for Learning Curve's online store where consumers will have to spend an average of $35.67 plus shipping costs upwards of $6.95 to purchase a new Thomas Toy**

Class members who no longer possess Recalled Toys due to destruction or disposal are entitled to coupon or credit in the amount of $15.00 for the purchase of any Learning Curve Thomas & Friends Wooden Railway item from Learning Curve's online store. Ex. 3. However, a $15.00 coupon is nothing more than a savvy marketing campaign to obtain more money from Class members. The average price of Thomas Toys on the website is $35.67, plus shipping costs are additional at $5.95 to $17.95.[6] Fegan Decl., ¶¶ 4-5. Thus, Class members would have to pay Defendants to get a new toy. Such marketing campaigns are routinely rejected as fair settlements. *See, e.g.*, *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 807-10 (3d Cir. 1995) (in a class action brought on behalf of purchasers of certain GM trucks alleged to have a fuel-tank design defect, the court found the defendant's settlement offer of a $1,000 voucher to each class member toward a purchase of a new GM truck to be of little value and deemed the voucher scheme to be, "in reality, a sophisticated GM marketing program" benefiting the defendant, as it simply encouraged the plaintiffs to purchase more GM products); *Clement v. American Honda Fin. Corp.*, 176 F.R.D. 15, 27-28 (D. Conn. 1997) (disapproving settlement because, *inter alia*, settlement was comprised in large part of restricted and speculative coupons which were "essentially worthless" to the class members). *See also* C.R. Leslie, *The Need to Study Coupon Settlements in Class Action Litigation*, 18 Geo. J. Legal Ethics 1395, 1397 (2005) (observing that "coupon settlements often fail to disgorge ill-gotten gains from the defendant" and that "[w]hen class members do redeem their coupons, it often represents a purchase induced by the settlement").

Moreover, regardless of the number of recalled toys Class members own, only a maximum of two such coupons are allowed per household. Ex. 3 (Settlement Agreement at 15).

---

[6] The median price is $19.99 (this means that 50% of Thomas Toys are cheaper than this price, while 50% are more expensive), and the mode price is $19.99 (this means that a toy at $19.99 is the most frequently occurring price). Fegan Decl., ¶ 5.

Finally, RC2 has the right to impose a $400,000 limit on the amount of coupons it issues.  If that limit is reached, RC2 may reduce the face value of the coupons it issues on a pro-rata basis.

> **d.    RC2 purports to settle for the same relief otherwise offered under the CPSC Recalls**

Class members who still posses Recalled Toys can return them and obtain replacement toys plus a bonus toy.  Ex. 3 at 14.  This is merely the same relief RC2 offers under its previous recalls, which was in place when the MDL Plaintiffs filed their respective lawsuits.

### 3.    The Cy Pres Fund is De Minimis

The Cy Pres Fund is minimal considering the scope of the case and settlement.  Despite the *Barrett* plaintiff's highly suspect valuation of the settlement at $30 million,[7] the Cy Pres Fund in the Settlement Agreement is only $100,000.  Ex. 3 at 16.

### 4.    The vague injunctive relief provisions mimic what RC2 told Congress it was doing two months before the *Barrett* case was filed

The Agreement vaguely discusses how RC2 must implement a Quality Assurance Program ("QAP") for Thomas & Friends Wooden Railway products.  Ex. 3 at 12-13.  However, RC2 represented to Congress that the requirements under the QAP had been implemented since at least June 2007 (two months before *Barrett* was filed).  Ex. 16.

According to the *Barrett* Settlement Agreement, RC2 agreed to injunctive relief in the form of the creation and implementation of a "Quality Assurance Program" for Thomas & Friends Wooden Railway products.  The QAP requires RC2 to establish the following five components:

> (1) Establish minimum testing and auditing procedures for all incoming material(s) used by any of Defendant's contract manufacturers and all outgoing finished products distributed in the United States.
>
> (2) Establish a direct link between U.S. representatives of RC2 and RC2 representatives in offshore facilities to allow for the direct

---

[7] Compare RC2's statements at Ex. 29.

reporting of any Thomas & Friends Wooden Railway products
which fail applicable heavy metals testing

(3) Establish a program to trace the source and location of any
problem/deficient products to the source

(4) Purchase and use on a regular basis in both the United States
and any offshore facilities, XRF testing equipment and utilize such
equipment for regular basis and on a spot testing basis of painted
products of Defendant

(5) All contracts entered into between RC2 and contract
manufacturers after the date of final judgment is entered shall
contain a clause that requires the contract manufacturer to comply
with RC2's minimum testing and auditing procedures for incoming
materials pursuant to the QAP. [Ex. 3 (Settlement Agreement at
12-13).]

However, this QAP program pre-existed settlement. In a September 6, 2007 letter to U.S.

Representatives Bobby Rush and Cliff Stearns, members of the House Committee on Energy and

Commerce, RC2 Corporation's CEO Curtis W. Stoelting responded to a number of questions

propounded by the committee in response to the various lead recalls. In response to the question

of whether there are "provisions in your agreements with the Chinese or other manufacturers

banning the use of lead or lead paint," Stoelting noted as follows:

Since June, RC2 has instituted its Multi-Check Toy Safety System, which includes

several significant additional safeguard to protect our toy quality, such as:

- A new, tougher certification program for paint suppliers
  and manufacturers

- A new 10-step paint safety control procedure for our
  contract manufacturers

- Increased scope and frequency of testing both incoming
  materials and finished products

- Test reporting on every batch of paint used in the
  manufacture of our products

- Increased random inspections and audits of contract
  manufacturers and vendors

- Vendor compliance seminars to assure clear understanding
  of our specifications and requirements and zero-tolerance
  for variations from these requirements

- 12 -

Ex. 16.

     **5.**     **The Agreement releases claims of business entities despite lack of adequate class representative**

The Settlement Class includes "[a]ll Persons (including corporations, partnerships, sole proprietorships or other forms of business entities) who purchased or otherwise acquired any Settlement Toy Product in the United States." Ex. 3. The meaning of "all persons" is expansive and far too broad.

In the Memorandum in Support of Preliminary Approval, the Parties ask the Court to certify the Settlement Class. Ex. 2 at 10-14. The parties assert that "Byron Barrett has the same interests as the other Class members – all have purchased or acquired allegedly defective recalled products and seek compensation for their allegedly defective product. Therefore he has no interests antagonistic to the Class Members' interests." *Id.* However, Mr. Barrett does not have the same interests as business entities, such as retailers.

According to the United States Supreme Court, certain "specifications of [Fed. R. Civ. P. 23] – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention" from this Court. *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) (discussing necessary procedural protections for class in the settlement context). Thus, courts are counseled to pay particular attention to Rule 23(a)(4). Otherwise known as the adequacy inquiry, Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 625-26 (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) and *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). Ultimately, courts should not allow named parties with diverse interests "to act on behalf of a single giant class rather than on behalf of discrete subclasses." *Amchem*, 521 U.S. at 627.

6.     **The Fox guarding the hen house: the designated claims administer is RC2's Chief Operating Officer**

The *Barrett* Settlement designates Gregory J. Kilrea, the COO of RC2, as the Claims Administrator. Ex. 3 at 3. The Agreement does not include any neutral third-party oversight.

Considering that the proposed settlement involves a "claims made" procedure, the designated claims administrator has a direct financial interest in denying the claims of the Class members. Perhaps this is why RC2 values the settlement at a mere $3.5 - $4.5 million. Ex. 20 (Press Release, RC2, RC2 Reaches Proposed Settlement of Nationwide Class Action Arising From Recall of Certain Thomas & Friends™ Wooden Railway Products, (Jan. 22, 2008) (available at http://www.rc2.com/press/2008/release_recall_settlement_0108.pdf)).

7.     **The Pay-Off: Attorneys' Fees and Costs**

RC2 will pay class counsel, subject to Court approval, $2,900,000.00 in attorneys' fees and reimbursement of costs, despite RC2's settlement valuation of a mere $4.5 million, at best.

The Class Action Fairness Act ("CAFA") is instructive in determining whether the Agreement provides an appropriate attorneys' fee.[8] Under CAFA, in any class action settlement that provides for the recovery of coupons to a class member, "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712(a). In support of CAFA, Congress required heightened judicial scrutiny of coupon-based settlements based on its concern that in many cases, "counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value." Pub. L. 109-2, § 2(a)(3)(A), 119 Stat. 4, 4. Indeed, before the passage of CAFA, the Senate Judiciary Committee described coupon settlements in this way:

---

[8] Even if a state court case is not covered by CAFA, courts have still found CAFA instructive. *See, e.g., Synfuel Techs., Inc. v. DHL Express (USA) Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (vacating the district court's settlement and recognizing how pre-paid envelopes "are a form of in-kind compensation that shares some characteristics of coupons, including forced future business with the defendant and, especially for heavier users, the likelihood that the full amount of Airborne's [Defendant's] gains will not be disgorged"); *Yeagley v. Wells Fargo & Co.*, No. 05-03403, 2008 U.S. Dist. LEXIS 5040 (N.D. Cal. Jan. 18, 2008) (finding that even though the free credit report did not fall under CAFA's "coupon provision," CAFA was still instructive).

- 14 -

> [A]busive class action settlements in which plaintiffs receive
> promotional coupons or other nominal damages while class
> counsel receive large fees are all too commonplace.  The risk of
> such abusive practices is particularly pronounced in the class
> action context because these suits often involve numerous
> plaintiffs, each of whom has only a small financial stake in the
> litigation.  As a result, few (if any) plaintiffs closely monitor the
> progress of the case or settlement negotiations, and these cases
> become "clientless litigation," in which the plaintiff attorneys and
> the defendants have "powerful financial incentives" to settle the
> "litigation as early and as cheaply as possible, with the least
> publicity."  These financial incentives create inequitable outcomes.
> For class counsel, the rewards are fees disproportionate to the
> effort they actually invested in the case. . . .  For society, however,
> there are substantial costs: lost opportunities for deterrence (if class
> counsel settled too quickly and too cheaply), [and] wasted
> resources (if defendants settled simply to get rid of the lawsuit at
> an attractive price, rather than because the case was meritorious).

S. Rep. 109-14, at 32 (footnotes omitted).  The recovery here – a maximum of two $15.00

coupons to be used only at Defendant's online store – has little value to the class.  The

Settlement Agreement has an additional limitation in allowing only two such coupons per

household.  Ex. 3 (Settlement Agreement at 15).  Also, RC2 has the right to impose a $400,000

limit on the amount of coupons it issues.  If that limit is reached, RC2 may reduce the face value

of the coupons it issues on a pro-rata basis.  This form of relief is essentially the same idea under

the recall, but worse.  Class members are restricted to replacement toys from Defendants, for

which the average price is in excess of $35.00.  To reward class counsel in *Barrett* $2.9 million

without regard to the true value of the settlement would be to award counsel "large fees, while

leaving class members with coupons or other awards of little or no value" in direct contradiction

of Congress's intent.

Even if a portion of the recovery of coupons is not used to determine the attorney's fee to

be paid to class counsel in *Barrett* under 28 U.S.C. § 1712(b), the $2.9 million award is not

justified by the "amount of time class counsel reasonably expended working on the action."[9]

Despite the broad language of the Agreement, it is not clear depositions or discovery of

documents actually took place or was just "made available."  There is no evidence of discovery

---

[9] Also, even if the attorney's fee award was calculated on a mixed basis under 28 U.S.C. § 1712(c), there is no
evidence to support a $2.9 million award under either subsection (a) or (b) of CAFA.

or motion practice on the State court docket.  Moreover, the parties did not submit "any expert testimony from a witness qualified to provide information on the actual value to the class members of the coupons that are redeemed."  28 U.S.C. § 1712(d) (explaining how "the court may, in its discretion upon the motion of a party, receive expert testimony" as to settlement valuation).

### III.    ARGUMENT

**A.    Legal Standards For Issuance of Injunctions Pursuant to the All Writs Act**

The All Writs Act, 28 U.S.C. § 1651(a), confers "extraordinary powers" upon federal courts by authorizing them to enjoin parallel state court proceedings that threaten their jurisdiction.  The Act provides:  "[t]he Supreme Court and all courts established by Acts of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions."  28 U.S.C. § 1651(a).

Under the Anti-Injunction Act, 28 U.S.C. § 2283, federal courts have the power to enjoin state court proceedings when (1) the injunction is "expressly authorized by Act of Congress," (2) the injunction is "necessary in aid of [the court's] jurisdiction," (3) the injunction is necessary "to protect or effectuate [the court's] judgments."  The provisions of the All Writs Act ("necessary or appropriate in aid of" the court's jurisdiction) closely resembles those of the Anti-Injunction Act's second exception ("necessary in aid of [the court's] jurisdiction"), and thus courts construe the two similarly.  *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1201-02 (7th Cir. 1996); *but see In re Diet Drugs Prod. Liab. Litig.*, 282 F.3d 220, 239 (3d Cir. 2002) (commenting that the "appropriate in aid of" jurisdiction language of the All Writs Act endows courts with greater authority to issue injunctions than does the Anti-Injunction Act exception).  An order pursuant to the All Writs Act is proper if it is "necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."  *In re Diet Drugs Prod. Liab.*

*Litig.*, 282 F.3d at 234 (quoting *Atlantic Coast Line R.R. Co. v. Board of Locomotive Engineers*, 398 U.S. 281, 295 (1970)).

Moroever, this Court has the power to enjoin any party over which it has personal jurisdiction from pursuing or settling the claims that are at issue in this action in any other forum. *See*, *e.g.*, *In re Lease Oil Antitrust Litig. (No. II)*, 48 F. Supp. 2d 699 (S.D. Tex. 1998); *Newby v. Enron Corp.,* 302 F.3d 295, 300-01 (5th Cir. 2002) (stating, "[i]t is a given that the district court, with jurisdiction over *Newby,* had subject matter jurisdiction to . . . preserve and protect its jurisdiction"); *Single Premium Deferred Annuities Ins. Litig.*, 770 F.2d 328, 335 (2d Cir. 1985) (noting that the All Writs Act empowers a federal court to issue an injunction against actions in state court "[e]ven before a federal judgment is reached. . . ."); *Hillman v. Webley,* 115 F.3d 1461, 1469 (10th Cir. 1997); *see also, United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977).

**B.    As An MDL Transferee Court, this Court Can and Should Enjoin RC2 from Seeking Final Approval of the Proposed *Barrett* Settlement**

While the general rule is that *in personam* actions should be allowed to concurrently proceed in federal and state court without interference from either, an injunction is proper "where a parallel state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation."  *Winkler*, 101 F.3d at 1202.

Thus, an MDL court has the authority under the All Writs Act to stay competing actions that threaten to interfere with the orderly disposition of the MDL proceedings.  *In re Diet Drugs*, 282 F.3d at 235 ("Under an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction."); *Winkler*, 101 F.3d at 1202 (stating that the Anti-Injunction Act's "in aid of jurisdiction" exception has been extended to "consolidated multidistrict litigation, where a parallel state court action threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation").

- 17 -

In *In re Managed Care Litig.*, 236 F. Supp. 2d 1336 (S.D. Fla. 2002), the JPML consolidated several suits brought by medical providers against managed care insurance companies. *Id.* at 1338. A defendant, CIGNA, entered into a settlement agreement with plaintiffs in a parallel state court action. *Id.* at 1338. After the state court plaintiffs amended their pleading to create federal jurisdiction and adopted the same class definition as the plaintiffs in the MDL proceeding, CIGNA removed the state case to an Illinois federal court. *Id.* at 1339. The Illinois federal court granted preliminary approval of a settlement the day after the case was removed. *Id.* The MDL court issued an injunction under the All Writs Act enjoining CIGNA from "proceeding in any manner with the proposed settlement" in the Illinois federal court without the express approval of the MDL court. *Id.* at 1345.

The MDL court blocked CIGNA's attempt to settle class claims in another court. *Id.* at 1342. The court reasoned that the JPML entrusted to the transferee court the power to exercise jurisdiction over the transferred claims:

> [T]he JPML vested in this Court the authority to streamline pretrial proceedings in these actions, while concomitantly directing the appropriate resolution of all claims. In order to follow the JPML's mandate, an injunction preventing CIGNA from proceeding with the settlement is necessary from the standpoint of the proper administration of justice.

*Id.* at 1343 (internal citation omitted).

The MDL court rejected CIGNA's argument that public policy principles favoring settlement precluded the issuance of the All Writs Act injunction. *Id.* at 1342. The court also rejected CIGNA's contention that the injunction was not necessary because the MDL plaintiffs were free to intervene in the Illinois court and object at the final fairness hearing. *Id.* at 1343. RC2 will seek to distinguish *Managed Care* on the grounds that the MDL court had certified a class for litigation purposes by the time CIGNA entered into the Illinois settlement. Here, class certification proceedings are underway. Nothing in *Managed Care* suggests the MDL court would have endorsed a pre-certification "fee-shopping" period during which Defendants are free to seek out pliant counsel in other courts if they wish to settle "on the cheap."

An MDL court has the power to prevent a party before it from pursuing a final settlement in a state court even if the federal court has not previously entered an order requiring preservation of its jurisdiction.  *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. 4:03-md-01559-FJG, 2003 U.S. Dist. LEXIS 26070, at *6-7 (W.D. Mo. Dec. 22, 2003).  In *Wireless Tel.*, an MDL proceeding, the defendants sought an injunction against the continued prosecution of related state court actions after the MDL court granted preliminary approval of a settlement class.  The court issued the injunction and stated that its preliminary approval order alone constituted a sufficient basis for the injunction.  *Id.* at *12-13.  However, the court further found that the effective discharge of its duties as an MDL court provided separate authority for issuance of the injunction:

> [E]ven in the absence of any conditional approval of the nationwide settlement agreement between the Plaintiffs' and Defendants, this Court's status as a multidistrict forum charged with the coordination of all current and future MDL-1559 cases challenging [the defendants' assessment of certain fees] provides an independent basis for issuing the All Writs Act injunction requested.

*Id*. at *13; *see also In re Lease Oil*, 48 F. Supp. 2d at 705 (holding that where an MDL court's jurisdiction is jeopardized by a potential settlement in state court, the MDL court is empowered to issue an injunction pursuant to the All Writs Act even where it has not already entered an order that requires preservation).

*Wireless Tel., Lease Oil,* and *Managed Care* all recognize that to effectuate their purpose of fairly and efficiently managing complex litigation, MDL courts must use their powers under All Writs Act to prevent forum-shopping excursions like this one.

Here, RC2 supported MDL centralization, removed and resisted remand of at least one case that was original filed in state court,[10] and repeatedly stated that this Court is the proper

---

[10] Another sign of RC2's game play is demonstrated by how differently it treated *Barrett* from *Wilson v. RC2* filed on September 21, 2007 in the Circuit Court of Lee County, Arkansas.  RC2 removed *Wilson* to federal court in November 2007 and *Wilson* was consolidated with these MDL proceedings by the JPML.  *See* Exs. 7, 31 (Notice of Removal, and Defendant's Response to Motion to Remand Removed Action by RC2 Corporation).  Thus, it is clear that RC2 cherry picked *Barrett* and the plaintiffs' counsel there as the ones that would be willing to sell out the Class.  All other cases were herded into the MDL by RC2.

forum for resolving the toy claims. *See* Ex. 12. Now RC2 proposes to settle those same claims in an Illinois state court that has no background or connection with the litigation. RC2's conduct poses exactly the kind of threat to this Court's MDL jurisdiction, and displays exactly the kind of contempt for the purposes underlying MDL proceedings, that *Wireless Tel., Lease Oil,* and *Managed Care* found impermissible.

RC2's settlement of the claims pending before this Court in the *Barrett* action has the potential of not only disrupting, but destroying the jurisdiction of this Court of RC2. The RC2 settlement sought to be consummated in the Illinois state court purportedly disposes of all claims related to RC2's sale of Thomas Toys that were coated in lead-based paint, and would extinguish the jurisdiction of this Court over RC2 for the pending claims. This is precisely the situation that the All Writs Act gives Courts the power to correct.

The analysis conducted by the *Lease Oil* case is instructive here:

> Here, the Court clearly exercises jurisdiction over the claims and the parties, and simply must take preliminary action to protect its jurisdiction . . the ***Court needs to act in order to prevent the parties before it from possibly pursuing an inadequate or collusive settlement in state courts which would both release the apparently stronger claims in this case.*** * * * If an effort by the defendants to reach an inadequate or collusive settlement in state courts is "left unchecked," then this court will be absolutely prevented from "bringing the litigation to its natural conclusion." *ITT Community,* 569 F.2d at 1359. For these reasons, the All Writs Act authorizes this Court to enter an injunctive order against the parties in order to preserve its jurisdiction over this MDL litigation.

48 F. Supp. 2d at 704 (emphasis added). Here, as in *Lease Oil,* the claims are stronger, broader and provide for the recovery for medical monitoring – relief not even sought but released – in the *Barrett* action.

**C.    Defendants' Reverse Auction Requires An Injunction**

Upon information and belief, since the beginnings of their negotiations with RC2 and continuing until today, *Barrett* counsel has placed their own financial self-interest ahead of the Class members' interests. Most significantly, *Barrett* counsel agreed to a manifestly unfair and

- 20 -

unreasonable settlement reached through a negotiating process corrupted by a collusive reverse auction.  Knowing full-well that the MDL Panel ordered that all actions pending against RC2 be consolidated in the United States District Court for the Northern District of Illinois, Defendants chose not to remove any of the *Barrett* actions in order to engage in a secretive negotiating process.  These are the archetypical conditions giving rise to a reverse auction, *see e.g.,* Jack C. Coffee, Jr., *Class Wars:  The Dilemma of the Mass Tort Class Action,* 95 COLUM. L. REV. 1343, 1370-73 (1995); *Reynolds v. Benefit Nat'l Bank,* 288 F.3d 277, 279 (7th Cir. 2002); *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.,* 834 F.2d 677, 681-82 (7th Cir. 1987); *see also Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 853 n.30 (1990), and a reverse auction is a type of collusion.  Coffee, *Class Wars,* 95 COLUM. L. REV. at 1370.

Moreover, an MDL Court's power under the All Writs Act to enjoin this type of behavior is clear:

> In the instant matter, the parties have begun settlement negotiations in the MDL litigation, and settlement in the Illinois state court action has the likelihood of eviscerating the Court's MDL jurisdiction over the putative [] class.  The purpose of MDL litigation is to allow "centralization" and to prevent the type of forum-shopping that can occur from reverse auctions.[4]
>
>> [n.4.]  This is precisely what Congress sought to do through the Class Action Fairness Act, which President George W. Bush signed into law in February 2005. ***[…]it was signed by the President in order to "prevent trial lawyers from shopping around for friendly local venues.
>>
>> *        *        *
>
> Accordingly, the underlying policy behind MDL litigation, coupled with a threat to the Court's jurisdiction over the MDL Plaintiffs, weighs in favor of granting Plaintiffs' motion for injunctive relief.

Ex. 23 (Order Granting Plaintiffs' Motion For Injunctive Relief Under The All Writs Act dated May 10, 2005 in *In re American Online Spin-Off Accounts Lit.*, MDL 1581, Master Case No. CV 03-6971, 2005 U.S. Dist. LEXIS 45625 (C.D. Cal. May 9, 2005)).

001975-11 219996 V1

RC2 and Barrett's counsel clearly understood what was happening. After several months of discussions, on December 10, 2007, Interim Lead Counsel submitted a written monetary demand at RC2's counsel's request. Fegan Decl., ¶¶ 7-10. Counsel for RC2 never responded to the settlement demand, despite specifically requesting and providing data for the demand from Interim Lead Counsel. *Id.* Less than forty-five days later, RC2 announced a settlement with *Barrett*'s counsel that is valued at a tiny fraction of the settlement demand made by Interim Lead Counsel. The announced settlement released all claims for medical monitoring, exposure to lead and failed to provide the total relief for the Class sought by Interim Lead Counsel.

Taken alone, these circumstances strongly suggest a reverse auction and require at a minimum that the Court approach the proposed settlement with great caution. *See Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (7th Cir. 1996) (noting danger that the "staged" class action settlement may "put one over on the court"). But these circumstances do not stand alone. In addition, RC2 and Barrett's counsel stalled the state court litigation. RC2 has not even answered the *Barrett* Complaint, which has been on file for nearly six months.[11] Ex. 21. RC2 never moved to dismiss the *Barrett* Complaint, as it did in the MDL proceeding.

Thus, by agreeing not to press its litigation, Barrett's counsel allowed RC2 to "disarm" them. *See Amchem*, 521 U.S. at 621. Moreover, every day that the *Barrett* litigation sat idle, Barrett's counsel lost ground to the MDL Proceeding, where Interim Lead Counsel continued to litigate successfully against RC2, thereby increasing the pressure on Barrett's counsel to secure a settlement at any cost.

**D.**    **The Class Action Fairness Act of 2005 Was Supposed to Prevent Backroom Sham Settlements Like That Proposed in *Barrett***

RC2's conduct in entering into secret negotiations to evade the MDL Court's jurisdiction, and its efforts to obtain judicial approval of a dubious settlement in Illinois state court is precisely the kind of conduct that Congress sought to eliminate in the 2005 Class Action Fairness

---

[11] In fact, RC2 did not even appear in the state court litigation until ***after*** the settlement was preliminarily approved. Ex. 21.

Act ("CAFA") (28 U.S.C. § 1332).  In essence, CAFA provides original jurisdiction for certain

class actions in federal court, based on Congress' determination that the procedures of the federal

courts are better suited to fairly managing and adjudicating class actions of national scope.

When Congress passed CAFA, Congress imposed new requirements on plaintiffs such that even

class actions asserting causes of action under several states' laws should be filed in federal court.

Under § 4 of CAFA, federal district courts have diversity jurisdiction over any class action in

which the controversy exceeds the sum or value of $5,000,000, where any member of a class of

plaintiffs is a citizen of a state different from any defendant.  *See* CAFA § 4(a).

      According to CAFA, state and local courts are the problem, not the answer:

> Class Action Fairness Act; findings and purposes: (a) Findings.
> Congress finds the following:  ….(4) Abuses in class actions
> undermine the national judicial system, the free flow of interstate
> commerce, and the concept of diversity jurisdiction as intended by
> the framers of the United States Constitution, in that State and
> local courts are – (A) keeping cases of national importance out of
> Federal court.

CAFA § 2(a)(4)(A).  Congress therefore enacted CAFA to "restore the intent of the framers of

the United States Constitution by providing for Federal court consideration of interstate cases of

national importance under diversity jurisdiction."  CAFA § 2(b)(2).  Thus, CAFA was passed in

order to prevent the very backroom sham settlement that is being attempted in the *Barrett* action:

> Currently, crafty lawyers are able to game the system by filing
> large, nationwide class-action suits in certain preferred State courts
> like Madison County, Illinois, where judges are quick to certify
> class actions and quick to approve settlements which reward
> attorneys with millions of dollars but give their clients worthless
> coupons.

*See* Ex. 11 (Statement of Rep. Ric Keller (R-Fl), in excerpts of Congressional Record reflecting

debate regarding the Class Action Fairness Act).  Representative Robert Goodlatte (R-Va),

echoed the sentiment of Representative Keller:

> It is long overdue that we finally have the opportunity to correct
> this problem.  It is one that has a very simple correction.  End the
> abusive forum shopping by a handful of lawyers who specialize in
> these cases and know the handful of jurisdictions where they are
> going to get this kind of spectacular treatment on one side and

> unfair treatment on the other side, and let us go to what our judicial system is supposed to be all about; and that is fair treatment, equal application of the laws and standards that are imposed to make sure that these kinds of abusive cases are heard in fair courts, so that businesses do not feel like they are forced to deal with a situation where they have to settle the case because they know they are in a jurisdiction.

*Id.* (Statement of Rep. Robert Goodlatte (R-Va)). Courts have also echoed these sentiments. *See*, *e.g.,* Ex. 23 (Order Granting Plaintiffs' Motion For Injunctive Relief Under The All Writs Act dated May 10, 2005 in *In re American Online Spin-Off Accounts Lit.*, MDL 1581, Master Case No. CV 03-6971, 2005 U.S. Dist LEXIS 45625 (C.D. Cal. May 9, 2005) (enjoining Defendants from proceeding with settlement in Illinois state court to the extent that the settlement purports to release claims over which the MDL Court was presiding)); Ex. 24 (Opinion and Order dated July 12, 2002 in *Zografos v. Qwest Communications Corp.*, No. 00-6201 (D. Or.), at 13 (dismissing complaint as a sanction for parties' forum shopping where pre-existing case was pending before Judge Andersen in the Northern District of Illinois in order to "[p]rotect the integrity of the judicial process. . . .")).

RC2 is now attempting to manipulate the system in precisely the way that concerned Congress and prompted it to significantly amend the diversity jurisdiction statute. RC2 seeks to obtain approval of the proposed *Barrett* settlement by circumventing federal court jurisdiction.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to enjoin Defendants, and all those acting in conjunction with Defendants, from pursuing, entering, negotiating, executing, or enforcing any settlement of any claims presented in this action without the express approval of this Court.

Respectfully Submitted,

Dated: January 28, 2008

By: **/s/ Elizabeth A. Fegan**

Elizabeth A. Fegan, Esq.
Daniel J. Kurowski, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Boulevard, Suite B
Oak Park, IL  60301
Tel. 708-776-5604
Fax. 708-776-5601
beth@hbsslaw.com
dank@hbsslaw.com

Steve W. Berman, Esq.
Ivy D. Arai, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
steve@hbsslaw.com
ivy@hbsslaw.com

Laurence D. King, Esq.
Linda M. Fong, Esq.
KAPLAN FOX & KILSHEIMER LLP
350 Sansome St., Suite 400
San Francisco, CA  94104
LKing@kaplanfox.com
lfong@kaplanfox.com

Frederic S. Fox, Esq.
Donald R. Hall, Esq.
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue
New York, NY  10022
ffox@kaplanfox.com
dhall@kaplanfox.com

001975-11 219996 V1

William Riley, Esq.
Joseph N. Williams, Esq.
Jamie Kendall, Esq.
PRICE WAICUKAUSKI & RILEY, LLC
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
wriley@price-law.com
jwilliams@price-law.com
jkendall@price-law.com

***Interim Co-Lead Counsel for the Class***

- 26 -

001975-11  219996 V1