# Exhibit 25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **IN RE THOMAS AND FRIENDS®**<br>**WOODEN RAILWAY TOYS LITIGATION** | Case No. 07 C 3514 |
| | |
| DOCUMENT RELATES TO: | JUDGE LEINENWEBER |
| | |
| *Hesse v. Learning Curve Brands Inc., et al.,*<br>No. 07 C 3514 | BY JURY DEMAND |
| *Deke v. RC2 Corp. et al*, No. 07 CV 3609 | |
| *Walton v. RC2 Corp. et al*, No. 07 CV 3614 | |
| *O'Leary v. Learning Curve Brands, Inc.,*<br>No. 07 C 3682 | |
| *Djurisic v. Apax Partners, Inc. et al,*<br>No. 07 C 3707; | |
| *Reddell v. Learning Curve Brands, Inc. et al.,*<br>No. 07 C 3747; | |
| *Rhode v. Learning Curve Brands, Inc. et al,*<br>No. 07 C 4187; | |
| *Kreiner v. RC2 Corp. et al.,* No. 07 C 4547; | |
| *Wilson v. RC2 Corp. et al,* No. 07 CV 4642 | |

## **PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

I.    OVERVIEW ............................................................................................................ 1

II.   JURISDICTION AND VENUE ............................................................................ 2

III.  PARTIES ................................................................................................................ 3

      A.    Plaintiffs ...................................................................................................... 3

      B.    Defendants ................................................................................................. 14

IV.   FACTS ................................................................................................................. 17

      A.    Overview of Lead Poisoning ................................................................... 17

            1.    Effects of lead on children ............................................................ 17

            2.    Effects of lead poisoning on society ........................................... 19

      B.    Defendants Knew That Imported Toys Were at Risk for Being
            Contaminated With Lead Paint ................................................................ 19

      C.    Defendants Marketed Thomas Toys as "Safe and Quality Playthings"
            Despite the Fact They are Colored With Lead Paint ............................ 21

      D.    The Recalled Thomas Toys ..................................................................... 22

      E.    The Class' Damages ................................................................................. 23

V.    CLASS CERTIFICATION ................................................................................. 24

VI.   CLAIMS FOR RELIEF ...................................................................................... 26

      A.    Consumer Protection Laws on Behalf of Nationwide Class ................ 26

            1.    COUNT I: FOR VIOLATIONS OF THE ILLINOIS
                  CONSUMER FRAUD  AND DECEPTIVE BUSINESS
                  PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*, BASED
                  UPON OMISSION OR CONCEALMENT ................................. 26

            2.    COUNT II: FOR VIOLATIONS OF THE ILLINOIS
                  CONSUMER FRAUD AND DECEPTIVE BUSINESS
                  PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*, BASED
                  UPON MISREPRESENTATIONS ............................................... 28

001975-11 206230 V1

B.    Express and Implied Warranty Claims ................................................ 29

    1.    COUNT III: FOR VIOLATIONS OF THE IMPLIED WARRANTY OF MERCHANTABILITY ON BEHALF OF RESIDENTS OF CERTAIN STATES................................. 29

    2.    COUNT IV:  FOR BREACH OF EXPRESS WARRANTY .................. 31

C.    Strict Liability ..................................................................................... 32

    1.    COUNT V:  STRICT LIABILITY ............................................... 32

    2.    COUNT VI:  STRICT LIABILITY – FAILURE TO WARN ................ 33

D.    COUNT VII:  NEGLIGENCE ............................................................... 34

E.    COUNT VIII:  MEDICAL MONITORING FOR BLOOD LEAD TESTING ...................................................................................... 35

F.    Alternative Claims for Unjust Enrichment ........................................... 36

    1.    COUNT IX:  UNJUST ENRICHMENT FOR RESIDENTS OF CERTAIN STATES ................................................................ 36

    2.    COUNT X:  UNJUST ENRICHMENT FOR RESIDENTS OF CERTAIN STATES ................................................................ 37

G.    COUNT XI:  ALTERNATIVE CLAIM FOR RELIEF UNDER THE STATE CONSUMER PROTECTION ACTS.................................... 38

VII.  PRAYER FOR RELIEF .................................................................................... 42

Plaintiffs, by their undersigned counsel, complain of Defendants RC2 Corporation, Learning Curve Brands, Inc. and DOES I through X as follows:

## I.   OVERVIEW

1.       Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased Thomas & Friends Wooden Railway vehicles, buildings and other train set components which contain lead paint and which were imported and/or distributed by Defendants between January 2005 and June 2007.

2.       Despite marketing their toys as safe for young children, Defendants RC2 Corporation, Learning Curve Brands, Inc., and DOES I through X (collectively "Defendants") distributed "Thomas & Friends Wooden Railway" components ("Thomas Toys") that are made using red and yellow surface paint containing lead which is poisonous to children, especially if ingested.

3.       Since January 2005, Defendants have manufactured, marketed and/or distributed at least 1.5 million Thomas Toys designed for toddlers, who can be expected to lick, suck, bite, chip, and ingest the poisonous lead paint.  Defendants did so despite clear regulatory prohibitions on the use of lead paint on toys, their knowledge that the ingestion of lead paint by children can cause serious long-term injury, their prior experiences with the marketing and sale of children's toys tainted with lead paint, and their representations that the Thomas Toys are safe for children.

4.       On June 14, 2007, the U.S. Consumer Product Safety Commission ("CPSC") announced a voluntary recall of these products.  Despite the recall, Defendants have not offered to reimburse Plaintiffs and the Class for the costs of the Thomas Toys.  Rather, Defendants are

001975-11 206230 V1

only offering to provide a replacement toy.  Defendants' offer fails to compensate Plaintiffs and the Class for their damages or make them whole.

5.     As a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the children of the Class have been significantly exposed to a known hazardous substance.  As a result of such exposure, the children are at an increased risk of being poisoned by lead.  Early detection, through medical testing, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the Thomas Toys painted with lead pigment.

6.     Accordingly, Plaintiffs bring this action to recover the actual and compensatory damages for themselves and the Class, as well as to recover the costs of diagnostic testing necessary to detect lead poisoning to their children resulting from Defendants' actions.

## II.     JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this nationwide Class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a Class action in which some members of the Class are citizens of states different than Defendants.  *See* 28 U.S.C. § 1332(d)(2)(A).  This Court also has personal jurisdiction over Defendants because they are authorized to do business and in fact do business in this state and Defendants have sufficient minimum contacts with this state, and/or otherwise intentionally avail themselves of the markets in this state through the promotion, marketing and sale of their products in this state, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Illinois because Defendants reside in this District.

## III.    PARTIES

### A.    Plaintiffs

9.    Plaintiff John O'Leary ("Mr. O'Leary") is and has been a resident of Wethersfield, Connecticut during the Relevant Period.  Mr. O'Leary has purchased many Thomas the Tank Engine products for his two sons, who are currently ages 4½ and 1½. Specifically, Mr. O'Leary owns 11 of the recalled Thomas Toys.  During the Relevant Period, Mr. O'Leary's sons have spent almost every waking hour playing with their trains, including sleeping with their Thomas Toys, never leaving the house without their Thomas Toys, and playing with their Thomas Toys at the dinner table.  Mr. O'Leary allowed his children to do so with no expectations that the Thomas Toys were painted with a hazardous substance and were seriously harmful to their health.  Upon learning of the recall, Mr. O'Leary and his wife contacted their pediatrician, who advised that the boys be tested for lead poisoning at their next check-up.  Mr. O'Leary also returned 13 Thomas Toys to Defendants in the recall (of which two were returned to him by Defendants as not being included in the recall); however, he is not interested in replacement products but believes that Defendants should be responsible for a full refund as well as the costs of medical testing for his children.

10.    Plaintiff Kimm Walton ("Ms. Walton") is a resident of Redding, Connecticut. Plaintiff Walton purchased one or more Thomas Toys for her child during the Relevant Period. Based upon Defendants' advertisements and packaging of the Thomas Toys, Ms. Walton reasonably believed the Thomas Toys she purchased for her son were sufficiently tested and safe for a child's enjoyment.  Ms. Walton's son played with the above Thomas Toys; however, she would not have let him had she known the truth about the lead contamination.  Ms. Walton was deceived, and believes that Defendants should be held responsible.

11.   Plaintiff Channing Hesse was a resident of Chicago, Illinois through January 2006 and has been a resident of Downers Grove, Illinois from January 2006 to the present. Plaintiff purchased the following products for her toddler sons: Red Lights & Sounds James Engine; Red James #5 Lights and Sounds Coal Tender; Red Hook & Ladder Truck; Red Water Tanker Truck; Red Stop Sign; Yellow Railroad Crossing Sign; Yellow "Sodor Cargo Company" Cargo Piece. She purchased the products for her children's birthdays and other holidays, such as Christmas, from the following retailers: Michaels (hobby/craft store), My Favorite Toy Store in Downers' Grove, Illinois, Toys R Us and the Thomas the Train store at Navy Pier in Chicago, Illinois. Plaintiff purchased these products based on Defendants' representations that the toys are safe for children and are intended to be played with by young children. Plaintiff was deceived because Defendants could not have represented the toys were safe had they truthfully disclosed that the products were covered in lead paint. Plaintiff would never have purchased these toys had she known her young sons would be exposed to lead paint.

12.   Plaintiff Aive Rei-Ghafoor ("Ms. Rei-Ghafoor") is and has been a resident of Deerfield, Illinois during the Relevant Period. About one year ago, Ms. Rei-Ghafoor purchased several of the Thomas Toys that are the subject of the recall for her now 23-month-old son based on Defendants' representations that the toys were safe for children. Her son played with the Thomas Toys everyday, even taking the toys to bed with him from time to time. Immediately upon learning of the recall, she checked the Thomas Toys and determined that there were scratches on them where her son had chewed them. She conducted lead tests on the toys, which came back positive. Ms. Rei-Ghafoor contacted Defendants to obtain a refund for the costs of the toys since she does not trust any replacement toys offered by Defendants, but Defendants refused to reimburse her for the costs of the products. Ms. Rei-Ghafoor was deceived because

- 4 -

Defendants could not have represented the toys were safe had they truthfully disclosed that the products were covered in lead paint. Ms. Rei-Ghafoor believes that Defendants should be responsible for refunding to her the costs of the Thomas Toys, as well as for medical testing for lead poisoning.

13. Plaintiff Sheree Argiris ("Ms. Argiris") is and has been a resident of Buffalo Grove, Illinois during the Relevant Period. Ms. Argiris owned at least four of the Thomas Toys on the recall list for her five year old son. Ms. Argiris was deceived because Defendants could not have represented that the Thomas Toys were safe had they truthfully disclosed that the products were covered in lead paint. Ms. Argiris is not interested in replacement products but believes that Defendants should be responsible for a full refund as well as the costs of medical testing for her son.

14. Plaintiff Tonya Tubbs ("Ms. Tubbs") is and has been a resident of Fayetteville, Arkansas during the Relevant Period. Ms. Tubbs' son received a set of the Thomas Toys, including three pieces listed on the recall list, for Christmas in 2005. Ms. Tubbs would never have allowed her son to play with the Thomas Toys if Defendants had truthfully disclosed that the products were covered in lead paint. Ms. Tubbs only lets her children play with safe and quality products, and had understood based on Defendants' marketing that the Thomas Toys were safe. She was deceived. Moreover, Ms. Tubbs has recently begun to throw out toys that say "Made In China" on them; however, the Thomas Toys do not even contain that designation and thus Ms. Tubbs could not have known that the Thomas Toys were manufactured, in whole or in part, in China. Ms. Tubbs believes that Defendants should be held responsible for their actions, should refund her for the cost of the products and pay for the costs of medical testing for her son.

15.     Plaintiff Christine Wallar ("Ms. Wallar") is and has been a resident of Glen Ellyn, Illinois during the Relevant Period. Ms. Wallar has purchased many Thomas the Tank Engine products for her son, who is currently age 3, as well as for the enjoyment of visiting children, including her sister's and friends' children. Ms. Wallar purchased the Thomas Toys based on Defendants' representations that the toys are safe for children and are intended to be played with by young children. Plaintiff was deceived because Defendants could not have represented the toys were safe had they truthfully disclosed that the products were covered in lead paint. Plaintiff would never have purchased these toys had she known her young son would be exposed to lead paint. Ms. Wallar believes that Defendants should be responsible for refunding to her the costs of the Thomas Toys, as well as medical testing for lead poisoning.

16.     Plaintiff Thomas Brady ("Mr. Brady") is and has been a resident of the State of Illinois during the Relevant Period. Mr. Brady owns at least 23 Thomas Toys (some duplicates) on the recall list issued by Defendants. Mr. Brady allowed his six-year-old son to play with the toys, because he believed that the toys were of superior quality based on Defendants' representations, including their provision of a lifetime warranty. Thus, prior to the recall, Mr. Brady was willing to pay premium prices for the Thomas Toys because Defendants represented them to be safe, durable and lifetime toys. However, Mr. Brady was deceived by Defendants' representations and omission. Upon learning of the recall, Mr. Brady removed all the tainted Thomas Toys from the play area and even removed some that were not on the recall list in order to protect his son from further lead exposure.

17.     Plaintiff Theresa Reddell ("Ms. Reddell") is and has been a resident of Lawrenceburg, Indiana during the Relevant Period. Ms. Reddell purchased the Red Lights and Sounds James Engine for her 2½ year old son. Ms. Reddell purchased the toy based on

- 6 -

Defendants' representations that the toys are safe for children and are intended to be played with by young children. Plaintiff was deceived because Defendants could not have represented the toys were safe had it truthfully disclosed that the products were covered in lead paint. Plaintiff would never have purchased the toy had she known her young son would be exposed to lead paint. Immediately upon learning of the problem, Ms. Reddell contacted the company to ask if it would pay for lead testing. The company refused. Ms. Reddell believes that Defendants should be responsible for paying for the costs of lead testing as well as refunding to her the costs of the Thomas Toys, and should be held responsible for placing children in harms' way.

18.     Plaintiffs Patrick and Caryn Hudspeth (the "Hudspeth Plaintiffs") at all times relevant to this complaint were residents of the State of Indiana. The Hudspeth Plaintiffs own approximately seven (7) of the recalled toys. These toys were purchased for their three year old son and two year old daughter, between 2005 and Christmas of 2006. The Hudspeth Plaintiffs own the following recalled toys: Red James Engine, Red, two (2) Red Sodor Mail Cars, Red Sodor Line Caboose, Red Musical Caboose, Red Fire Truck and Water Tanker Truck. The Hudspeth Plaintiffs expected that the higher priced, wooden trains would be safe for their children. The Hudspeth Plaintiffs have several Thomas the Train Toys, including a large train table. The children played with the trains daily and often chewed on the toys. After hearing about the recall the Hudspeth Plaintiffs removed all of the recalled toys from their children's' reach. The Hudspeth Plaintiffs have not returned the recalled toys.

19.     Plaintiffs Ryan and Claudine Kreiner (the "Kreiner Plaintiffs"), at all times relevant to this complaint were residents of the State of Indiana. The Kreiner Plaintiffs own approximately 35 Thomas and Friends Toys. The Kreiner Plaintiffs own approximately five (5) of the recalled toys which they purchased for their two older sons, ages 3 (three) and 5 (five),

between the years of 2005 and 2006.  The Plaintiffs own the following recalled toys:  Red Hook and Ladder Truck, Red Water Tanker Truck, Yellow "Sodor Cargo Company" Cargo piece, Red Stop Sign and the Yellow Railroad Crossing Sign.  The Kreiner Plaintiffs, based upon the relatively expensive price and reputation of the Thomas Toys, as well as Defendants' representations regarding the safety and quality of the Thomas Toys, expected the wooden trains to be safe for their young children to use.  After seeing the recall on the news, the Kreiner Plaintiffs removed all the recalled toys from their Thomas collection and attempted to clean their Thomas Train Table, remaining Thomas Trains and Track and other toys in and around the Thomas Train Table.  The Kreiner children were also regularly exposed to other Thomas and Friends Toys impacted by the recall.

20.     Plaintiff Jodie Morrison ("Ms. Morrison") is currently a resident of Wakefield, Massachusetts and was a resident of Melrose, Massachusetts during the Relevant Period. Ms. Morrison purchased and/or was given as gifts at a Thomas themed birthday party in March 2006 a collection of the Thomas the Tank Engine products for her children, who are currently four-and-a-half-years-old and one-and-a-half-years-old.  Specifically, Ms. Morrison owns approximately seven of the recalled Thomas Toys, including the Red James Engine, James Coal Tender, Red Sodor Line Caboose, Sodor Ice Cream Factory, Yellow Railroad Crossing Sign, Red Stop Sign, and the Yellow Cargo Piece.  During the Relevant Period, both of Ms. Morrison's children played with these recalled toys daily, the oldest sometimes took them to bed with her and the youngest often was found chewing on them.  The paint is chipped on several of these toys.  The stress on Ms. Morrison as a parent now realizing she gave, and let her children play with, lead paint toys is awful.  She only wants the best for her children and feels deceived by Defendants.  Removing these cherished, supposedly kid-friendly, toys from her

- 8 -

children is upsetting.  In light of Defendants' hazardous actions, Ms. Morrison feels that they should be responsible for the costs of the lead poisoning tests and should reimburse her for the costs of the recalled toys.

21.    Plaintiff Michelle Stumpf ("Ms. Stumpf") is and has been a resident of Springfield, New Jersey during the Relevant Period.  Ms. Stumpf purchased a collection of Thomas the Tank Engine products for her son, who is nearly three-years-old.  Upon learning of the recall, she immediately returned approximately sixteen toys to Thomas Toys, including the Deluxe Sodor Fire Station, Red Fire Brigade Truck, Brown & Yellow Old Slow Coach, Red Musical Caboose, Red Sodor Line Caboose, Red Hook and Ladder Truck, Read Water Tanker Truck, Red "Sodor Mail" Car, and the Yellow & Green Box Car.  Most of these toys were purchased after 2005.  During the Relevant Period, Ms. Stumpf's son regularly played with these recalled toys and put them in his mouth.  The Red Fire Brigade Train and Red Hook and Ladder Truck were her son's favorites and had paint chips missing as well as visible bite marks.  Ms. Stumpf's son was recently tested for lead poisoning and his lead levels were on the high-end.  Based on Defendants' representations, Ms. Stumpf believed these toys were safe.  She is livid about the recall and her son's exposure to lead paint.  Ms. Stumpf further believes that Defendants should be liable for the cost of her son's blood lead test and refund to her the costs of the expensive recalled Thomas Toys.

22.    Plaintiff Tracy Hofmann ("Ms. Hofmann") is and has been a resident of Santa Fe, New Mexico during the Relevant Period.  Ms. Hofmann has purchased numerous Thomas Toys for her 2½-year old son.  Ms. Hofmann was deceived because Defendants could not have represented that the Thomas Toys were safe had they truthfully disclosed that the products were covered in lead paint.  Upon learning of the recall, Ms. Hofmann contacted Defendants

- 9 -

numerous times over two weeks and had several fruitless conversations with Defendants' employees in an attempt to explain to them that their purported remedy – replacement products that they swear are not defective – is wholly inadequate.  Ms. Hofmann is not interested in replacement products but believes that Defendants should be responsible for a full refund as well as the costs of medical testing for her son.

23.     Plaintiff Kim A. Cosgrove ("Ms. Cosgrove"), who has a five-year-old child, currently is, and at the time of the following purchases was, a resident of Massapequa, New York.  Plaintiff purchased the following Thomas Toys for her child during the period January 2005 through December 2006:  Red James Engine & Red James' #5 Coal Tender; Red Skarloey Engine; Brown & Yellow Old Slow Coach; Red Hook & Ladder Truck & Red Water Tanker Truck; Sodor Line Caboose; Red Coal Car labeled "2006 Day Out With Thomas" on the side; Red "Sodor Mail" Car; Red Coal Car; Yellow Box Car; Red Stop Sign; Yellow Railroad Crossing Sign; Smelting Yard; Ice Cream Factory.  Based upon Defendants' advertisements and packaging touting the quality of the Thomas Toys, Ms. Cosgrove reasonably believed the Thomas Toys she purchased for her son were sufficiently tested and safe for a child's enjoyment.  As a result, Ms. Cosgrove's son played with the above Thomas Toys including handling and mouthing them.  Upon learning of the recall from television news reports in mid-June 2007, Ms. Cosgrove searched the internet for a list of the affected products.  She discovered a telephone number for RC2, but when she attempted to contact the Company, she received a message that "all circuits were busy."  Ms. Cosgrove then called her local Toys R' Us store in Massapequa, NY and was informed by one of its customer service representative that they had "no idea" about the Thomas Toys recall.  Upon further internet research, Ms. Cosgrove eventually obtained the list of recalled items as well as a return form on an unknown website.

After inspection of her son's Thomas Toys collection, she discovered that she had purchased 13 of the 22 recalled Thomas Toys and immediately removed them from her child's possession. Shortly thereafter, she contacted an RC2 Customer Service Representative and was informed that the recall was "voluntary" and was instructed to send back the tainted items. Ms. Cosgrove received no instructions from the RC2 representative regarding how or if she would be compensated.

24.     Plaintiff Rebekah Lockhart ("Ms. Lockhart") is and has been a resident of China Grove, North Carolina during the Relevant Period. Ms. Lockhart purchased hundreds of dollars of Thomas the Tank Engine products for her son, who is currently age 2½. Specifically, Ms. Lockhart owns four of the recalled Thomas Toys. During the Relevant Period, Ms. Lockhart's son slept for three to four months with at least one of the recalled Thomas Toys, during which time her son was physically ill almost every night and had to go to the emergency room for vomiting on at least one occasion. At that time, she had no reason to believe that her son was being exposed to lead paint by his Thomas Toys. Upon learning of the recall, Ms. Lockhart called Defendants, and was told that the company refused to pay for the cost of sending the Thomas Toys back as well as refused to promise that it would not replace the Thomas Toys with other duplicate toys already in her possession. Although Ms. Lockhart is not seeking the pain and suffering to her son during the months when he was sleeping with his Thomas Toys, Ms. Lockhart does seek to hold Defendants responsible for refunding to her and the Class the costs of the recalled toys as well as the costs for blood lead testing for the children exposed to the toys.

25.     Plaintiff Cherise Wilson ("Ms. Wilson") is and has been a resident of Cincinnati, Ohio during the Relevant Period. Ms. Wilson owned at least eight of the Thomas Toys on the

recall list for her son. Ms. Wilson would not have purchased the Thomas Toys had she been aware that the toys were contaminated with lead paint. Ms. Wilson is always careful to ensure that he is only exposed to safe and quality playthings. She was deceived because Defendants could not have represented that the Thomas Toys were safe had they truthfully disclosed that the products were covered in lead paint. While Ms. Wilson did return the toys to the Defendants upon immediately learning of the recall, she has not heard since from the company. Moreover, Ms. Wilson is not interested in replacement products but believes that Defendants should be responsible for a full refund as well as the costs of medical testing for her son.

26.    Plaintiff Robyne Rohde ("Ms. Rohde") is and has been a resident of Oklahoma during the Relevant Period. Ms. Rohde has twin nine-year-old sons. Because she believed the Thomas Toys to be safe and quality products based on Defendants' representations, she allowed her sons to play with Thomas Toys that she purchased and that her sons received as gifts. She never would have allowed either son to play with the Thomas Toys had she known that they were contaminated with lead paint. Ms. Rohde owns the following Thomas Toys, which were purchased between October and December 2005 and October and December 2006, on the recall list: Yellow "Sodor Cargo Co." Cargo piece, two Red Sodor Line Cabooses, #5 Coal Tender, Yellow & Green Box Car, and Red James Engine. Ms. Rohde has not purchased another Thomas and Friends toy since learning of the Defendants' conduct. Ms. Rohde believes that Defendants should be held responsible for the medical costs associated with the lead exposure from the Thomas Toys.

27.    Plaintiff Elaine Vallejo ("Ms. Vallejo") is and has been a resident of Philadelphia, Pennsylvania during the Relevant Period. In 2006, Ms. Vallejo purchased several Thomas the Tank Engine products, including the Red Musical Caboose, Yellow & Green Box Car, and the

- 12 -

Red Stop Sign, for her son, who is currently two-years-old.  During the Relevant Period,

Ms. Vallejo's son regularly played with these recalled toys.  After learning of the Thomas the

Tank Engine recall, Ms. Vallejo had her son tested for lead poisoning in June 2007.  Her son

tested positive for lead and has highly elevated lead levels.  Ms. Vallejo believed these toys were

safe.  She is extremely upset that her son unknowingly played with these hazardous toys and has

lead poisoning.  Ms. Vallejo feels that Defendants should be held responsible and pay for the

cost of her son's blood lead test as well as refund to her the costs of the recalled Thomas Toys.

       28.    Plaintiff Elizabeth Harris ("Ms. Harris") is and has been a resident of Portsmouth,

Rhode Island during the Relevant Period.  Ms. Harris purchased a collection of the Thomas the

Tank Engine products for her son, who is currently three-years-old.  Specifically, Ms. Harris

owns eight of the recalled Thomas Toys, including the James Coal Tender, Red James Engine,

Yellow Sodor Cargo Co., Red Baggage Car, Yellow Railroad Crossing Signs, and the Red

Skarloey Engine.  During the Relevant Period, Ms. Harris' son played with these recalled toys

daily.  Paint chips are missing from the toys.  Ms. Harris is outraged that Defendants have

marketed the toys as safe and charge a high premium for them.  Profit appears more important

than child safety.  Ms. Harris further believes that Defendants should be held accountable and

pay for the costs of blood lead testing as well as refund to her the costs of the expensive Thomas

Toys.

       29.    Plaintiff Thomas Toms ("Mr. Toms") is and has been a resident of Dripping

Springs, Texas during the Relevant Period.  Mr. Toms owns at least ten of the Thomas Toys on

the recall list for his five year-old son.  Mr. Toms would not have purchased the Thomas Toys,

or let his son play with them, had he been aware that the toys were contaminated with lead paint.

Mr. Toms was deceived because Defendants could not have represented that the Thomas Toys

were safe had they truthfully disclosed that the products were covered in lead paint.  Mr. Toms is

not interested in replacement products but believes that Defendants should be responsible for a

full refund as well as the costs of medical testing for his son.

30.     Plaintiff Cheng Yin ("Ms. Yin") is and has been a resident of Pearland, Texas

during the Relevant Period.  Ms. Yin has purchased several of the toys that are the subject of the

recall for her four-year-old son.  Ms. Yin's son has played with the Thomas Toys virtually every

day throughout the Relevant Period.  Ms. Yin was deceived because Defendants could not have

represented the toys were safe had it truthfully disclosed that the products were covered in lead

paint.  As a physician, Ms. Yin is keenly aware of the consequences of lead exposure to

children's growth and health; she would not have purchased the Thomas Toys and/or allowed her

son to play with the Thomas Toys had she known that they were not safe as Defendants had

represented them to be.  Ms. Yin believes that Defendants should be responsible for refunding to

her the costs of the Thomas Toys, as well as for medical testing for lead poisoning.

a.     Plaintiff Jennifer Foshee Deke, at all relevant times herein, was and is a

resident and citizen of the State of Alabama.  Ms. Deke is the mother of Parker Hayden Deke,

almost six years old, and Connor William Deke, two and a half years old.  Ms. Deke purchased

the following products which were recalled by Defendants: Red James Engine & Red James' #5

Coal Tender; Red Lights & Sounds James Engine & Red James' #5 Lights & Sounds Coal

Tender; Brown & Yellow Old Slow Coach; Red Hook & Ladder Truck & Red Water Tanker

Truck; Red Musical Caboose; Red Sodor Line Caboose; Yellow Box Car; and Smelting Yard.

**B.     Defendants**

31.     Defendant RC2 Corporation ("RC2") is incorporated in Delaware, with its

headquarters in Oak Brook, Illinois.  RC2 engages in the design, production and marketing of

toys, collectibles and infant, toddler and pre-school products.  The products are then marketed

and sold under the Learning Curve Brand.  RC2 is the parent company of, among others,

Learning Curve Brands.

32.     In addition to RC2's corporate headquarters in Illinois, the State of Illinois

awarded RC2 more than a million dollars in 2004 to operate a new distribution center in Illinois,

thus expanding its operations in Illinois and allowing RC2 to develop a global intermodal

logistics facility in Illinois.  According to RC2, from this Illinois-based shipping facility, RC2

intended to reduce its shipping costs and greatly improve its business efficiency.

33.     RC2's corporate headquarters are located in Illinois, from which, on information

and belief, RC2 conducts the following business:

    a.     The negotiation of its licenses for the Thomas and Friends name;

    b.     The sale of its Thomas Toys to retail stores and other distributors;

    c.     The marketing and advertisement of its Thomas Toys;

    d.     The oversight of its limited number of foreign suppliers in China, which

manufacture a majority of RC2's products, including the Thomas Toys;

    e.     The communications with the Consumer Product Safety Commission, as

well as the development of its alleged recall strategy.

34.     RC2 was formerly doing business as Collectible Champions, Inc., Racing

Champions Corporation, and Racing Champions Ertl Corporation.  In 2003, it acquired Learning

Curve International, Inc, and certain of its affiliates.  In January 2007, it changed the name of its

main domestic operating subsidiary from RC2 Brands, Inc to Learning Curve Brands, Inc.

35.     Defendant Learning Curve Brands, Inc. ("Learning Curve") is incorporated in

Delaware, with its headquarters in Oak Brook, Illinois, and is a subsidiary of RC2.  Learning

Curve markets and sells what it purports to be "developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by safe and quality playthings." Learning Curve brands include The First Years®, Lamaze®, John Deere Kids™, Thomas & Friends™ and Bob the Builder, among others. Learning Curve is responsible for the licensing, marketing and distribution of the toys, collectibles and infant and toddler and preschool products manufactured by RC2 Corporation. These products include the Thomas & Friends Wooden Railway Toys. Learning Curve sells the products through chain and specialty retailers, wholesalers and original equipment manufacture dealers. Learning Curve also sells the products directly to consumers. In 2003, shortly after its acquisition by RC2 Corporation, Learning Curve Brands issued a recall of 3800 activity toys due to unsafe levels of lead in the paint. Learning Curve was formerly known as The Ertl Company, Racing Champions, Ertl, Inc., RC Ertl, Inc. and RC2 Brands, Inc.

36.    At all times relevant hereto, Defendants DOES I through X, were and now are corporations, firms, partnerships, associations or other legal entities who committed the acts alleged herein, and acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interests and the interests of Defendants they aided and abetted, and with whom they conspired, as set forth below; that the true names, identities or capacities whether individual, corporate, associate or otherwise of the Defendants DOES I through X, inclusive are presently unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names; that the Plaintiffs are informed and do believe and thereupon allege that each of the Defendants sued herein as DOES I through X are responsible in some manner for the events and happenings herein referred to, which thereby proximately caused the injuries and damages to the Plaintiffs alleged herein; that when their true

- 16 -

names and capacities of such Defendants become known, Plaintiffs will ask leave of this Court to amend this Complaint to insert the true names, identities and capacities, together with proper charges and allegations.

## IV.  FACTS

**A.  Overview of Lead Poisoning**

### 1.  Effects of lead on children

37.  Lead is invisible to the naked eye and has no smell.  Yet, lead is known to be very dangerous to human beings.  Essentially, lead lodges in the bone or skeletal structure of the body and certain events can cause it to latently move into the blood stream and cause significant difficulties.

38.  The U.S. Center for Disease Control has set a blood lead "level of concern" of a mere 10 micrograms per deciliter of blood (a microgram is 1/1,000,000th of a gram and a deciliter is 1/10th of a liter or about 1/10 of a quart), and new research suggests that serious health effects may begin to set in with blood levels as low as 5 micrograms per deciliter.

39.  On average, children under six will absorb and/or retain about 50% of the lead they ingest.  Exposure to lead causes a wide range of health effects which vary from child to child.  For example, children can lose IQ points at levels in blood **below** 10 micrograms per deciliter.

40.  Children can be exposed to lead through such things as contaminated dust, paint chips or lead-based toys.  Children may be exposed to lead from consumer products through normal hand-to-mouth activity, which is part of their development.  Children often place toys, fingers, and other objects in their mouth, exposing themselves to lead paint or dust.

001975-11 206230 V1

41.     According to the National Safety Council, it only takes the lead dust equivalent of a single grain of salt for a child to register an elevated blood lead level.

42.     Children under the age of six are the most vulnerable to poisoning by lead, due in large part to the fact that their brains and nervous systems have yet to fully form. The direct effects of pediatric lead poisoning can include reading disabilities, attention deficit, hyperactivity, behavioral problems, stunted growth, hearing impairment and damage to the kidneys and greater demand for medical care generally to treat those problems. If exposed to higher levels, young children may suffer from mental retardation, fall into a coma or die.

43.     Lead poisoning can also have drastic effects on adults including increased blood pressure, nerve disorders, muscle and joint pain, memory and concentration problems and infertility in both men and women.

44.     Moreover, children exposed to lead may not experience any issues until they are adults and certain events occur. If a child ingests sufficient levels of lead, some of this lead will be stored in their bones where it will lay dormant likely causing no ill effects for many years. However, problems may begin during adulthood.

45.     For example, when a woman gets pregnant, the lead may begin to leech from her bones where it previously lay dormant and pass through the placenta and umbilical cord to the baby, causing the baby to be born with increased lead blood levels. Similarly, in the case of a woman going through menopause, the lead may leech from her bones and then begin to cause increased blood pressure, nerve disorders, muscle and joint pain, memory and concentration problems.

46.     A universally recognized method for testing lead levels is a blood test. The reliability of blood lead testing comes from, in part, the capability of comparing blood lead test

- 18 -

results, especially for children, to the published standard of 10 ug/dl, established by the Center

for Disease Control (CDC).

47.     Blood lead testing is also useful in signaling a need for further medical

examinations, which can lead to a more definite diagnosis.

**2.     Effects of lead poisoning on society**

48.     Although childhood lead poisoning is entirely preventable, the CDC reports that

hundreds of thousands of children in the U.S. are lead poisoned.  Indeed, in 2001, Chicago

(home of RC2/Learning Curve) had more lead poisoned children than any other city in the U.S.,

with over 12,000 children identified.

49.     While it is clear that lead poisoning has a drastic effect on the children and

families who suffer from its devastating physiological and neurological effects, there are public

costs as well.

50.     The annual costs of environmentally attributable diseases in American children

total $54.9 billion, of which the vast majority arises from lead poisoning.  It is estimated that the

total cost of lead poisoning in the U.S. each year is $43.4 billion.  *See* Landrigan, Philip J. *et al.*,

"Environmental Pollutants and Disease in American children:  Estimates of Morbidity,

Mortality, and Costs for Lead Poisoning, Asthma, Cancer, and Developmental Disabilities,"

Environmental Health Perspectives (Vol. 110, No. 7, July 2002).

**B.     Defendants Knew That Imported Toys Were at Risk for Being Contaminated With
         Lead Paint**

51.     The CPSC is supposed to takes steps to prevent children from being exposed to

hazardous lead and cadmium (and any other substance) in consumer products under the

Consumer Product Safety Act ("CPSA"), 15 U.S.C. §§ 2051-84, and the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-78.

52.     In 1978, the CPSC banned paint containing in excess of 0.06% lead by weight intended for consumer use. At the same time, it also banned toys and other articles intended for use by children that use paint with a lead content in excess of 0.06% because they present a risk of lead poisoning to young children. *See* 16 C.F.R. Part 1303.

53.     While lead was banned on products marketed to children in the United States in 1978, it is still widely used in other countries and therefore can still be found on imported toys.

54.     Defendants first faced the issue of marketing and selling toys contaminated with lead paint at least as early as April 2003.

55.     In April 2003, Defendants and the Consumer Products Safety Commission recalled two Lamaze-brand products due to their lead content. *See* Recall Alert, U.S. Consumer Product Safety Commission, April 4, 2003, SKU #97222, SKU #97325. The recall included approximately 3,800 children's activity toys because the point on the metal wires of these toys contained excessive levels of lead.

56.     At that time, Defendants were contacted by a number of advocacy groups and concerned citizens, including the Children's Health and Education Project at the Chicago Lawyers' Committee for Civil Rights Under Law; Kids In Danger; Voices for Illinois Children; the Illinois Lead Safe Housing Task Force; Health and Disability Advocates; and a Professor of Pediatrics and Preventive Medicine from the Feinberg School of Medicine, Northwestern University, seeking to work with Defendants to discuss possible remedial and preventative conduct, including lead poisoning prevention and child product safety campaigns.

57.     However, despite this outreach, Defendants failed to implement appropriate testing and other safeguards to prevent the sale and marketing of toys contaminated with lead paint in the future, particularly from its Chinese manufacturing partners.

58.     RC2's Thomas Toys are manufactured in China, where RC2 has a longstanding investment. In 1997, RC2 developed the RC2 Industrial Zone in Dongguan, China, where three third-party, dedicated suppliers, operate three separate free-standing facilities.

59.     Yet, despite the fact that RC2 used Chinese suppliers and manufacturers for the Thomas Toys, it was not until at least mid-2007 that Defendants purportedly instituted a new certification program for paint suppliers and alleged that they would begin safety testing each batch of paint used. Such measures are too little, too late for the Class.

## C.     Defendants Marketed Thomas Toys as "Safe and Quality Playthings" Despite the Fact They are Colored With Lead Paint

60.     Defendants' marketing campaign is built around assuring parents that their toys are safe for children. For example, on their website, Defendants state:

a.     **"We understand that what matters most to parents is keeping their children healthy, happy and safe.** What matters most to us is helping parents do just that by offering products for every stage of your child's development...."

b.     "Learning Curve offers developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by **safe and quality playthings**." (emphasis supplied).

61.     Plaintiffs and the Class were deceived by Defendants' representations and purchased the Thomas Toys believing that the toys were safe for their children to play with as

- 21 -

children normally do, including with the expectation that their toddlers and young children

would lick, suck and bite the toys while playing.

62.     However, despite their clear representations that the Thomas Toys were safe for

children, Defendants distributed Thomas Toys manufactured in China which contain lead paint.

**D.     The Recalled Thomas Toys**

63.     The Thomas Toys were manufactured in Dongguan City, China, where they were

purposefully painted with products containing lead.

64.     Defendants failed to adequately screen and test the products imported from China,

ignoring the threat that these Thomas Toys presented to children.

65.     As a result, on June 14, 2007, the U.S. Consumer Product Safety Commission

("CPSC") announced a voluntary recall of the following Thomas Toys: Red James Engine &

Red James' #5 Coal Tender, Red Lights & Sounds James Engine & Red James' #5 Lights &

Sounds Coal Tender, James with Team Colors Engine & James with Team Colors #5 Coal

Tender, Red Skarloey Engine, Brown & Yellow Old Slow Coach, Red Hook & Ladder Truck &

Red Water Tanker Truck, Red Musical Caboose, Red Sodor Line Caboose, Red Coal Car labeled

"2006 Day Out With Thomas" on the Side, Red Baggage Car, Red Holiday Caboose, Red

"Sodor Mail" Car, Red Fire Brigade Truck, Red Fire Brigade Train, Deluxe Sodor Fire Station,

Red Coal Car, Yellow Box Car, Red Stop Sign, Yellow Railroad Crossing Sign, Yellow "Sodor

Cargo Company" Cargo Piece, Smelting Yard, and the Ice Cream Factory. Defendants'

"Replacement Request" form, which also sets out the specific recalled products, is attached as

Exhibit A.

66.     The Thomas Toys include vehicles, buildings and other train set components sold

at various retailers throughout the United States from January 2005 through June 2007,

suggesting that for two years Defendants failed to properly inspect and discover that its toys contained toxic lead paint. The Thomas Toys were made with yellow and red surface paints containing lead.

67.     Defendants distributed at least 1.5 million of the toys containing lead paint.

68.     To date, Defendants have not commented on why it took nearly two years to discover the lead contamination in the Thomas Toys.

**E.     The Class' Damages**

69.     The very children that Defendants expected to lick, suck, bite, chip, and ingest the paint on the Thomas Toys have now been exposed to poisonous lead that can cause serious long-term injury.

70.     Plaintiffs are not seeking some unspecified replacement toys from Defendants, but rather expect to be reimbursed for the cost of the defective and dangerous Thomas Toys. They are outraged that Defendants failed to determine that approximately 1.5 million units of its product were made with surface paint containing lead. Plaintiffs have no faith in the capacity of Defendants to provide a safe replacement toy to their children and instead seek a full refund for the purchases made by them and the Class.

71.     Moreover, as a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the Class have been significantly exposed to a known hazardous substance. As a result of such exposure, the children are at an increased risk of being poisoned by lead. Accordingly, Plaintiffs also seek to recover the costs of diagnostic testing necessary to detect lead poisoning to their children resulting from Defendants' actions.

## V.    CLASS CERTIFICATION

72.    This action is brought as a Class action under Rule 23 of the Federal Rules on behalf of:

> All persons who purchased Thomas & Friends Wooden Railway vehicles, buildings and other train set components which contain lead between January 2005 through June 2007 imported and/or distributed by Defendants (the "Class").

73.    Membership in the Class is so numerous as to make it impractical to bring all Class members before the Court.  The identity and exact number of Class members is unknown but can be quickly determined from Defendants.  It is estimated to be tens of thousands or more.

74.    Plaintiffs' claims are typical of those of other Class members, all of whom have suffered harm due to Defendants' uniform course of conduct.  Plaintiffs are members of the Class.

75.    There are numerous and substantial questions of law and fact common to all of the members of the Class which control this litigation and predominate over any individual issues pursuant to Rule 23(b)(3).  The common issues include, but are not limited to, the following:

a.    Are the products defective;

b.    Were the products recalled by the CPSC;

c.    Did Plaintiffs and members of the Class purchase the products;

d.    Whether Defendants are refusing to reimburse Plaintiffs and the members of the Class for the cost of the defective products;

e.    Whether, as a result of Defendants' negligent and reckless conduct, children have been significantly exposed to a known hazardous substance;

f.     Whether early detection, through medical testing of children, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the Thomas Toys painted with lead pigment;

g.     Whether Defendants are refusing to pay for the costs of lead testing;

h.     Whether Plaintiffs and Class members are entitled to injunctive relief; and

i.     Whether Plaintiffs and Class members were damaged and in what amount.

76.     Defendants' conduct is such that it is appropriate there be final injunctive relief to enjoin their conduct with respect to the Class as a whole pursuant to Rule 23(b)(2).

77.     A Class action is the appropriate method for the fair and efficient adjudication of this controversy for the following reasons:

a.     Without a Class action, the Class will continue to suffer damage, Defendants' violations of the law or laws will continue without sufficient remedy, and Defendants will continue to enjoy the fruits and proceeds of their unlawful misconduct;

b.     Given (i) the substantive complexity of this litigation; (ii) the size of individual Class members' claim; and (iii) the limited resources of the Class members, few, if any, Class members could afford to seek legal redress individually for the wrongs Defendants have committed against them;

c.     This action will foster an orderly and expeditious administration of Class claims, economies of time, effort and expense, and uniformity of decision;

d.     Inferences and presumptions of materiality and reliance are available to obtain Class-wide determinations of those elements within the Class claims, as are accepted methodologies for Class-wide proof of damages; alternatively, upon adjudication of Defendants'

common liability, the Court can efficiently determine the claims of the individual Class members; and

> e.      This action presents no difficulty that would impede the Court's management of it as a Class action, and a Class action is the best (if not the only) available means by which members of the Class can seek legal redress for the harm caused them by Defendants.

## VI.      CLAIMS FOR RELIEF

**A.      Consumer Protection Laws on Behalf of Nationwide Class**

> **1.      COUNT I: FOR VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*, BASED UPON OMISSION OR CONCEALMENT**

78.      Count I is brought by all Plaintiffs, individually and on behalf of the Class. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

79.      Defendants engaged in unfair and/or deceptive acts and practices by, among other things, concealing, suppressing, omitting or failing to inform Plaintiffs and members of the Class, that the surface paint on the Thomas Toys contained lead which could cause adverse health effects to young children exposed to that toxic substance.

80.      Upon information and belief, Defendants knew or should have known of the defect at all material times, but did not disclose the defect to Plaintiffs and members of the Class.

81.      Defendants intended that Plaintiffs and the members of the Class rely on their omissions and concealment of material facts regarding the health risks poses by the Thomas Toys, and Plaintiffs and the members of the Class were actually deceived by Defendants' omissions and concealment as it portrayed that the Thomas Toys were safe for use by children

when in fact the products were not safe by virtue of the fact that they were covered in paint containing lead.

82.    If not for Defendants' deceptive and unfair act of failing to inform Plaintiffs and the members of the Class as to the adverse health effects that the Thomas Toys could have on young children, Plaintiffs and members of the Class would not have purchased the Thomas Toys.

83.    Defendants were able to sell millions of products that they could not have sold absent its deceptive marketing campaign, causing the Plaintiffs and members of the Class substantial injuries.

84.    The acts, practices, misrepresentations and omissions by Defendants described above, with intent that Plaintiffs and other members of the Class rely upon the concealment, suppression and omission of such material facts, constituted unfair and/or deceptive acts and practices occurring in the course of conduct involving trade or commerce within the meaning of 815 ILCS section 505/1, *et seq*.

85.    Defendants' misconduct in the course of trade and/or commerce offends public policy and is immoral, unethical, oppressive, and/or unscrupulous and caused substantial injury to consumers and their children.

86.    Plaintiffs and members of the Class suffered damages as a result of Defendants' deceptive and/or unfair acts.  Accordingly, Plaintiffs, on behalf of themselves and the other Class members, seek monetary damages, punitive damages and such other and further relief as set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act.

2.    **COUNT II: FOR VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*, BASED UPON MISREPRESENTATIONS**

87.    Count II is brought by all Plaintiffs, individually and on behalf of the Class. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

88.    Defendants engaged in unfair and/or deceptive acts and practices by, among other things, the dissemination of deceptive and misleading advertising and marketing materials in connection with the Thomas Toys by marketing such products as safe for children, when in fact, the Thomas Toys contained lead surface paint which could cause adverse health effects to young children exposed to that toxic substance.

89.    Upon information and belief, Defendants knew or should have known of the defect at all material times, but did not disclose the defect to Plaintiffs and members of the Class.

90.    Defendants intended that Plaintiffs and the members of the Class rely on their deceptive acts and misrepresentations, and Plaintiffs and the members of the Class were actually deceived by Defendants' representations that the Thomas Toys were safe for use by children when in fact the products were not safe by virtue of the fact that they were covered in paint containing lead.

91.    If not for Defendants' deceptive and misleading representations, Plaintiffs and members of the Class would not have purchased the Thomas Toys given the health risks they posed to their children.

92.    Defendants were able to sell millions of products that they could not have sold absent its deceptive marketing campaign, causing the Plaintiffs and members of the Class substantial injuries.

- 28 -

93.     The acts, practices, and misrepresentations by Defendants described above, with intent that Plaintiffs and other members of the Class rely upon the concealment, suppression and omission of such material facts, constituted unfair and/or deceptive acts and practices occurring in the course of conduct involving trade or commerce within the meaning of 815 ILCS section 505/1, *et seq*.

94.     Defendants' misconduct in the course of trade and/or commerce offends public policy and is immoral, unethical, oppressive, and/or unscrupulous and caused substantial injury to consumers and their children.

95.     Plaintiffs and members of the Class suffered damages as a result of Defendants' deceptive and/or unfair acts.  Accordingly, Plaintiffs, on behalf of themselves and the other Class members, seek monetary damages, punitive damages and such other and further relief as set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act.

**B.      Express and Implied Warranty Claims**

**1.      COUNT III: FOR VIOLATIONS OF THE IMPLIED WARRANTY OF MERCHANTABILITY ON BEHALF OF RESIDENTS OF CERTAIN STATES**

96.     Count III is brought by Plaintiffs, individually, and on behalf of all similarly situated residents of Alaska, Arkansas, Colorado, Delaware, Hawaii, Louisiana, Maine, Maryland, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia and Wyoming (hereinafter "Implied Warranty Subclass").  Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

97.     At all times, there were in effect the following statutes governing the implied warranty of merchantability:  Alaska Stat. § 45.02.314; Ark. Code Ann § 4-2 314; CRS § 4-2-

- 29 -

314; 6 Del. C. § 2-314; HRS § 490:2-314; § 554.2314; 11 M.R.S.A. § 2 314; Md. Code Ann.

Art. 95B § 2-314; Mass. Gen. Laws. Ch. 106 § 2-314; Miss. Code. Ann. § 75-2-314; MCA 30-2-

314; Neb. UCC 2-314; NRS 104.2314; N.J.S.A. 12A:2-314; NDCC 2-314; O.S. 1991 § 2-314;

G.L. 1956 §6A-2-314; S.C. Code Ann. § 36-2-314; SDCL 57A-2-314; Tex. Bus. & Com. Code

Ann. § 2-314; VA. Code § 8.2-314; W. VA. Code § 46-2-314; and Wyo. Stat. 34.1-2-314.

98.    As a designer, manufacturer, producer, marketer and seller of toys, collectibles

and juvenile products, Defendants are "merchants" within the meaning of the various states'

commercial codes governing the implied warranty of merchantability.

99.    The Thomas Toys are "goods," as defined in various states' commercial codes

governing the implied warranty of merchantability.

100.    Implied in the sale of the Thomas Toys is a warranty of merchantability that

requires, among other things, that the Thomas Toys pass without objection in the trade and are of

merchantable quality and safe and fit for such use by young children.

101.    Because the Thomas Toys are defective and inherently dangerous, as a result of

containing lead-based surface paint, the Thomas are not able to function in their ordinary

capacities and were therefore not merchantable at the times they were sold, as impliedly

warranted by Defendants.

102.    Due to Defendants' wrongful conduct as alleged herein, Plaintiffs and members of

the Class could not have known about the risks associated with the Thomas Toys until after

Defendants issued the Thomas Toys recall notice on or about June 13, 2007.

103.    By virtue of the recall on or about June 13, 2007, Defendants were put on notice

of the defect in The Thomas Toys.

104.    Defendants were also put on notice of the defect in the Thomas Toys by the numerous inquiries that they received concerning the defect, and by the filing of numerous lawsuits.

105.    As a direct and proximate result of the Defendants' breach of implied warranty, Plaintiffs and members of the Class suffered damages as alleged herein.

## 2.    COUNT IV:  FOR BREACH OF EXPRESS WARRANTY

106.    Count IV is brought by Plaintiffs, individually and on behalf of the Class. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

107.    Defendants expressly warranted that the Thomas Toys were manufactured, packaged and labeled to conform with all safety requirements under U.S. federal and other applicable laws and regulations, industry developed voluntary standards and product specific standards, and that they were periodically reviewed and approved by independent safety testing laboratories.

108.    The Thomas Toys did not conform to these express representations because the products are not safe for handling by young children and can cause adverse health effects, including death.

109.    Due to Defendants' wrongful conduct as alleged herein, Plaintiffs and members of the Class could not have known about the risks associated with the Thomas Toys until after Defendants issued the Thomas Toys recall notice on or about June 13, 2007.

110.    By virtue of the recall on or about June 13, 2007, Defendants were put on notice of the defect in the Thomas Toys.

001975-11 206230 V1

111.    Defendants were also put on notice of the defect in the Thomas Toys by the
numerous inquiries that they received concerning the defect, and by the filing of numerous
lawsuits.

112.    As a direct and proximate result of the breach of said warranties, and as the direct
and legal result of the defective condition of the Thomas Toys as designed, manufactured,
packaged, labeled and supplied by Defendants, and other wrongdoing of Defendants described
herein, Plaintiffs and their children were caused to suffer damages.

## C.    Strict Liability

### 1.    COUNT V:  STRICT LIABILITY

113.    Count V is brought by all Plaintiffs, individually and on behalf of the Class.
Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

114.    At all relevant times, Defendants were producers, manufacturers and/or
distributors of Thomas Toys.

115.    The Thomas Toys produced, manufactured and/or distributed by Defendants were
unreasonably dangerous in that, when the Thomas Toys left the hands of the Defendants they
contained lead surface paint that could cause adverse health effects to young children exposed to
that toxic substance.

116.    Defendants' products were expected to and did reach Plaintiffs and members of
the Class without substantial change in condition.

117.    As a direct and proximate result of the defective and unreasonably dangerous
condition of the Thomas Toys, as produced, manufactured and/or supplied by Defendants,
Plaintiffs and members of the Class have suffered direct economic loss, as well as a significantly

- 32 -

increased risk of their children sustaining a range of health effects, from behavioral problems and learning disabilities to seizures and death.

**2.      COUNT VI:  STRICT LIABILITY – FAILURE TO WARN**

118.    Count VI is brought by all Plaintiffs, individually and on behalf of the Class. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

119.    At all relevant times, Defendants were producers, manufacturers and/or distributors of the Thomas Toys.

120.    The Thomas Toys produced, manufactured and/or distributed by Defendants were defective in design or formulation in that, when the Thomas Toys left the hands of the Defendants they contained lead surface paint that could cause adverse health effects to young children exposed to that toxic substance.

121.    Defendants knew or should have known that the Thomas Toys contained a non-obvious danger in their surface paint.  However, Defendants failed to inform Plaintiffs and the members of the Class as to the adverse health effects that the Thomas Toys could have on young children.

122.    Had Plaintiffs and members of the Class been warned about the adverse health effects that the surface paint on the Thomas Toys posed to their children, they would not have purchased the Thomas Toys.

123.    As a direct and proximate result of the Defendants' failure to warn Plaintiffs and members of the Class about defective and unreasonably dangerous condition of the Thomas manufactured and/or supplied by Defendants, Plaintiffs and members of the Class have suffered economic damages, as well as a significantly increased risk of their children sustaining a range of health effects, from behavioral problems and learning disabilities to seizures and death.

- 33 -

## D.    COUNT VII:  NEGLIGENCE

124.    Count VII is brought by all Plaintiffs, individually and on behalf of the Class. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

125.    Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Thomas Toys into the stream of commerce, including a duty to assure that these products did not expose children to adverse health effects including without limitation IQ deficits, learning disabilities, behavioral problems, stunted growth or slowed growth, impaired hearing, kidney damage, mental retardation, and even death from lead poisoning.

126.    Defendants failed to exercise ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, and/or distribution of the Thomas Toys into interstate commerce in that Defendants knew or should have known that the Thomas Toys created a high risk of adverse health effects which can cause extraordinary suffering and even death. Defendants' failure to exercise reasonable care in the design, manufacture, sale and/or distribution of the Thomas Toys was grossly negligent.

127.    Specifically, Defendants were grossly negligent in the design, manufacture, testing, advertising, warning, marketing and/or sale of the Thomas Toys in that they:

a.    Failed to use due care in designing and manufacturing the relevant products so as to avoid the aforementioned risks to children;

b.    Failed to accompany their products with proper warnings regarding all possible adverse effects associated with young children's handling and mouthing of, and otherwise being exposed to, the relevant products;

c.    Failed to conduct adequate testing and post-marketing surveillance to determine the safety of the relevant products;

- 34 -

d.     Failed to warn Plaintiffs and members of the Class prior to actively encouraging the sale of the Thomas Toys either directly or indirectly, orally or in writing, about the following: (1) the possibility that young children handling or otherwise exposed to the Thomas Toys could suffer adverse health effects as described herein, and/or (2) the possibility of affected children requiring hospitalization and/or continuous medial monitoring as a result of exposure to the Thomas Toys; and

e.     Were otherwise careless or grossly negligent.

128.    Despite the fact that Defendants knew or should have known that the Thomas Toys could cause unreasonable, adverse health effects to children, Defendants continued to market the relevant products to consumers including Plaintiffs despite the possibility that these products could be produced without lead-based surface paint.

129.    Defendants knew or should have known that consumers such as Plaintiffs and the Class would foreseeably suffer adverse health effects and injury as a result of Defendants' failure to exercise ordinary care as described above.

130.    Defendants' negligence was a proximate cause of Plaintiffs' and the Class' economic damages, as well as their children's increased risk of harm as previously set forth herein.

## E.     COUNT VIII:  MEDICAL MONITORING FOR BLOOD LEAD TESTING

131.    Count VIII is brought by all Plaintiffs, individually and on behalf of the Class. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

132.    As a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the children of the Class have been significantly exposed to a known hazardous substance.

133.    Early detection, through medical testing of children, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the Thomas Toys painted with lead pigment.

134.    The cost of diagnostic blood lead testing is necessary to detect a possible injury and is in itself a present compensable injury, resulting from Defendants' actions.

135.    Plaintiffs and the Class are entitled to recover the costs of a diagnostic blood lead testing, and to recover punitive damages in amounts to be ascertained at trial.

**F.    Alternative Claims for Unjust Enrichment[1]**

    **1.    COUNT IX:  UNJUST ENRICHMENT FOR RESIDENTS OF CERTAIN STATES**

136.    Count IX is brought by Plaintiffs individually, and on behalf of all similarly situated residents of Arkansas; California; Colorado; Connecticut; Hawaii; Illinois; Indiana; Iowa; Michigan; Mississippi; Missouri; Nebraska; New Hampshire; New Jersey; New York; Oklahoma; Vermont; and West Virginia for unjust enrichment (the "18-State Unjust Enrichment Subclass").  Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

137.    At all times relevant hereto, Defendants designed, manufactured, produced, marketed and/or sold the Thomas Toys that contained lead-based surface paint.

138.    Plaintiffs and members of the Class conferred upon Defendants, without knowledge that the Thomas Toys have had their young children exposed to adverse health effects resulting from exposure to lead paint, payment for such toys, benefits that were non-gratuitous.

---

[1] These Counts are plead in the alternative to the breach of express warranty claim.

139.    Defendants appreciated, or had knowledge of the non-gratuitous benefits conferred upon them by Plaintiffs and members of the Class.

140.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the Class, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, Plaintiffs and members of the Class were not receiving products of high quality, nature, fitness or value that had been represented by Defendants and reasonable consumers would have expected. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

141.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and members of the Class is unjust and inequitable, Plaintiffs and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

### 2.    COUNT X: UNJUST ENRICHMENT FOR RESIDENTS OF CERTAIN STATES

142.    Count X is brought by Plaintiffs, individually, and on behalf of all similarly situated residents of Alaska, District of Columbia, Florida, Georgia, Kansas, Kentucky, Maine, Minnesota, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Utah, Virginia, Washington and Wisconsin for unjust enrichment (the "21-State Unjust Enrichment Subclass"). Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

143.    At all times relevant hereto, Defendants designed, manufactured, produced, marketed and/or sold the Thomas Toys that contained lead-based surface paint.

144.     Plaintiffs and members of the Class conferred upon Defendants, without knowledge that the Thomas Toys have had their young children exposed to adverse health effects resulting from exposure to lead paint, payment for such toys, benefits that were non-gratuitous.

145.     Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the Class, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, Plaintiffs and members of the Class were not receiving products of high quality, nature, fitness or value that had been represented by Defendants and reasonable consumers would have expected. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

146.     Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and members of the Class is unjust and inequitable, Plaintiffs and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

## G.     COUNT XI:  ALTERNATIVE CLAIM FOR RELIEF UNDER THE STATE CONSUMER PROTECTION ACTS[2]

147.     Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here and further allege as follows:

148.     Count XI is brought by Plaintiffs, individually, and on behalf of all similarly situated residents of each of the 50 states for violations of the state consumer protection acts including:

---

[2] This Count is plead in the alternative to Counts I and II.

a.      the Alaska Unfair Trade Practices And Consumer Protection Act, AS § 45.50.471 *et seq.*;

b.      the Arizona Consumer Fraud Act, A.R.S §§ 44-1521 *et seq.*;

c.      the Arkansas Deceptive Trade Practices Act, Ark. Code §§ 4-88-101 *et seq.*;

d.      the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.* and 17500 *et seq.*;

e.      the California Consumers Legal Remedies Act, Civil Code §1750, *et seq.*;

f.      the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq.*;

g.      the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq.*;

h.      the Delaware Consumer Fraud Act, 6 Del. C. § 2513., *et seq.*;

i.      the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;

j.      the Florida Deceptive And Unfair Trade Practices Act, FSA § 501.201, *et seq.*;

k.      the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;

l.      the Hawaii Unfair Competition Law, H.R.S. § 480-2, *et seq.*;

m.      the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;

n.      the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq.*;

o.      the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq.*;

p.      the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.*;

q.      the Kentucky Consumer Protection Act, KRS 367.110, *et seq.*;

- 39 -

r.      the Louisiana Unfair Trade Practices And Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;

s.      the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207, *et seq.*;

t.      the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq.*;

u.      the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq.*;

v.      the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq.*;

w.      the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, *et seq.*;

x.      the Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq.*;

y.      the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq.*;

z.      the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq.*

aa.      the New Hampshire Regulation of Business Practices For Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq.*;

bb.      the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq.*;

cc.      the New Mexico Unfair Practices Act, N.M.S.A. 1978 §§ 57-12-1, *et seq.*;

dd.      the New York Consumer Protection from Deceptive Acts and Practices, GBL § 349, *et seq.*;

ee.      the North Carolina Unfair And Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq.*;

ff.      the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15, *et seq.*;

001975-11 206230 V1

gg.     the Ohio Consumer Sales Practices Act, <u>R.C. 1345.01</u>, *et seq.*;

hh.     the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq.*;

ii.     the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq.*;

jj.     the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

kk.     the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq.*;

ll.     the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq.*;

mm.     the South Dakota Deceptive Trade Practices and Consumer Protection, SDCL § 37-24-1, *et seq.*;

nn.     the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq.*;

oo.     the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq.*;

pp.     the Utah Consumer Sales Practices Act, UT ST § 13-11-175, *et seq.*;

qq.     the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq.*;

rr.     the Virginia Consumer Protection Act of 1977, VA ST § 59.1-199, *et seq.*;

ss.     the Washington Consumer Protection Act, RCWA 19.86.010, *et seq.*;

tt.     the West Virginia Consumer Credit And Protection Act, W.Va.Code § 46A, *et seq.*;

uu.     the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, *et seq.*; and

vv.     the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq.*

149.    The acts, practices, misrepresentations and omissions by Defendants described above, and Defendants' dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

150.    Defendants' acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or damaged Plaintiffs and members of the Class in connection with the sale or advertisement of the Thomas Toys. Defendants' conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

151.    Plaintiffs, on behalf of themselves and the other Class members, seek monetary damages, treble damages and such other and further relief as set forth in each of the above-enumerated statutes.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class members request that the Court enter an order or judgment against Defendants including the following:

a.    Certification of the action as a Class Action pursuant to Rule 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

b.    Damages in the amount of monies paid for Thomas Toys;

c.      Damages in the amount of monies paid or to be paid for lead testing of the children handling the Thomas Toys;

d.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

e.      Pre-judgment and post-judgment interest on such monetary relief;

f.      Other appropriate injunctive relief;

g.      The costs of bringing this suit, including reasonable attorneys' fees; and

h.      All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on their own behalf and on behalf of Class members.

Dated: November 7, 2007

By:   **/s/ Elizabeth A. Fegan**

Elizabeth A. Fegan
Timothy P. Mahoney
Daniel J. Kurowski
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd, Suit B
Oak Park, IL 60301
(708) 776-5600
(708) 776-5601 (fax)

001975-11 206230 V1

Steve W. Berman
Ivy D. Arai
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292
*Attorneys for Plaintiffs Channing Hesse, John
O'Leary, Christine Wallar, Theresa Reddell,
Rebekah Lockhart, Cherise Wilson, Aive Rei-
Ghafoor, Tonya Tubbs, Thomas Toms, Tracy
Hofmann, Sheree Argiris, Cheng Yin, Jodie
Morrison, Michelle Stumpf, Elaine Vallejo,
Elizabeth Harris*

Kenneth A. Wexler
Edward A. Wallace
Andrae P. Reneau
WEXLER TORISEVA WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60602

Laurence D. King
Linda M. Fong
KAPLAN FOX & KILSHEIMER LLP
555 Montgomery Street
Suite 1501
San Francisco, CA 94111

Frederic S. Fox
Donald R. Hall
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue
New York, NY 10022
*Attorneys for Plaintiffs Kimm Walton and Kim
Cosgrove*

William N. Riley
Jamie Kendall
PRICE WAICUKAUSKI & RILEY, LLC
301 Massachusetts Ave
Indianapolis, IN 46204
*Attorneys for Ryan Kreiner, Claudine Kreiner,
Patrick Hudspeth and Caryn Hudspeth*

- 44 -

Robert James Pavich
John J. Pavich
MONICO, PAVICH & SPEVACK
20 South Clark Street
Suite 700
Chicago, IL 60603

Kevin Barry Rogers
LAW OFFICES OF KEVIN ROGERS
307 North Michigan Avenue
Suite 305
Chicago, IL 60601
*Attorneys for Paul Djurisic*

Thomas A. Zimmerman, Jr.
Hugh J. Green
ZIMMERMAN LAW OFFICES, P.C.
100 West Monroe Street
Suite 1300
Chicago, IL 60603
*Attorneys for Robyne Rhode and Thomas Brady*

Alex G. Streett
James A. Streett
STREETT LAW FIRM, P.A.
107 W. Main St.
Russellville, AR 72811
*Attorneys for Plaintiffs Cherise Wilson, Aive Rei-Ghafoor, Tonya Tubbs, Thomas Toms, Tracy Hofmann, Sheree Argiris, and Cheng Yin*

Robert M. Foote
Mark A. Bulgarelli
Craig S. Mielke
Joe R. Whatley, of counsel
Edith Kallas, of counsel
Mitchell M. Breit, of counsel
FOOTE, MEYERS, MIELKE & FLOWERS, LLC.
28 North First Street, Suite 2
Geneva, IL 60134

Kathleen C. Chavez
CHAVEZ LAW FIRM, P.C.
28 North First Street, Suite 2
Geneva, IL 60134

001975-11 206230 V1

Nicholas B. Roth
EYSTER KEY TUBB ROTH
MIDDLETON & ADAMS LLP
Eyster Building
P.O. Box 1607
Decatur, AL  35602
*Attorneys for Plaintiff Jennifer Foshee Deke*

001975-11 206230 V1

# Exhibit A

## Replacement Request Form - Wooden Vehicle & Train Set Components Recall (U.S.)

The following is a list of recalled items from the Thomas & Friends Wooden Railway. If you own one of these items, please return it to us for replacement and a free gift. Please mail the item and this form to the following address:

RC2 Corporation
Attn: Wooden Vehicle Recall
2021 9th St. SE
Dyersville, IA 52040

If you reside outside of the United States or Canada, please call 866-725-4407 or email recalls@rc2corp.com for further instructions. DO NOT use this form.

Please allow 6-8 weeks for replacement processing.

NOTE: Please do not return entire set.  Return only the specific part listed.

| Date: | | | | | |
|-------|---|---|---|---|---|
| Parent or Adult Name Only: | | | Street Address: | | |
| Phone: | | | City/State/Zip: | | |
| E-mail: | | | | | |
| Qty | Item Name and Image | Qty | Item Name and Image | Qty | Item Name and Image |
| | Red James Engine | | Red Musical Caboose | | Red "Sodor Mail" Car |
| | Red James # 5 Coal Tender | | Red Sodor Line Caboose | | Red Coal Car |
| | Red Lights & Sounds James Engine | | Red Holiday Caboose | | Red "2006 Day Out With Thomas" Coal Car |
| | Red # 5 Lights & Sounds Coal Tender | | Red Fire Brigade Train | | Yellow & Green Box Car |
| | James Engine w/Team Colors | | Red Fire Brigade Truck | | Yellow "Sodor Cargo Co." Cargo Piece |
| | James # 5 Coal Tender w/Team Colors | | Red Hook & Ladder Truck | | Red Stop Sign |
| | Red Skarloey Engine | | Red Water Tanker Truck | | Yellow Railroad Crossing Sign |
| | Brown & Yellow Old Slow Coach | | Red Baggage Car | | |
| | Deluxe Sodor Fire Station | | Sodor Smelting Yard | | Sodor Ice Cream Factory |

- 47 -

## CERTIFICATE OF SERVICE

I, Elizabeth A. Fegan, certify that I caused copies of the foregoing **PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT** to be served on all counsel of record in the following cases:

*Hesse v. Learning Curve Brands Inc., et al.*, No. 07 C 3514

*Deke v. RC2 Corp. et al*, No. 07 CV 3609

*Walton v. RC2 Corp. et al*, No. 07 CV 3614

*O'Leary v. Learning Curve Brands, Inc.*, No. 07 C 3682

*Djurisic v. Apax Partners, Inc. et al*, No. 07 C 3707;

*Reddell v. Learning Curve Brands, Inc. et al.*, No. 07 C 3747;

*Rhode v. Learning Curve Brands, Inc. et al*, No. 07 C 4187;

*Kreiner v. RC2 Corp. et al.*, No. 07 C 4547;

*Wilson v. RC2 Corp. et al*, No. 07 CV 4642

via E-Mail this 7th day of November, 2007.

/s/ Elizabeth A. Fegan
Elizabeth A. Fegan

**Service List For In Re Thomas and Friends®
Wooden Railway Toys Litigation, No. 07C 3514**

**Interim Lead Counsel For Plaintiffs**

Elizabeth A. Fegan, Esq.
Timothy P. Mahoney, Esq.
Daniel J. Kurowski, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Boulevard, Suite B
Oak Park, IL 60301
beth@hbsslaw.com
timm@hbsslaw.com
dank@hbsslaw.com

Steve W. Berman, Esq.
Ivy D. Arai, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
ivy@hbsslaw.com

Laurence D. King, Esq.
Linda M. Fong, Esq.
KAPLAN FOX & KILSHEIMER LLP
555 Montgomery Street, Suite 1501
San Francisco, CA 94111
LKing@kaplanfox.com
lfong@kaplanfox.com

Frederic S. Fox, Esq.
Donald R. Hall, Esq.
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue
New York, NY 10022
ffox@kaplanfox.com
dhall@kaplanfox.com

William Riley, Esq.
Joseph N. Williams, Esq.
Jamie Kendall, Esq.
Joe Williams, Esq.
PRICE WAICUKAUSKI & RILEY, LLC
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
wriley@price-law.com
jwilliams@price-law.com
jkendall@price-law.com

**Additional Plaintiffs' Counsel**

Robert M. Foote, Esq.
Mark A. Bulgarelli, Esq.
Craig S. Mielke, Esq.
FOOTE, MEYERS, MIELKE & FLOWERS, LLC
28 North First Street, Suite 2
Geneva, IL 60134
rmf@foote-meyers.com
mbulgarelli@foote-meyers.com
csm@foote-meyers.com

Kathleen Currie Chavez, Esq.
CHAVEZ LAW FIRM P.C.
28 North First Street, #2
Geneva, IL 60134
gkeg4@aol.com

Nicholas B. Roth, Esq.
EYSTER KEY TUBB ROTH MIDDLETON &
ADAMS LLP
402 East Moulton Street, S.E.
Decatur, AL 35602
nbroth@eysterkey.com

Joe R. Whatley, Esq.
Joseph P. Guglielmo, Esq.
Edith Kallas, Esq.
Mitchell M. Breit, Esq.
WHATLEY DRAKE & KALLAS
1540 Broadway, 37th Floor
New York, New York 10036
jwhatley@wdklaw.com
jguglielmo@wdklaw.com
ekallas@whatleydrake.com
mbreit@whatleydrake.com

Kenneth A. Wexler, Esq.
Edward A. Wallace, Esq.
Andrae P. Reneau, Esq.
WEXLER TORISEVA WALLACE LLP
1 North LaSalle Street, Suite 2000
Chicago, IL 60602
kaw@wtwlaw.us
eaw@wtwlaw.us
apr@wtwlaw.us

Mark J. Tamblyn, Esq.
WEXLER TORISEVA WALLACE LLP
1610 Arden Way, Suite 290
Sacramento, CA 95815
mjt@wtwlaw.us

Alex G. Streett, Esq.
James A. Streett, Esq.
STREETT LAW FIRM, P.A.
107 West Main St;
Russellville, AR 72811
alex@streettlaw.com
james@streettlaw.com

Robert James Pavich, Esq.
John J. Pavich, Esq.
Melanie Fairman, Esq.
MONICO, PAVICH & SPEVACK
20 South Clark Street, Suite 700
Chicago, IL 60603
rpavich@monicopavich.com
jpavich@monicopavich.com
mfairman@monicopavich.com

Kevin Barry Rogers, Esq.
LAW OFFICES OF KEVIN ROGERS
307 North Michigan Avenue, Suite 305
Chicago, IL 60601
rogers-law@sbcglobal.net

Thomas A. Zimmerman, Jr., Esq.
ZIMMERMAN AND ASSOCIATES
100 West Monroe, Suite 1300
Chicago, IL 60603
tom@attorneyzim.com

**Defendants' Counsel**

James L. Petersen, Esq.
Bart Thomas Murphy, Esq.
ICE MILLER LLP
2300 Cabot Drive
Suite 455
Lisle, IL 60532
James.petersen@icemiller.com
Bart.murphy@icemiller.com

Katherine A. Winchester, Esq.
Judy S. Okenfuss, Esq.
ICE MILLER LLP
One American Square
Suite 3100
Indianapolis, IN 46282-0200
Katherine.winchester@icemiller.com
Judy.okenfuss@icemiller.com