# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| IN RE RC2 CORP. TOY LEAD PAINT | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | Case No. 07 CV 7184 |
| | ) | |
| | ) | MDL No. 1893 |
| | ) | |
| | ) | The Honorable H. Leinenweber |
| _____ | ) | |

## REAL-PARTY-IN-INTEREST, STATE PLAINTIFFS' RESPONSE TO "EMERGENCY" MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO THE ALL WRITS ACT

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................1

**STATEMENT OF FACTS** .........................................................4

**I.     MOVANTS' MISCHARACTERIZATIONS OF THE SETTLEMENT
         TERMS** ...................................................................5

**II.    NATURE OF THE ILLINOIS LITIGATION** ...........................5

    **A.    Barrett's Complaint** ...........................................5

    **B.    Other State Cases** .............................................6

    **C.    RC2 Corporation's Position** ................................6

**III.   PUBLIC KNOWLEDGE OF STATE CASES** ..........................6

**IV.    SETTLEMENT HISTORY** ...........................................7

**V.     POST SETTLEMENT MISSTATEMENTS AND PROCEEDINGS IN THE
         STATE COURT** ..........................................................8

**ARGUMENT** ......................................................................9

**I.     POSTPONING AN EXPLANATION OF MOVANTS' MISAPPLICATION
         OF THE LAW TO JUSTIFY THEIR REQUESTED RELIEF FOR
         SECTION II, MOVANTS REPEATEDLY MISREPRESENT THE FACTS
         SURROUNDING THE PROCESS AND TERMS OF THE SETTLEMENT
         REQUIRING A DENIAL OF THEIR "EMERGENCY" MOTION** ..........9

    **A.    The Emergency Motion is Replete with Misstatements of Fact and
                Material Omissions** ...........................................9

    **B.    Using Hagen Berman's Own Initial Demand as a Benchmark,
                the Proposed State Court Settlement is Reasonable, Fair and
                Adequate** .....................................................11

    **C.    The Settlement was Achieved Through an Open and Fair Process** .12

    **D.    The State Court Provides an Appropriate Forum for Disputing
                the Merits of the Settlement** ................................13

**II.** **THE ANTI-INJUNCTION ACT NARROWLY LIMITS THE GROUNDS FOR A FEDERAL COURT TO ENJOIN A STATE COURT** ..................13

**A.** **The First and Third Exceptions Under the AIA Cannot Apply** .......14

**B.** **The Only Arguably Applicable Exception – The Second Exception for Stays "Where Necessary In Aid Of" A Federal Court's Jurisdiction, Does Not Apply Here** .......................................15

**1.** **Even if the second AIA exception applied to *in personam* litigation, it would not apply to this case** .............................16

    **a.** General rule of thumb is that the second AIA exception only applies where judgment or settlement of federal litigation is imminent ..................................................................................17

    b. Courts may consider massive investments of judicial resources ... when applying the second AIA exception, but no such investments are present here .........................................................................18

    c. The cases cited by Movants are minority cases that are readily distinguishable .............................................................19

**C.** **Movants' Proposed Remedy Is Not Supported by the Law** .............22

**CONCLUSION** .............................................................................24

# TABLE OF AUTHORITIES

## CASES

*Annunziato v. eMachines Inc.*,
No. 05-610, 2006 U.S. Dist. LEXIS 97020 (C.D. Cal. July 24, 2006) . . . . . . . . . . . . . .14

*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*,
398 U.S. 281 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Battle v. Liberty Nat'l Life Ins. Co.*,
877 F.2d 877 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bennett v. Medtronic, Inc.*,
285 F.3d 801 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Grider v. Keystone Health Plan Cent., Inc.*,
500 F.3d 322 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 22

*Hernandez v. SmithKline Beecham Pharm.*,
No. 02-2750, 2006 U.S. Dist. LEXIS 72846 (D.P.R. June 6, 2006) . . . . . . . . . . . . . . .14

*In re America Online Spin-Off Litig.*,
MDL 04-1581, 2005 U.S. Dist. LEXIS 45625 (C.D.Cal. May 9, 2005) . . . . . . . . . . . . 21

*In re Baldwin-United, Corp.*
770 F.2d 336 (2d Cir 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Cendant Corp. Sec. Litig.*,
404 F.3d 173 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Diet Drugs Prods. Liab. Litig.*,
282 F.3d 220 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18 - 19

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*,
369 F.3d 293 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Domestic Air Transportation Antitrust Litigation*,
144 F.R.D. 421 (N.D. Ga. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13 n.4

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
134 F.3d 133 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Lease Oil Antitrust Litig.*,
48 F. Supp. 2d 699 (S.D. Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*In re Managed Care Litig.*,
236 F. Supp. 2d 1336 (S.D. Fla. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20, 21, 23

*In re NASDAQ Market-Makers Antitrust Litigation*,
176 F.R.D. 999 (S.D.N.Y 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13 n.4

*In re Ret Sys. of Ala. v. J.P. Morgan Chase & Co.,*
386 F.3d 419 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mars Steel v. Continental Ill. Bank & Trust*,
834 F.2d 677 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13 n.4

*Okla. Packing Co. v. Okla. Gas & Elec. Co.*,
309 U.S. 4 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Peters v. Brants Grocery*,
990 F. Supp. 1337 (M.D. Ala. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ramsden v. AgriBank, FCB*,
214 F.3d 865 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Reynolds v. Benefit Nat'l Bank*,
288 F.3d 277 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sandpiper Vill. Condo. Ass'n v. Louisiana-Pacific Corp.*,
428 F.3d 831 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 19

*Texas Employers' Ins. Ass'n. v. Jackson*,
820 F.2d 1406 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Zurich Am. Ins. Co. v. Superior Court for Cal.*,
326 F.3d 816 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23

## OTHER AUTHORITIES

Anti-Injunction Act, 28 U.S.C. § 2283 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Class Action Fairness Act of 2005, Pub. L. No. 109-2, 118 Stat. 4 (2005) . . . . . . . . . . 14

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE RC2 CORP. TOY LEAD PAINT | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | Case No. 07 CV 7184 |
| | ) | |
| | ) | MDL No. 1893 |
| | ) | |
| | ) | The Honorable H. Leinenweber |
| | ) | |

### REAL-PARTY-IN-INTEREST,[1] STATE PLAINTIFFS' RESPONSE TO "EMERGENCY" MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO THE ALL WRITS ACT

As the Movants before this Court know full well, it is not improper to settle a class action in state court.

- The State Plaintiffs chose to litigate in state court, as is their right.

- The State Plaintiffs conducted extensive discovery prior to making their first settlement demand.

- The state plaintiffs conducted multi-day mediation before a well-respected former judge, the Honorable Robert Boharic (Ret).

- The state plaintiffs settled the case while respecting every rule and fulfilling each procedural requirement needed to obtain preliminary approval.

- The settlement reached by the State Plaintiffs is fair, reasonable and adequate and provides immediate benefits for the Class.  It is supported by numerous plaintiffs from around the country and was particularly well-received by the press and the Class.

- The Movants have already sought to intervene in the state court proceedings so as to have their objections heard by the state court, the state plaintiffs have not objected to such efforts and seek to have such a review done on an expedited basis.

- The settlement exceeds the requirements necessary for preliminary approval.

---

[1] Byron Barrett, the court appointed lead Plaintiff, is charged with protecting the interests of his certified class and thus is the real party in interest to this motion.  Mr. Barrett was joined by Plaintiffs in New Jersey, California, Florida and Tennessee (the "State Plaintiffs").  The instant counsel is the court-appointed lead counsel in the state action.

▪ The Movants present no basis to obtain the extraordinary relief they seek or to otherwise delay the state court proceeding.

Each of these facts, as well as many others set forth herein, contradict the representations made by Movants in filing their so-called "Emergency Motion" before this Court.  The State Plaintiffs properly presented a real and concrete settlement that provided timely and much-needed relief to the class. (Indeed, the State Plaintiffs are so confident in the merits of the settlement they do not object to Movants' efforts to intervene in the state court proceeding for the limited purpose of appearing before the state court judge to voice any legitimate objections they wish to present to the state court).

As this Court may be aware, the Movants have already filed with the state court a host of documents, including pleadings challenging the terms and conditions of the settlement. With the state court already engaged in such an expedited review of the Movants' objections to the settlement, the issuance of the extraordinary relief sought by Movants is moot and would only unnecessarily interfere with the state court's sovereignty and principles of federalism, and violate the Anti-Injunction Act.

*                                    *                                    *

The Movants want to sidetrack a quality settlement that seeks to provide significant relief to the class solely because it was not *their* proposed settlement.  The Movants' motives are now readily transparent.  Indeed, even before understanding the basic terms of the settlement agreement, the Movants issued a misleading press release, directly calling for class members to object to the settlement.  Movants also repeated the same misleading statements regarding the terms of the settlement agreement in their motion to intervene and requested that the court stay further dissemination of the notice of the settlement.  The State Plaintiffs have no objection to the Movants proceeding in state court, and in fact, the State Plaintiffs have offered to stipulate to

2

the limited purpose intervention so that the truth about the settlement can be fully heard by the state court judge and, thereby, the relief can benefit the class sooner rather than later.  The state court has now agreed to hear the Movants' purported challenges to the settlement.  Yet, with the hope of having two bites of the judicial apple, Movants still come before this Court with an emergency "writ" to ensure that the settlement now subject to satellite litigation even before the state court has the opportunity to look at the merits of their attack.

Movants fail to heed their own caution that "charges of collusion and defendants use of the reverse auction process are easily asserted and rarely substantiated."  (MDL Pl.'s Br. 1.) Movants' charges that the state plaintiffs engaged in a reverse auction which resulted in a fair, reasonable and adequate settlement are particularly offensive in view of the procedural history of the state court settlement.

To preserve the integrity of the settlement process, the State Plaintiffs made a number of demands from the outset:  First, if RC2 had any interest in soliciting competing bids from the various plaintiffs' groups, the State Plaintiffs would have no part of that.  Second, the State Plaintiffs would make no settlement demand until sufficient discovery was complete.  Third, the mediation had to proceed before a private mediator.  In short, the record shows that the settlement process in state court was conducted with integrity and consistent with well established class action jurisprudence.  Indeed, the benefits contained in the resulting state settlement exceeded the Movants' own final demand.  Even more important, the Movants demand – apparently made without the consent of all plaintiffs with MDL cases – was made by the Movants without the benefit of the discovery obtained by the state plaintiffs.

In filing their "emergency motion," Movants make a host of disturbing charges without any substantiation.  Rather than joining with the State Plaintiff and the other supportive plaintiffs

from around the country to effectuate the settlement, Movants are prepared to destroy the work of other plaintiffs lawyers so they can take control—even to the detriment of the class they purport to represent.  In order to expose the falsehoods championed by the Movants, the state plaintiffs welcome the state court's current and ongoing review of Movants' objections to the settlement.  In view of the lack of any factual or legal support for the Movants' motion, this Court should not enjoin the ongoing state proceedings under the All Writs Act.  To do so would only set a precedent that the All Writs Act is an effective shortcut for counsel in a federal case to derail a state settlement based solely on falsehoods and innuendo.

## STATEMENT OF FACTS

This class action concerns the much-publicized recall of hundreds of thousands of "Thomas & Friends Wooden Railway" toys sold by Defendant RC2 Corporation.  On August 7, 2007, Byron Barrett filed a Complaint against RC2 in the Circuit Court of Cook County, Case No. 2007 CH 20924 seeking both money damages and injunctive relief.  In October 2007, Barrett, along with unrelated plaintiffs who had filed state class actions in California, New Jersey, Florida, and Tennessee, agreed with RC2 to mediate the dispute before the Honorable Robert Boharic (Ret.).  Over the next two months, Judge Boharic oversaw both the initiation and completion of extensive discovery, consisting of thousands of pages of documents and the depositions of RC2's Chief Executive Officer and Products Integrity Manager.  Through the mediation process, the Parties were able to reach a settlement agreement.

Under the Settlement, class members are entitled to exchange their recalled toys for the choice of either (a) a full cash refund or (b) replacement toys with extra "bonus" toys supplied by RC2.  The Settlement also provides comprehensive injunctive relief requiring RC2 to intensify and increase its system of quality control checks to ensure the safety of Thomas & Friends

4

Wooden Railway products and also individual relief to class members as detailed below. Finally, RC2 will be making a *cy pres* donation of $100,000 to a not-for-profit entity to be approved by the Court.

On January 22, 2008, the Parties moved the state court for preliminary approval of the Settlement, to certify the settlement class, approve the class notice, and to appoint a leadership structure consisting of:  Gino DiVito of Tabet DiVito & Rothstein, LLC (liaison counsel); Jay Edelson and Scott Kamber of KamberEdelson, LLC, and William M. Audet of Audet & Partners, LLP (lead counsel), and B.J. Wade Glassman of Edwards, Wade & Wyatt, P.C., William H. Garvin of Garvin & Milles, and Mark C. Gardy of Gardy & Notis, LLP (affiliated class counsel).

## I.      Movants' Mischaracterizations of the Settlement Terms

Movants spend eight pages of their brief "characterizing" the terms of the settlement. Virtually every statement they make contains some inaccuracy.  And, tellingly, Movants make no mention of the fact that on December 10, 2007, they made a settlement demand of their own, which was largely worse than the settlement State Plaintiffs had procured nearly two weeks earlier.  A detailed analysis of these misstatements, as well as a comparison of the settlement State Plaintiffs procured and the Movant's December demand is contained in the Declaration of Jay Edelson, attached hereto as Exhibit A.

## II.     Nature of the Illinois Litigation

### A.      Barrett's Complaint

Plaintiff Byron Barrett brought the underlying Class Action on behalf of purchasers or owners of Thomas & Friends Wooden Railway products (the "Settlement Toy Products") which were recalled in June and September of 2007 due to excess heavy metals, primarily lead, in the surface paint of the toys.  Third-party manufacturers in China manufactured the Settlement Toy

Products for Defendant.  Defendant marketed and distributed these toys specifically intended for children throughout the United States.

Barrett's complaint alleges that, despite knowing of the dangers of excessive lead in paint manufactured, used, or applied to toys in China, Defendant failed to take reasonable steps to ensure that its products were safe for use by children.

### B.    Other State Cases

In addition to the *Barrett* case, four similar class actions were filed by Audet & Partners, LLP in California, by Wade & Wyatt, P.C. in Tennessee, by Garvin & Milles in Florida, and by Gardy & Notis, LLP in New Jersey.  Those attorneys actively participated in the formulation of case strategy and the settlement process, including reviewing discovery, asking questions at depositions, attending strategy conferences, and participating in the several mediation sessions.

### C.    RC2 Corporation's Position

RC2 conceded for the settlement that the paint in certain of the Settlement Toy Products contained unacceptable levels of lead and other heavy metals.  However, it further maintained that once it was alerted to these problems, it immediately notified the federal government and began the process of issuing a voluntary recall.  RC2 further contended that it systematically tested its products more broadly and issued additional recalls accordingly.  RC2 also maintained that, without a settlement, it was prepared to vigorously defend itself against the merits of the suit as well as adversarial class certification.

### III.    Public Knowledge of State Cases

Movants spend considerable energy suggesting that the State Plaintiffs somehow concealed their cases from them.  In fact, the *Barrett* case was publicized as the "Case of the Day" in the Chicago Daily Law Bulletin.  William Audet publicized his California case on his

6

firm's website.  Counsel for the State Plaintiffs further openly discussed their suits with the press

and the public and, at public forums, with the legal community.

## IV.    Settlement History

In August 2007 (shortly after the instant suit was filed), Barrett's counsel, along with

William Audet, who was representing a similar putative class in a California-filed case, met in

person with RC2's counsel to discuss their respective views of the case and to determine whether

they could agree upon any pre-trial procedures.  Coming out of that initial meeting, the Parties

agreed to share informal discovery.  Over a period consisting of the next two months, counsel

met twice more in person and engaged in several telephonic conferences.  Over time, the focus of

these discussions turned to the prospect of settlement.

In October 2007, the Parties, by agreement, retained the Honorable Robert Boharic (Ret.)

to serve as a mediator.  Over the next two months, which included three mediation sessions,

Judge Boharic helped the parties agree first on a formal exchange of discovery.  Specifically, the

plaintiffs in the respective state cases agreed to make themselves available for depositions and

agreed to provide any other relevant information requested by Defendant.  Similarly, Defendant

produced thousands of pages of documents, including internal test results, correspondence with

the government about all phases of the recalls, timelines, the customer complaints that triggered

the initial recall, and product pricing information.

After reviewing those documents, the plaintiffs, represented by three separate attorneys,

deposed both RC2's Chief Executive Officer and Products Integrity Manager.

Following discovery, the Parties had a final mediation session in front of Judge Boharic,

which was attended by four plaintiffs' attorneys – including Gino DiVito, Jay Edelson, Scott

Kamber and Willlam Audet – as well as RC2.  By the conclusion of that fourth session, the state

parties had reached an agreement in principle.  The parties subsequently negotiated a comprehensive 34 page settlement agreement which they presented to the Court for preliminary approval.  On January 22, 2008, the Circuit Court, Judge William Maki presiding, entered a preliminary approval order.

## V.    Post-Settlement misstatements and proceedings in the state court

Approximately 36 hours following the preliminary approval of the settlement, Hagens Berman Sobol Shapiro ("Hagens Berman"), a Seattle-based law firm that had filed federal cases, issued a national press release urging class members to object to or otherwise oppose the settlement.  It is well-established that such an objection campaign is prejudicial to the court's authority to proscribe the appropriate notice to the class, so Barrett moved for a Rule to Show Cause against Hagens Berman and a temporary restraining order enjoining the law firm from issuing further press releases on January 25, 2008.  *See Georgine v. Amchem Prods.*, 160 F.R.D. 478, 518 (E.D. Pa. 1995).  Judge Maki felt it appropriate to allow Hagens Berman time to respond, and therefore continued the matter to January 29, 2008.  On January 25, 2008, Barrett's counsel sent a copy of Judge Maki's order continuing the matter to Elizabeth Fegan at Hagens Berman.

That same day, January 25, 2008, RC2 filed a Motion to Stay Proceedings before this Court, explaining the Cook County litigation, the comprehensive nature of the settlement, and the appropriateness of applying the abstention doctrine to this litigation.  Rather than immediately respond to either the state-court Motion for Rule to Show Cause or RC2's Motion to Stay Proceedings, Hagens Berman filed the instant emergency motion.  Shortly thereafter, Hagens Berman filed a petition for leave to intervene in the Illinois case.  On January 29, 2008, Judge Maki denied the Motion for Rule to Show Cause.  Judge Maki has ordered the notice to

class members be postponed until he had an opportunity to entertain and consider the instant Movants' arguments against the settlement.

## ARGUMENT

The Movants seek to induce this Court to improperly use its authority to enjoin the Circuit Court of Cook County's approval of the proposed settlement. Even if this Court had the power to issue the injunction, no facts are presented that would suggest an injunction would be appropriately exercised in this instance. In reality, the Emergency Motion and Memorandum for Preliminary Injunction contain numerous misstatements of both fact and law that militate against its issuance. The settlement is fair, reasonable, and adequate, and was the product of an open and respectful process. Accordingly, this Court ought to deny the Plaintiff's Request for a Preliminary Injunction as explained below.

**I.　Postponing an explanation of Movants' misapplication of the law to justify their requested relief for Section II, Movants repeated misrepresentations of the facts surrounding the process and terms of the settlement requires a denial of their "emergency" motion.**

The Emergency Motion contains several misstatements about the settlement terms and the process employed to reach an agreement. Also, the Movants fail to disclose that their own settlement demand sought less relief than that obtained by the state court litigants.

**A.　The Emergency Motion is replete with misstatements of fact and material omissions**.

The Movants display a fundamental lack of understanding about the terms of the settlement. As detailed in attached Declaration of Jay Edelson, Movants incorrectly state that:

*　　Class members who already participated in the recalls are not entitled to cash refunds. In fact, they receive full cash refunds.

*　　Class members who no longer possess Recalled Toys are entitled to coupons or credits. In fact, such class members are entitled to cash refunds so long as they have proof of purchase.

* The Designated Claims Administrator is RC2's COO and the settlement provides no "neutral third party oversight." In fact, an independent third party firm is in charge with overseeing the claims process. Further Plaintiff may challenge the exercise of any discretionary obligations before the Special Master, even if the COO obtained the approval of the third party overseer.

* The Settlement is valued by RC2 at $4.5M. In fact, the $4.5M figure refers to the 2007 costs associated with the recalls and the resulting lawsuits and does not take into account future payout

* The Injunctive relief merely regurgitates what RC2 had already indicated to Congress it was doing. In fact, as detailed above, the State Plaintiffs obtained much broader injunctive relief, and ensured that that relief can be monitored through the auspices of the court system.

Movants similarly misconstrue the state court process. Contrary to the Movants' assertions that discovery was merely "made available," state counsel and counsel for RC2 engaged in extensive discovery. State Counsel reviewed thousands of pages of documents and conducted "tag-team" depositions of RC2's Chief Executive Officer and Products Integrity Manager. Counsel for State Plaintiffs hardly sat "idle," but rather diligently prosecuted their case from its inception. Movants likewise hide the fact that their settlement proposal also excepted personal injury claims, that the state proceedings were open to the public, that apparently numerous federal plaintiffs do not support their instant motion, and that the state class was joined by plaintiffs in four other states including Florida, Tennessee, California and New Jersey. The Movants also contend that class certification proceedings are underway, despite the docket's silence with respect to any such motion having been filed.

Movants further likely were not aware that counsel for State Plaintiff's were unwilling to negotiate with RC2 if RC2 was attempting to create a reverse auction situation and further that it almost abandoned the mediation proceedings when RC2 balked at timely meeting their discovery demands.

10

Finally on this issue, and as further explained below, the Movants' neglect to inform this Court that the settlement reached is in many ways superior to that demanded by the Movants in their formal settlement correspondence.

**B.      Using Hagens Berman's own initial demand as a benchmark, the proposed state-court settlement is reasonable, fair and adequate.**

The Federal Plaintiffs expend considerable energy arguing that the instant settlement could have been stronger. Yet, it is instructive to note that on December 10, 2007, the Federal Plaintiffs made a settlement demand that was comparable, if not weaker, to the one reached by the State Plaintiffs nearly two weeks earlier.

- The Federal Plaintiffs first demanded 80% cash refunds. The State Plaintiffs negotiated a settlement wherein class members would receive the option of 100% cash refunds or a replacement toy plus a free bonus toy.[2] According to the Federal Plaintiffs own analysis that difference alone amounts to over $6,000,000 in potential relief. See Dmd Ltr., 12-10-07, p 3 (explaining that 80% cash refunds equates to nearly $31M).

- The Federal Plaintiffs have no *cy pres* component, unlike the State Plaintiffs.

- The Federal Plaintiffs seek only one specific remedial measure, i.e. that "individual western inspectors" perform periodic inspections of the Chinese Plants. The State Plaintiffs secured a complete overhaul of Defendant's testing procedures, including enhanced auditing and testing procedures, requiring direct communication between U.S. and offshore RC2 representatives, establishing a program ensuring that Defendant can trace the source and location of any problematic toys, the purchase and use of state-of-the-art testing equipment, and the requirement that all contract manufacturers agree to comply with Defendants' testing and auditing procedures.

The only element of Federal Plaintiffs' demand that the State Plaintiffs did not secure was the reimbursement of out-of-pockets for blood testing due to the fear of lead poisoning from

---

[2] The Federal Plaintiffs fault the State Plaintiffs for failing to secure a common fund. However, given that the class members were entitled to the option of cash or replacements, a common fund would not be possible. Further, the Federal Plaintiffs' give no suggestion in their demand that any money remaining in the common fund will do anything other than revert back to the Defendant. The class is in fact better-off without such artificial limits on potential refunds.

Defendants' toys. Federal Plaintiffs have never suggested how many people spent money on blood testing, nor do they suggest how one would easily establish that a particular individual was undergoing blood testing as a result of exposure to RC2 products – as opposed to the numerous other toys that have been recalled in the past few months due to lead testing issues. Regardless, given that the State Plaintiffs secured full monetary relief, as opposed to the 40% Federal Plaintiffs seemed to be aiming for, class members will have extra money to help compensate them for whatever co-pays they incurred.

**C.     The settlement was achieved through an open and fair process.**

As described, the settlement was achieved only following substantial discovery, depositions, and lengthy mediation. These state court proceedings were far from concealed. To the contrary, the Illinois action received considerable press coverage. Class counsel for the state action discussed the matter with the press, at public symposiums attended by the legal community, and with the public. William Audet of Audet Partners, a California firm, published facts about its California action on its website. The case information was also readily available at the Clerk of Cook County website.

The Movants' repeatedly argue that RC2 failed to notify the MDL panel or this Court of the pendency of the state action. This is unpersuasive. The MDL rules only require defendants to notify the MDL court of "tag-along" actions. See JMPL Rule 7.2. Tag-along case are defined as civil actions "pending in a district court and involving common questions of fact with actions previously transferred under Section 1407." JMPL Rule 1.1. Accordingly, state actions are not covered under the JMPL rules and RC2 had no affirmative duty to notify the MDL panel. Had Movants wanted to find out if other actions were pending and, assuming they did not want to bother checking the Cook County docket, they could have simply asked RC2 either informally or

through a formal discovery request.  Movants offer no suggestion as to whether any such demand was made.

Accordingly, the Illinois settlement was achieved in an open forum.  The fact that it provides the instant Movants with an opportunity to be heard is addressed next.

**D.     The State court provides an appropriate forum for disputing the merits of the settlement.**

The Movants' position that this Court ought to enjoin the Illinois settlement is belied by the fact the law firm has filed a lengthy Emergency Petition to Intervene.  The Petition evidences an understanding that the federal counsel will have the opportunity to object and potentially re-craft the settlement agreement to the benefit of class members.[3]  Furthermore, Judge Maki has already stayed class notice pursuant to a request made by Hagens Berman attorneys.  Since the settlement is on-hold and subject to closer examination, there is little need for this Court to further prevent the progress of those proceedings.  Indeed, having filed their voluminous verified petition, it appears inconsistent for them to now ask this Court to enjoin the matter in which they have recently sought to participate.

**II.     The Anti-Injunction Act narrowly limits the grounds for a federal court to enjoin a state court.**

The Anti-Injunction Act ("AIA") restricts the Court's authority to grant the Movants' requested relief –an injunction against an Illinois Court.  28 U.S.C. § 2283 (2008) (a federal

---

[3]Courts have repeatedly rejected efforts by objectors to delay or otherwise interfere with the settlement process. *See, e.g., In re Domestic Air Transportation Antitrust Litigation*, 144 F.R.D. 421, 424 (N.D. Ga. 1992) (objectors may only 'participate in the fairness hearing w/tout undue burdening the parties or causing an unnecessary delay."); *Mars Steel v. Continental Ill. Bank & Trust*, 834 F.2d 677 (7th Cir. 1987) ("the temptation to convert a settlement hearing into a full trial on the merits must be resisted."  Indeed, the preliminary approval process is of limited nature, but specifically sets forth a procedure for class member to raise legitimate, merit-based objections. *In re NASDAQ Market-Makers Antitrust Litigation*, 176 F.R.D. 999 (S.D.N.Y 1997) (the court's evaluation is limited at the initial stage as to whether the settlement is 'within the range of possible final approval').

court "may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments"). The AIA "is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions"). *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970). "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy. [T]he fundamental principle of a dual system of courts leads inevitably to that conclusion." *Id*. at 297.

Movants' brief does not specify which of the AIA exceptions Movants seek to establish. Movants bear the burden of establishing the application of the AIA exceptions. *Texas Employers' Ins. Ass'n. v. Jackson*, 820 F.2d 1406, 1416-17 (5th Cir. 1987); *Hernandez v. SmithKline Beecham Pharm.*, No. 02-2750, 2006 U.S. Dist. LEXIS 72846, at *18-19 (D.P.R. June 6, 2006). This lack of particularity is understandable given the fact that none of the three exceptions appropriately apply here.

## A.    The first and third exceptions under the AIA cannot apply.

It is self-evident that exceptions one and three cannot be applied here. The first AIA exception is inapplicable because neither the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 118 Stat. 4 (2005) ("CAFA") nor any other legislative enactment provides a statutory basis to stay the court proceeding. Nothing in CAFA even hints at authorizing a stay of state court proceeding: "CAFA fails as an exception, because it does not place class actions within the sole province of federal courts; CAFA merely enlarges federal court jurisdiction where diversity

14

is 'minimal' and the aggregate amount in controversy is more than $ 5,000,000." *Annunziato v. eMachines Inc.*, No. 05-610, 2006 U.S. Dist. LEXIS 97020 (C.D. Cal. July 24, 2006).

Equally obvious is the lack of applicability of the third AIA exception which stays action so as to "protect or effectuate" a federal court judgment. Movants fail to identify any judgment or order that the Court might seek to protect through their requested order, and therefore do not bear the burden of establishing the third AIA exception. The third AIA exception is also called the "relitigation exception" and applies to "a party with a favorable federal judgment to protect that judgment by enjoining repetitive state court proceedings instead of relying on a claim or issue preclusion defense." *Ramsden v. AgriBank, FCB*, 214 F.3d 865, 868 (7th Cir. 2000). While "a federal court may enjoin state proceedings that attempt to readjudicate previously-decided matters," Movants do not point to any such order here. *Id*.

**B.     The only arguably applicable exception—the second exception for stays "where necessary in aid of" a federal court's jurisdiction, does not apply here.**

The only arguably applicable exception is the second exception, which implies that some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Id*.  In the years since *Atlantic Coast*, many courts have interpreted and applied the preceding language, and distilled it into a set of concrete restrictions on the second AIA exception. This case falls outside of those restrictions: the second AIA exception does not apply to the *Barrett* court's preliminary approval of the State Plaintiffs' class settlement.

The AIA's intended goal informs the limitations of the second AIA exception. The AIA represents "a limitation of the power of the federal courts dating almost from the beginning of our history and expressing an important Congressional policy–to prevent needless friction

between state and federal courts." *Okla. Packing Co. v. Okla. Gas & Elec. Co.*, 309 U.S. 4, 8-9 (1940). "Rooted firmly in constitutional principles, the [AIA] is designed to prevent friction between federal and state courts by barring federal intervention in all but the narrowest of circumstances." *Sandpiper Vill. Condo. Ass'n v. Louisiana-Pacific Corp.*, 428 F.3d 831, 842 (9th Cir. 2005). The AIA "evidences confidence in state courts." *Zurich Am. Ins. Co. v. Superior Court for Cal.*, 326 F.3d 816, 826 (7th Cir. 2003) (citation omitted).

1.      **Even if the second AIA exception applied to *in personam* litigation, it would not apply to this case.**

Courts continue to tightly regulate the application of the second AIA exception. As the Third Circuit states, the second AIA exception applies only where a state court "interfere[s] with the federal court's own path to judgment," not where the state court "threaten[s] to reach judgment first." *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 333 (3d Cir. 2007).

> [A] district court may not issue an injunction simply to be the first court to reach a judgment and thereby avoid issues of collateral estoppel: There is no reason why [a] state court cannot or should not determine issues of fact and state law relevant thereto as they come up in the state litigation. The subsequent effect of collateral estoppel, far from requiring the federal court to stay proceedings in the state court, is a result which should be welcomed to avoid the task of reconsidering issues which have already been settled by another competent tribunal.

*Ret. Sys. v. J.P. Morgan Chase & Co (In re Ret Sys)*, 386 F.3d 419, 429 (2d Cir. 2004). Recognition of closely competing federalism interests require this restraint. Where a state court *in personam* case is not "of the rare breed that is typically excepted from the Act," the AIA bars an injunction of the state court proceeding. *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 807 (9th Cir. 2002). "To hold otherwise would effectively eliminate parallel or related federal and state proceedings, a result that is at odds with our constitutional structure and the intent of the Act itself." *Id.* "[S]imultaneous federal and state adjudications of the same *in personam* cause of action do not of themselves trigger the necessary in aid exception, and the letter and spirit of the

16

Anti-Injunction Act and All-Writs Act counsel a restrictive application of that exception."
*Carlough v. Amchem Prods., Inc.,* 10 F.3d 189, 202 (3d Cir. 1993) (recognizing "deference paid
to the independence of the state courts").  This restraint holds true of class actions in state court.
"[C]lass actions are [not], by virtue of that categorization alone, exempt from the general rule
that *in personam* cases must be permitted to proceed in parallel."  *In re Diet Drugs Prods. Liab.
Litig.*, 282 F.3d 220, 236 (3d Cir. 2002) (citing *In re Glenn W. Turner Enters. Litig.*, 521 F.2d
775, 780 (3d Cir. 1975)).

**<u>a</u>.**    **<u>General rule of thumb is that second AIA exception only applies where judgment or
settlement of federal litigation is imminent.</u>**

The predominant authorities on the second AIA exception suggest a general rule of
thumb that the exception is limited to state court proceedings that threaten to disrupt imminent
judgments or settlements in federal court.  In *In re Baldwin-United Corp.*, the court found that a
"potential for an onslaught of state actions . . . threatened to seriously impair the federal court's
flexibility and authority to approve settlements in the multi-district litigation," in part because as
"no defendant in the consolidated federal actions in the present case could reasonably be
expected to consummate a settlement of those claims if their claims could be reasserted under
state laws" in another venue.  770 F.2d 328, 336-37 (2d Cir. 1985); *See also In re Diet Drugs
Prods. Liab. Litig.*, 282 F.3d at 236-237 (imminent settlement of federal case created rationale
for injunction); *Carlough*, 10 F.3d at 203 (injunction appropriate where "the prospect of
settlement was indeed imminent"); *Peters v. Brants Grocery*, 990 F. Supp. 1337, 1342-1343
(M.D. Ala. 1997) ("cases which have allowed injunctions against state court proceedings are
cases in which a judgment had been entered by the federal court or is imminent . . . or where the
federal court had spent so much time on a case that the lengthy litigation has become the virtual
equivalent of a *res*").

Indeed, some cases go further, and hold that an injunction is not appropriate without an imminent settlement or judgment. In *Retirement Systems of Alabama*, the defendants did not present evidence of a prompt settlement on the horizon, and thus failed to demonstrate the "protect[ion of] an actual or impending settlement in a federal action from being undone or thwarted by state-court litigation" justified an injunction under the second AIA exception. *Ret. Sys.*, 386 F.3d at 428. In *In re GMC Pick-Up Truck Fuel Tank Products Liability Litigation*, 134 F.3d 133 (3d Cir. 1998), the court rejected arguments for an injunction against state court proceedings under the AIA because "[t]here is no classwide settlement pending before the district court . . . and no stipulation of settlement or prospect of settlement in that court is imminent." *Id.* at 145. *See also Sandpiper*, 428 F.3d at 845-846 (injunction was not available in case where settlement was approved long ago and district court's role was simply to enforce settlement, unlike case where "competing state class action covering a portion of the federal class posed a significant danger to the delicate and transitory process of approving a settlement agreement").

**b.** **Courts may consider massive investments of judicial resources when applying the second AIA exception, but no such investments are present here.**

A number of courts have articulated or considered factors beyond imminent settlements as qualifications for the second AIA exception. These cases are best characterized as considering a) the investment of judicial resources in the federal cases, and b) the potential damage to that investment the state court proceedings may cause. Under these cases, the second AIA exception is applied to protect extraordinary investments of judicial resources. The Third Circuit articulated this point best:

18

> Complex cases in the later stages – where, for instance, settlement negotiations are underway – embody an enormous amount of time and expenditure of resources.  It is in the nature of complex litigation that the parties often seek complicated, comprehensive settlements to resolve as many claims as possible in one proceeding.  These cases are especially vulnerable to parallel state actions that may "frustrate the district court's efforts to craft a settlement in the multi-district litigation before it . . . thereby destroying the ability to achieve the benefits of consolidation. . . . [W]here settlement is pending, the challenges facing the overseeing court are such that it is likely that almost any parallel litigation in other *fora* presents a genuine threat to the jurisdiction of the federal court.

*In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d at 236.  In that case, the MDL transferee court consolidated "over two thousand cases," the certified class "comprised six million members," the transferee court "entered well over one thousand orders in the case" over "two years of exhaustive work by the parties and the District Court."  *Id.*  "[K]eeping this enormously complicated settlement process on track required careful management by the District Court.  Any state court action that might interfere with the District Court's oversight of the settlement at that time, given the careful balancing it embodied, was a serious threat to the District Court's ability to manage the final stages of this complex litigation."  *Id.* at 236-37.  Under these circumstances, an injunction was appropriate.  Likewise, *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877 (11th Cir. 1989) involved "approximately seven years of litigation over complicated antitrust issues," "several weeks of court hearings," "200 depositions," "2.5 million policies, more than 1 million policyholders and about 300 funeral home operators in the state."  *Id.* at 880-81.  Where the case "involv[ed] years of litigation and mountains of paperwork," *Battle* affirmed that the district court's treatment of the case as a *res*, subject to injunctive relief under the AIA.  *Id.* at 882.  "[A]ny state court judgment would destroy the settlement worked out over seven years, [and] nullify this court's work in refining its Final Judgment over the last ten years . . ."  *Id.*  Conversely, where the difficulties posed by resolving a class action consume fewer resources, "are different in kind[,] and smaller in magnitude . . . the second exception to the Anti-Injunction

19

Act does not apply." *Bayshore Ford Trucks Sales, Inc. v. Ford Motor Co.*, 471 F.3d 1233, 1253 (11th Cir. 2006). *See also Sandpiper Vill.*, 428 F.3d at 845-46. Similarly, here, the relatively modest investment of judicial resources in the Movants' case cannot justify the injunction they seek.[4]

**c.** **The only cases cited by Movants are minority cases that are readily distinguishable.**

Movants' proceeding has not progressed to the point where a settlement is imminent, and so they cannot seek an injunction under the mainstream cases cited above. Movants' proceeding hardly involves the massive investment of judicial resources discussed above and so cannot seek an injunction under those grounds. Movants are left with disparaging the Illinois courts and accusing State Plaintiffs' counsel of conducting a reverse auction, in an effort to apply *In re Managed Care Litig.*, 236 F. Supp. 2d 1336, 1339 (S.D. Fla. 2002) and *In re Lease Oil Antitrust Litig.*, 48 F. Supp. 2d 699, 703 (S.D. Tex. 1998). There are several significant distinguishing factors here. First, *In re Managed Care Litigation* and *In re Lease Oil Antitrust Litigation* involved parties who were "deliberately using [a state court] forum to circumvent a pending settlement agreement in the enjoining court." *Grider*, 500 F.3d at 330. There is no corresponding settlement between RC2 and Movants here. Second, "there is no evidence of any collusion or wrongdoing" by RC2. *Id.* at 332. As in *Grider*, the *Barrett* settlement is the result of extensive mediation. *Id.* In contrast, the defendant in *In re Managed Care Litigation* sought to settle national class claims in another district court after the MDL transferee court had been managing the consolidated case for two years. The proposed settlement was accomplished

---

[4] Without disparaging or discounting the work performed by this Court and the various MDL counsel, a review of the record shows that aside from defending against a Motion to Dismiss, the thrust of the federal litigation has concerned the consolidation of the several cases before the Court and the filing of amended pleadings. Meanwhile, discovery and settlement have been comparatively minimal.

through "underhanded maneuvers . . . [The defendant] snookered both this Court and [the judge who approved the proposed settlement in the non-transferee court] in an obvious attempt to avoid this Court's jurisdiction.  [The defendant] settled the claims of this Court's Plaintiff class and yet seeks approval from another judge in Illinois without informing that judge, apparently, of the proceedings in this case."  *Id*. at 1342.  Unlike the other judge in *In re Managed Care*, Judge Maki of the Illinois court was fully informed of the progress of the federal case.  Moreover, RC2 complied with all the JPML rules – it had no obligation to disclose the *Barrett* proceeding in Illinois state court, because it was not a federal case.  JPML Rule 1.1 ("'tag-along action' refers to a civil action pending in a district court"); *In re Managed Care Litig.*, 236 F. Supp. 2d at 1342 n.6 (JPML Rule 7.5(e) applied only once state case had been removed to federal court).  The *Barrett* litigation does not involve any of the underhanded dealing that marked *In re Managed Care*.  Moreover, state court class action settlements cannot be subject to a presumption of collusiveness any more than a settlement in federal court, without doing lasting harm to our federalist system.

In *In re America Online Spin-Off Litig*., MDL 04-1581, 2005 U.S. Dist. LEXIS 45625 (C.D. Cal. May 9, 2005), the state-case was completely unrelated and was used simply as a vehicle to extinguish federal-filed claims.  Unlike movants, the federal AOL plaintiffs were in the midst of "extensive" settlement negotiations with a mediator and had completed significant litigation activity.  *Id.,* at 12.  The defendants then abruptly abandoned those negotiations, and struck a deal to extinguish the federal court claims "in a completely unrelated . . . state court action," obtaining no compensation for those claims.  *See, id.*, at 9-10.  And, unlike in the instant case, defendants ignored a local rule mandating that the defendants notify the Court of any related state-filed cases.

Conversely, *In re Lease Oil Antitrust Litigation* presented a slightly different issue. In that case, the court found that a state court class action settlement purporting to settle state and federal antitrust claims was impermissible. "[F]ederal law confers exclusive jurisdiction over federal antitrust claims in federal courts . . . To allow these federal claims to be 'hijacked' by a global settlement in state court--where the claims could not even be adjudicated--would effectively destroy those federal rights and the federal procedures designed to safeguard them and to enable their orderly resolution." *Id.* at 703. To the best of the State Plaintiffs counsel's knowledge, none of the claimants against RC2 assert any federal claims, let alone claims that can Only be litigated in federal court.[5] This is a straightforward consumer fraud case, and the federalism principles at issue in *In re Lease Oil* are not applicable.

Movants' motion is best understood as an attempt by Movants' counsel to recoup their investment in this case. *Cf. In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 196 (3d Cir. 2005) ("best approach is to view [filing] complaints as entrepreneurial effort[]: each firm's complaint is the price of admission to a lottery that might result in it being named lead counsel"). However, even where "significant resources have been invested in [this] litigation . . . there is simply no support for the proposition that a court may enjoin parties from participating in or reaching a bona fide settlement in another federal court that may dispose of claims before it – particularly when there is no pending settlement in the enjoining court . . ." *Grider*, 500 F.3d at 331. There is no reason to presume that the *Barrett* settlement is collusive, disadvantageous, or inadequate simply because it disappoints the commercial expectations of the Movants' counsel. *See Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277, 283-84 (7th Cir. 2002) (state court class

---

[5] It is worth noting that the MDL interim lead counsel, including Hagens Berman and the Foote firm, have settled numerous nation-wide class actions in state courts throughout the past several years.

22

representatives may be any more vigorous class representatives than their federal court counterparts). Rather, the *Barrett* settlement must be evaluated on its own terms, and the State Plaintiffs' right to proceed in Illinois state court should be evaluated in light of that settlement.

That is especially true given the history of the settlement. Unlike in the cases cited by Movants, the State Plaintiffs made significantly more progress than Movants did. They reviewed thousands of pages of documents, deposed key witnesses, and were they only ones who were actively involved in negotiations.

**2.    Movants' proposed remedy is not supported by the law.**

Movants seek a sweeping remedy, unsupported by the law. (Mov.s' Br. 24 ("Plaintiffs respectfully request this Court to enjoin Defendants . . . from pursuing, entering, negotiating, executing, or enforcing any settlement of any claims presented in this action without the express approval of this Court"). Even if the Court found that it was appropriate to enter an injunction in this case, it would not be appropriate to enter the injunction Movants seek. "[T]he fact that an injunction *may* issue under the Anti-Injunction Act does not mean that it *must* issue. . . . Specifically, principles of comity, federalism, and equity always restrain federal courts' ability to enjoin state court proceedings." *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 369 F.3d 293, 306 (3d Cir. 2004) (emphasis in original). "The proper tailoring of injunctive relief is especially important when principles of federalism are involved." *Id*. at 307. As with any injunction, an injunction under an exception to the AIA "must be commensurate with the wrong it is crafted to remedy." *Id*. There is no need for an injunction where Movants have already intervened in the *Barrett* proceeding before the Illinois court, and the Illinois court has continued the notice under the preliminary settlement. Movants have an opportunity to be heard in the Illinois forum, and appear to be taking full advantage of that

opportunity. Under these circumstances, the requested injunction will only work harm on the

federalism principles which the AIA balances, without any countervailing benefit. Likewise, an

injunction under an exception to the AIA "must also be supported by the traditional equitable

requirements such as irreparable harm for which there is no adequate remedy at law." *Zurich*

*Am. Ins. Co.*, 326 F.3d at 825; *see also In re Managed Care Litig.*, 236 F. Supp. 2d at 1344-45

(finding irreparable harm). Movants cannot establish irreparable harm where they have adequate

remedies either as intervenors or as objectors to the Barrett settlement. *Cf.* 735 ILCS 5/2-804

(2008) (providing for intervention and objection to class judgments and settlement) *with Grider*,

500 F.3d at 332 (objection procedure under Federal Rule 23(e) was adequate remedy of law

which precluded injunction).

## CONCLUSION

The Movants have filed with the state court a host of documents, including pleadings

challenging the terms and conditions of the settlement. With the state court already engaged in

such an expedited review of the Movants' objections to the settlement, the issuance of the

extraordinary relief sought by Movants is moot and would only unnecessarily interfere with the

state court's sovereignty, dishonor principles of federalism, and violate the Anti Injunction Act.

In view of the lack of any factual or legal support for the Movants' "emergency" motion, this

Court should not enjoin the ongoing state proceedings. To do so would only set a precedent that

the all writs act is an effective shortcut for counsel in a federal case to derail a state settlement

based solely on falsehoods and innuendo.

WHEREFORE, Byron Barrett, the real party in interest, respectfully requests this

Honorable Court deny the "Emergency Motion for Injunction Pursuant to the All Writs Act and

for such additional relief as this Court deems necessary and just.

Respectfully submitted

BYRON BARRETT, the real party in interest, individually, and on behalf of all others similarly situated,


 s/Ethan Preston

One of the Plaintiff's attorneys


State-Appointed Class Counsel
Jay Edelson (No. 6239287)
Ethan Preston (No. 6278271)
Scott A. Kamber, *pro hac vice pending*
KAMBEREDELSON LLC
53 West Jackson Bvld., Suite 1530
Chicago, Illinois 60604
(312) 589-6370

William M. Audet
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105

State-Appointed Liaison Counsel
Gino L. DiVito
TABET DIVITO & ROTHSTEIN LLC
180 North LaSalle Street, Suite 1510
Chicago, Illinois 60601
(312) 762-9450