# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| IN RE RC2 CORP. TOY LEAD PAINT | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | Case no. 07 CV 7184 |
| | ) | |
| | ) | MDL no. 1893 |
| | ) | |
| | ) | The Honorable H. Leinenweber |
| _____ | ) | |

## DECLARATION OF JAY EDELSON

I, Jay Edelson, certify under oath and penalty of perjury, that the following statements are true and correct, except to those matters herein stated to be made upon information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true:

1.   I am the co-founder and managing partner of the Chicago office of KamberEdelson, LLC. I also serve as the court-appointed Lead Counsel for the class in the above-referenced case. A copy of KamberEdelson LLC's resume is attached hereto as Exhibit 1.

2.   I filed a state court action entitled *Barrett v. RC2 Corp.*, No 07 CH 20924, in Cook County, Illinois.

3.   I was told by colleagues that that, shortly after the Barrett case was filed, it was publicized in the Chicago Daily Law Bulletin as the "case of the day."

4.   Since the filing of our suit, I spoke openly to the press, the public, and to the legal community (at symposiums or other similar talks) about having filed a case against RC2 involving the toy recalls.

5.   Co-lead counsel William Audet, who filed a similar action in California, publicized his lawsuit on his firm's website www.audetlaw.com.

6.   In October 2007, the parties retained the Honorable Robert Boharic (ret.) to serve as a mediator in this action. For Barrett, Gino DiVito, William Audet, Scott Kamber, and Jay Edelson attended the mediations.

7.   At the start of the mediation process, I asked for assurances that defendant was not engaged in any settlement discussions with other counsel. I received oral, and later written, assurances of the same. At no time did RC2 ever suggest that if we could not reach an agreement, it would negotiate with other counsel.

8.   I also informed the mediator and RC2 that I was unwilling to make a settlement offer until we had completed the necessary discovery.

9.    Over the next two months, we had three formal mediation sessions with Judge Boharic. During those sessions, Judge Boharic first helped the parties agree on a discovery plan, which included both depositions and document production.

10.   At one point in the mediation process, I was forced to inform Judge Boharic and/or his staff that I was unwilling to continue participating in the mediation given that I was not receiving the agreed-upon discovery.  Ultimately Judge Boharic and/or his staff, after extensive communications with both me and RC2 helped me secure the information I felt I needed, which resulted in moving forward with the mediation.  Had we not received this discovery, I was prepared to terminate the mediation and cease settlement discussions.

11.   Ultimately, my colleagues and I reviewed thousands of pages of documents, including internal test results, correspondence with the government about all phases of the recalls, timelines, the customer complaints that triggered the initial recall, and product pricing information.

12.   We then conducted depositions of defendant's Chief Executive Officer and senior safety officer.  There were no limitations on the scope of those depositions and defendant permitted three separate plaintiffs attorneys (including me) to conduct the examinations.

13.   After plaintiff completed the discovery process, we, at a mediation session with Judge Boharic, made a comprehensive settlement demand on all issues, save attorneys' fees and incentive awards.

14.   With Judge Boharic's help, the parties negotiated all aspects of the class relief, until we were able to reach an agreement in principle.  Only after that agreement was reached did the parties begin to negotiate attorneys' fees and incentive awards.

15.   I received from RC2, within the last week, a letter that purports to be a settlement demand from the *Hesse* counsel (the instant Movants) and is dated December 10, 2007.   See "Letter of Dec. 10, 2007," a copy of which is attached as Exhibit 2.

16.   December 10, 2007 was approximately two weeks after we reached an agreement in principle with RC2 and it, in no way, factored into any settlement issues.

17.   The federal class plaintiff's Emergency Motion for an a Preliminary Injunction Pursuant to the All Writs Act contains numerous false and misleading statements regarding the nature of the settlement and the process employed to achieve the settlement.  See "Chart of Misrepresentations," attached as Exhibit 3.

18.   Even where Movants have accurately described the terms of the settlement, their comments are misleading insofar as they fail to apprise the Court that their initial settlement demand contained less favorable terms.

19.     Prior to Movants' filing their motion, State Plaintiffs and RC2 realized that there was a potential ambiguity in the settlement agreement.  Although it is clear that the Parties contemplated that such class members would receive cash refunds (see, e.g., Settl. Agr., 14 providing that "Class Members who have already returned recalled Settlement Toy Produces and received replacement products in the recall process are not eligible for the Toy exchange.", while containing no such carve out for cash refunds), the Parties filed a motion to amend the settlement to avoid any potential confusion.  See Agreed Motion to Amend Settlement Agreement, Claim Form and Notice to Class Members attached as Exhibit 4.

Further Affiant Sayeth Not.

Dated this 30th day of January, 2008.

/s/ Jay Edelson
Jay Edelson

### KAMBEREDELSON, LLC -- FIRM RESUME

In 2007, two nationally recognized plaintiffs' class action firms - Blim & Edelson, LLC and Kamber & Associates, LLC - merged to form KamberEdelson, LLC. KamberEdelson has attorneys in New York, Los Angeles, and Chicago.

KamberEdelson focuses its practice on all types of plaintiff's-side class and mass actions, and has ten primary practice areas:

* "New technology" class actions;
* Privacy class actions
* Products liability class actions
* Privacy class actions;
* Securities class actions;
* Mass tort class and mass actions;
* Consumer class actions;
* Insurance class actions;
* Antitrust cases; and
* International arbitrations

The firm's cases frequently involve important legal issues, and regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including on ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States.  We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## ATTORNEYS

**SCOTT A. KAMBER** is a founding member of KamberEdelson and managing member of its New York office. Mr. Kamber specializes in technology-related litigation and representing individuals and businesses domestically, as well as in complex international matters. Mr. Kamber has an extremely diverse practice before federal and state courts throughout the United States and arbitration panels abroad, with clients ranging from individuals to multinational corporations to classes of consumers and investors. Mr. Kamber and his firm regularly serve in leadership roles in numerous litigations including suits on behalf of shareholders, consumers and private corporations in the United States and abroad. Experienced in law and business, Mr. Kamber has a proven track record of addressing a client's needs in an individualized manner.

Mr. Kamber has served as class counsel in dozens of class actions in state and federal courts throughout the United States.  Presently, Mr. Kamber is litigating nationally prominent class actions such as In re Menu Foods (D.NJ.); Johnson et al. v. Microsoft(W.D.WA); Elvey et al. v. Ameritrade (N.D.CA); In re Network Commerce

Securities Litigation (W.D.WA); In re ATI HDCP Litigation (N.D.CA); In re Power Plug Litigation (Hewlett Packard) (N.D.CA); and In re GM Onstar Litigation (E.D.MI). Mr. Kamber has served as lead counsel and in other leadership roles for numerous class actions that have achieved significant results, including In re Sony BMG CD Technologies (ground-breaking settlement providing injunctive relief and refunds to customers who purchased music CD's which could compromise computer security): Wormley v. GeoCities (consumer class action for privacy violations that is believed to be the first internet privacy case to recover a benefit for impacted class members); In re Starlink Growers (represented sub-class of farmers who grew Starlink in a consolidated settlement of federal class action valued in excess of $100 million); In re Loch Harris (derivative action that successfully obtained dissolution of corporation and distribution of assets to shareholders); In re Command Systems (securities class action in which participating shareholders recovered over 80% of their losses); and In re WebTV (consumer class action for false advertising). In addition to these commercial litigations, Mr. Kamber has been involved in the efforts of African torture victims to bring their persecutors to justice under the Alien Tort Claims Act and has achieved significant decisions for his clients before the United States Court of Appeals for the Second Circuit and the Southern District of New York. One such result, Cabiri v. Ghana, 165 F.3d 193 (1999), is a leading Second Circuit case under the Foreign Sovereign Immunities Act.

Mr. Kamber graduated cum laude from University of California, Hastings College of the Law in 1991 where he was Order of the Coif, Articles Editor for Hastings Constitutional Law Quarterly and a member of the Moot Court Board. Mr. Kamber graduated with University and Departmental Honors from The Johns Hopkins University in 1986. Mr. Kamber has extensive courtroom experience and has tried over 15 cases to verdict. Prior to founding Kamber & Associates, LLC, Mr. Kamber represented both plaintiffs and defendants in a wide range of commercial litigation. Mr. Kamber is admitted to practice in the State of New York as well as the United States Supreme Court, the United States Court of Appeals for the Second Circuit and Eighth Circuit, and the United States District Courts for the Southern and Eastern Districts of New York. In addition, Mr. Kamber is well-versed in the procedures and practice of numerous arbitration forums, both domestic and international. Prior to practicing law, Mr. Kamber was a financial consultant.

**JAY EDELSON** is a founding member of KamberEdelson.  He has served as lead counsel in over 40 class actions, resulting in hundreds of millions of dollars in relief for his clients.  In February of 2007, the Chicago Sun Times nicknamed Mr. Edelson the "Spam Slammer" after he secured the first settlement of a suit under the Telephone Consumer Protection Act for the alleged transmission of unsolicited text messages.  Later that same year, a leading legal publication recognized Mr. Edelson a "class action master," based on his success over the years.

Mr. Edelson has been involved in a number of high-profile "mass tort" class and mass actions, including ones against Menu Foods for selling contaminated pet food, and suits involving damages arising from second hand smoke.

Mr. Edelson is frequently asked to participate in legal seminars and discussions regarding

the cases he is prosecuting. He has also appeared on dozens of television and radio programs to discuss his cases. In April of 2007, Mr. Edelson provided testimony to the Subcommittee on Agriculture Appropriations, Senate Committee on Appropriations, U.S. Senate Hearing on "Pet Food Contamination" in connection with one of the class action cases he is prosecuting. Mr. Edelson consults with the University of Chicago Medical Center and the Pritzker School of Medicine on internet and legal ethics issues and has been a guest lecturer at a number of law schools.

Mr. Edelson is a 1994 graduate of Brandeis University and a 1996 graduate of the University of Michigan Law School.

**ALAN HIMELFARB** is a member of KamberEdelson. Mr. Himmelfarb was admitted to the practice of law in California in July, 1979. At that time, at the age of 23, he was the youngest member of the California Bar. Within five years, he became managing attorney of a law firm employing six attorneys and a support staff of ten. He specialized in complex litigation, contracts, high technology, foreign licensing, and foreign technology transfers, and practiced before both state and federal courts. In 1988, he took a position overseas as a foreign legal consultant in Asia. In this capacity, he acted as chief negotiator for international sales/service/technical transfer agreements, mediated cross-cultural (Asian--Western) business and governmental interests, evaluated international business/marketing strategies for multinational corporations, drafted and negotiated a full range of international transactional agreements for Korean, European and American corporations and businessmen and marketed legal services to Korean domestic market and international community. In 1992, Mr. Himmelfarb returned to Los Angeles in the capacity of a litigator, with an emphasis on plaintiff's work against banks and other financial institutions. He has been engaged in class action litigation since 1994.

**ETHAN PRESTON** is a member of KamberEdelson. Mr. Preston focuses on consumer technology, and concentrates his practice in antitrust/competition issues and information security issues. Mr. Preston has taken substantial leadership roles in numerous class action lawsuits.

Mr. Preston has authored the following law review articles: Cross-Border Collaboration by Class Counsel in the U.S. and Ontario, 4 Canadian Class Action Rev. 164 (2007), The Global Rise of a Duty to Disclose Information Security Breaches, 22 J. Marshall J. Computer & Info. L. 457 (2004) (with Paul Turner), Computer Security Publications: Information Economics, Shifting Liability and the First Amendment, 24 Whittier L. Rev. 71 (2002) (with John Lofton), and The USA PATRIOT Act: New Adventures in American Extraterritoriality, 10 J. Fin. Crime 104 (2002). Mr. Preston has lectured on copyright issues at the University of Illinois at Chicago, and on comparative law on attorneys' fees and costs for the Center for International Legal Studies.

Mr. Preston is admitted to practice before the Northern District of Illinois, the District of New Mexico, and Illinois state courts. Mr. Preston is an inactive member of the New Mexico state bar.

Mr. Preston received his Bachelor of Arts degree with honors from the Plan II honors program at the University of Texas at Austin, and his J.D. with distinction from the Georgetown University Law Center in 2001.

**MYLES MCGUIRE** is a Senior Counsel at KamberEdelson. His practice concentrates on consumer protection law and class actions. Mr. McGuire directs many of the firm's cases involving electronic commerce, cellular telephony and wireless media. He has had key roles in numerous cases, including a groundbreaking settlement with Facebook, Inc. involving the alleged transmission of unauthorized text messages. He has also successfully prosecuted class actions involving commerce transacted over cell phones, as well as more traditional consumer class actions involving health clubs and home alarm installation companies.

Mr. McGuire received his B.A. and J.D. from Marquette University in 1997 and 2000, respectively and is admitted to practice in Wisconsin and Illinois. He is a member of the National Association of Consumer Advocates and the Chicago Bar Association. Prior to working as a class action attorney, Mr. McGuire spent several years counseling high-tech companies.

**STEVEN W. TEPPLER** is a Senior Counsel at KamberEdelson. Mr. Teppler concentrates his practice on data protection and information technology law, including electronic discovery, loss or destruction of information, authentication and admissibility issues uniquely inherent to computer generated information, including spoliation issues arising from unauthorized or illegal data manipulation or alteration.

Mr. Teppler has authored over a dozen articles relating to information technology law and routinely presents his work at conferences. He is the Co-Vice-Chair of the American Bar Association Information Security Committee as well as the Florida Bar's Professional Ethics Committee.

Mr. Teppler graduated from the Benjamin N. Cordozo School of Law in 1980 after earning his B.A., *summa cum laude*, from the City College of New York in 1977.

**DANA B. RUBIN** is an associate at KamberEdelson focusing her practice on a wide range of class action issues. She graduated with honors from the University of Maryland, College Park in 1993. She received her J.D. in 1999 from Fordham University School of Law, where she was an Associate Editor on the Intellectual Property, Media & Entertainment Law Journal.

Prior to joining KamberEdelson, Ms. Rubin played a role in numerous private and class actions on behalf of shareholders and consumers. Ms. Rubin has also represented both plaintiffs and defendants in employment litigation and civil rights matters. Ms. Rubin is admitted in the State Courts of New York and the United States District Courts for the Southern and Eastern Districts of New York. She is a member of the New York State Bar Association.

**JENNIFER H. FELDSCHER** is an associate at KamberEdelson.  Ms. Feldscher was previously a litigation associate at Lewis, Brisbois Bisgaard & Smith, LLP, where she concentrated her practice on all areas of complex commercial litigation.

Ms. Feldscher is a 2001 graduate of Georgetown University School of Law and a 1998 graduate of Brown University.  She is a member of the New York State Trial Lawyers Association and the American Bar Association.

**STEVEN LEZELL** is an associate at KamberEdelson.  Mr. Lezell has tried a number of bench trials, engaged in extensive motion practice from routine to complex , written appellate briefs, litigated class action matters and arbitrated cases.

Mr. Lezell received his J.D. at Chicago-Kent College of law with High Honors in 2005. Mr. Lezell received certificates in litigation and alternative dispute resolution and was awarded Order of the Coif. He was president of the Student Bar Association and Notes and Comments Editor for the Chicago Kent Law Review. Mr. Lezell also presented Chicago-Kent at the National Sports Law Moot Court Competition in New Orleans in 2004 and received the ABA-ALI Scholarship and Leadership Award, for best representing the combination of leadership and scholarship in his graduating class. Mr. Lezell also received the Lowell H. Jacobson Memorial Scholarship which is awarded every year to the strongest law student in the Seventh Circuit. Mr. Lezell received his B.A. in political science, with Distinction, from the University of Michigan in 2002.

**ELIZABETH MACKEY** is as associate at KamberEdelson.   Upon graduation from law school, Ms. Mackey clerked for Judge Vergeront at the Wisconsin Court of Appeals and then moved on to an internship at a U.S.A.I.D. project at the Ministry of Trade in Indonesia, where she wrote briefing notes on World Trade Organization reports, worked with Indonesian lawyers on the Ministry's official English translation of Indonesia's new investment law, and reviewed proposed agreements between ASEAN nations.

Ms. Mackey graduated magna cum laude from the University of Illinois College of Law in 2005.  She has a B.A. from Grinnell College and a Masters of Arts from the University of Illinois at Chicago.  In November of 2006, Ms. Mackey presented her paper *entitled The Effect, or Lack Thereof, of Wealth on Well-Being, and the Implications for Law and Economic Development,* Joint Seminar, Hasanuddin University and Malaysian National University, The Malayness of Indonesia and Malaysia, Hasanuddin University, Makassar, Indonesia.

**STUART D. WECHSLER** is Of Counsel to KamberEdelson. The efforts of Mr. Wechsler in the area of securities litigation have received considerable judicial comment. U.S. District Court Judge Alvin K. Hellerstein commented in Doney v. Command Systems, (98 Civ. 3279), in an opinion dated August 10, 1999, "I don't think it needs my comment to note that, Mr. Wechsler, you are a senior and most respected and most competent member of the securities class action bar. I would take it as a given your hours are worth the rates that you charge and that the hours that you have put in reflect the efficiency with which you work." In a report dated May 23, 1977, in Bucher v. Shumway,

76 Civ. 2420 (S.D.N.Y.), United States Magistrate Leonard Bernikow stated that "Stuart Wechsler . . . is a leading expert in securities class action litigation." Mr. Wechsler also led the team of attorneys that successfully prosecuted the class action, Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979), to a landmark decision in federal civil procedure. He was also the responsible partner in Van Gemert v. Boeing, one of the earliest actions maintained as a class action under the then newly amended Federal Rules of Civil Procedure and one of the very few securities class actions ever to go to trial and judgment. Moreover, Mr. Wechsler played an integral role in obtaining a landmark Supreme Court decision in an important phase of that action. See Boeing Co. v. Van Gemert, 444 U.S. 472 (1980).

Mr. Wechsler was admitted to the bar 1958, New York; Supreme Court; U.S. Court of Appeals, Second, Third and Fifth Circuits; U.S. District Court, District of Arizona; U.S. District Court, Western District of Michigan. Education: University of Pennsylvania (B.S., 1953); Yale University (J.D., 1955). Editor: "Prosecuting and Defending Stockholder Suits," Practicing Law Institute, Nov., 1973. Author: "The Securities Acts Amendments of 1964," Stock Market Magazine, November, 1964; "Notice to Debenture Holders," The Review of Securities Regulation, April 15, 1976. Chairman: PLI Programs regarding class actions and stockholder suits, 1970-1977, "New Trends in Securities Litigation," 1977-79 and "Exemptions from Registration: Spinoffs-Shells and other Devices," 1970. Faculty Member, Columbia Law School Continuing Education Programs, 1979-1982. Chairman: Practicing Law Institute program, "Stockholder Suits and Class Actions," 1986; University of Virginia seminar, "Trial of a Securities Case," 1989. Lecturer, Panels on Securities Litigation and Class Actions, American Bar Association, 1975; ALI-ABA Study Course, Civil Rico Member, Board of Directors, Concert Artists Guild, 1982-1984. Member, Board of Editors, "Class Action Reports," 1977. Chairman, Securities Law Committee, Federal Bar Council, 1980-1985. Member, Committee on Second Circuit Courts of the Federal Bar Council, 1986. Member: American Bar Association; Federal Bar Council.

**JOHN BLIM** is Of Counsel to KamberEdelson. Mr. Blim is a graduate of Northwestern University School of Law, where he received his J.D. degree cum laude in 1994 and was elected to the Order of the Coif. He served as an associate articles editor on the Northwestern University Law Review from 1993 to 1994. Mr. Blim was also a member of the winning team and voted Best Speaker in the law school's moot court competition. From 1994 to 2000, he was a litigation associate at nationally recognized law firms, including Sidley & Austin.

Mr. Blim has published articles in major legal journals, and his writing has been described as "thoughtful commentary" by a leading treatise on constitutional law. Before attending law school, John earned his Ph.D. in English literature from Northwestern University, where he was also a lecturer in the school's English department.

State and federal courts have appointed Mr. Blim as class counsel in numerous class action cases collectively benefiting millions of individuals.

**Notable Cases**

Our members have taken leading roles in the following cases:

"NEW TECHNOLOGY" CONSUMER PROTECTION CLASS ACTIONS

In re Sony BMG CD Technologies, 1:05-cv-09575-NRB (S.D.N.Y.)
Co-lead counsel in suit alleging that defendants' "rootkit" technology encoded into music
CDs harmed users computers and computer software.  Settlement was valued at over
$300 million.

Shen v. Distributive Networks LLC. No. 06 C 4403 (N.D.Ill.)
Co-lead counsel in a class action alleging that defendant violated federal law by sending
unsolicited text messages to the cellular telephones of consumers throughout the country.
The settlement - which is the first of its kind in the country - provided each class member
with up to $150 in cash.

Zurakov v. Register.com, No. 01-600703 (N.Y.Cty, New York)
Co-lead counsel in a class action brought on behalf of an international class of over one
million members against Register.com for its deceptive practices in registering internet
domain names.   In November, 2003, the New York Supreme Court (trial division)
granted final approval of a settlement that required Register.com to fully disclose its
practices and provided the class with a relief with a collective face value in excess of $17
million.

Abrams v. Facebook, Inc., No. 07-5378 (N.D.Cal.)
Sole counsel is class action alleging that defendant's text messaging platform – which
sent upwards of one million text messages per day – resulted in unintended recipients
receiving numerous text messages, including some which contained adult content.  The
case settled in December of 2007.

Kiesel v. Time Warner No. 809542 (Orange County Sup. Ct.)
Co-lead counsel in a representative action on behalf of thousands of apartment and
condominium residents in which firewalls were breached during cable installation. The
settlement provided the class with complete relief including the inspection of every multi-
unit dwelling in the affected county and repair of all breached units wherever they were
found.

Weaver v. Webtv No. 793551 (Santa Clara Sup Ct.) co-lead counsel in a certified
nationwide consumer class action case alleging consumer fraud / deceptive advertising of
computer services and capabilities. The settlement provided the class with a collective
award with a guaranteed minimum face value of six millions of dollars.

PRIVACY CLASS ACTIONS

Wormley v. GeoCities, No. 196032 (Los Angeles Sup. Ct.)
Class Counsel in consumer class action for privacy violations that is believed to be the
first internet privacy case to recover a benefit for impacted class members

Elvey v. TD AMERITRADE Inc. (N.D.Cal.)
Pursuing class action against an Internet-based securities broker for failing to disclose a
security breach which involved customer names and email addresses for over 6 million
accounts.


PRODUCTS LIABILITY CLASS ACTIONS

In re Pet Food Product Liability Litig., 1:2007cv02867 (D.N.J.)
Co-lead counsel in prosecution of products liability class action arising from largest pet
food recall in U.S. history.

In re Starlink Corn Products Liability Litigation (N.D.Ill.)
Represented sub-class of farmers who grew recalled Starlink corn in a consolidated
settlement of federal class action valued in excess of $100 million.

Kan v. Toshiba America Information Systems, Inc. No. BC327273 (Los Angeles Sup.
Ct.)
Class counsel in a defective product / breach of warranty action concerning laptop
computers. The settlement provided the class with a collective award with a face value of
approximately $45,000,000.

SECURITIES CLASS ACTIONS

Stassi et al. v. Loch Harris et al., No. GN 200180 (Tex)
Brought derivative action on behalf of technology development company that
successfully obtained dissolution of corporation and distribution of assets to shareholders.

In re Command Systems, Case No. 98-cv-3279 (S.D.N.Y.)
Brought securities class action against technology company in which participating
shareholders recovered over 80% of their losses.

MASS/CLASS TORT CASES

Aaron v. Chicago Housing Authority, 99 L 11738, (Cook County, Illinois)
Part of team representing a group of public housing residents bringing suit over
contamination-related injuries.  Case settled on a mass basis for over $10,000,000.

Sturman v. Rush Presbyterian-St.Luke's Medical Center, 2000 L 11069 (Cook County,
Ill.)
Part of team of attorneys in suit against hospital and national association of blood banks
alleging failure to warn of risks of hepatitis C infection as a result of past blood

transfusions.

Januszewski v. Horseshoe Hammond, No. 2:00CV352JM (N.D.Ind.)
Part of team of attorneys in mass suit alleging that defendant riverboat casino caused
injuries to its employees arising from exposure to second-hand smoke.

GENERAL CONSUMER PROTECTION CLASS ACTIONS

Pulcini v. Bally Total Fitness Corp., No. 05 CH 10649 (Cook County, Ill.)
Co-lead counsel in four class action lawsuits brought against two health clubs and three
debt collection companies.  A global settlement provided the class with over $40 million
in benefits, including cash payments, debt relief, and free health club services.

Kozubik v. Capital Fitness, Inc., 04 CH 627 (Cook County, Ill.)
Co-lead counsel in state-wide suit against a leading health club chain, which settled in
2004, providing the over 150,000 class members with between $11 million and $14
million in benefits, consisting of cash refunds, full debt relief, and months of free health
club membership.

Kim v. Riscuity, No. 06 C 01585 (N.D.Ill)
Co-lead counsel in suit against a debt collection company accused of attempting to
collect on illegal contracts.  The case settled in 2007, providing the class with full debt
relief and return of all money collected.

Jones v. TrueLogic Financial Corp., No. 05 C 5937 (N.D.Ill)
Co-lead counsel in suit against two debt collectors accused of attempting to collect on
illegal contracts.  The case settled in 2007, providing the class with approximately $2
million in debt relief.

Chancer v. Princess Cruises No. BC 115472 (Los Angeles Sup. Ct.)
Co-lead counsel in a class action lawsuit challenging a cruise line's deceptive "low price
guarantee" as a consumer fraud class action. The settlement provided the class with a
collective award with a face value of millions of dollars.

Fertelmeyster v. Match.com, No. 02 CH 11534 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit brought under Illinois consumer
protection statutes.  The settlement provided the class with a collective award with a face
value in excess of $3,000,000

Cioe v. Yahoo!, Inc., No. 02 CH 21458 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit brought under state consumer protection
statutes.  The settlement provided the class with a collective award with a face value
between $1,600,000 and $4,800,000.

Cioe v. Lycos, No. 02 CH 21456 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit settled under state consumer protection

statutes.

Gavrilovic v. Vintacom Media Group, Inc., No. 04 CH 11342 (Cook County, Illinois);
Co-lead counsel in a state-wide class action suit settled under state consumer protection
statutes.

McArthur v. Spring Street Networks, 100766/2004 (NY Cty.)
Co-lead counsel in a nationwide class action suit settled under New York consumer
protection statutes.

California Reconveyance Cases
Part of a team of attorneys who settled a series of state court class action cases under
California's Reconveyance Statute. Cases settled for a collective amount of over
$10,000,0000.

INSURANCE CLASS ACTIONS

Holloway v. J.C. Penney, No. 97 C 4555, (N.D.Ill.)
One of the primary attorneys in a multi-state class action suit alleging that the defendant
illegally denied life insurance benefits to plaintiffs' class. The case settled in or around
December of 2000, resulting in a multi-million dollar cash award to the class.

Ramlow v. Family Health Plan (Wisc.Cir.Ct.):
Co-lead counsel in a class action suit challenging defendant's termination of health
insurance to groups of self-insureds. The plaintiff won a temporary injunction, which
was sustained on appeal, prohibiting such termination and eventually settled the case
ensuring that each class member would remain insured.



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

ELIZABETH A. FEGAN
DIRECT • (708) 776-5604
BETH@HBSSLAW.COM

December 10, 2007

## Confidential Settlement Communication
## Pursuant to Fed. R. Civ. P. 408

### *Via Facsimile and Electronic Mail*

Bart Murphy
Ice Miller LLP
2300 Cabot Drive
Suite 455
Lisle, IL 60532

James Petersen
Judy Okenfuss
Ice Miller LLP
One American Square
Suite 3100
Indianapolis, IN 46282-0200

Re:    *Hesse et al. v.Learning Curve Brands, Inc. et al.*

Counsel:

After our October 12 discussion, we sent you a follow-up letter outlining a structure for a proposed settlement. In response, you requested a formal monetary demand on behalf of a Settlement Class. To that end, we requested and you provided, for purposes of settlement only, certain data in order to allow us to formulate a demand on behalf of a Settlement Class.

Set forth below is the demand of the Class Plaintiffs on behalf of a Settlement Class. This demand will remain open for 30 days; after that time, any settlement discussions we have will start at 100% of single damages.

We also thought it would be helpful to outline some of the issues we previously discussed with you. Preliminarily, we believe that this case can and should be settled. The cost of settlement to RC2 Corporation and Learning Curve Brands, Inc. ("RC2") at this point will be manageable compared to the risk RC2 faces if it loses on any issue in this case. Given just the undisputed facts that are within public knowledge, as well as what we expect to receive in further discovery, it is apparent that a Class judgment against Defendants could be several hundreds of millions of dollars when punitives are considered.

Bart Murphy
James Peterson
Judy Okenfuss
December 10, 2007
Page 2

However, we understand RC2's desire to regain the trust of the parents that will buy RC2's products in the future and to focus its time and energy on ensuring that future products are safe for children as opposed to defending an ongoing class action suit. Therefore, we are willing, at this point in the case (prior to full class certification proceedings, including expenditures for final expert reports), to discuss a reasonable settlement that will fairly and adequately compensate the Settlement Class. We believe our settlement proposal, outlined below, is more than reasonable and look forward to discussing with you RC2's response and/or a date for mediation.

**A.    Liability Analysis**

The first step in our analysis, as is true in any case, is to assess the strength of the case. Although you may dispute this, we view the class certification and liability case as strong. We don't believe we need to debate the essential elements of our consumer protection and product liability claims. While we may disagree over nuances in the law as to how the various elements of our claims are interpreted, we believe that our claims are sufficiently strong to achieve class certification and survive RC2's motion to dismiss. We also believe that if the Court concludes that RC2 sold toys that were tainted with lead paint and exposed children to a known toxic substance (both undisputed facts based on the regulatory documents publicly available), the Court will order Defendants to compensate consumers.

We both have had the benefit of reviewing certain documentary evidence to date and the parties' respective positions on the law (at least in the context of the Consolidated Complaint and Motion To Dismiss), and thus we will refrain from an exhaustive overview of our class certification or liability case. Suffice it to say that we expect in the next several months a parade of witnesses who will testify regarding RC2's lack of effective safety and quality controls and, as a result, RC2's sale and distribution of dangerous toys that pose significant risks to children's health. These witnesses will include the Class Plaintiffs, various third parties, and, if they testify truthfully, current and former employees of Defendants as well.

**B.    Settlement Proposal**

Based on the foregoing here is an outline of a settlement proposal.

**1.    Settlement Class:**

All persons and their children that owned any toy from the Thomas & Friends Wooden Railway Toys or Britains brand Knights of the Sword product lines that were subject to recall in June 2007 or September 2007.

Bart Murphy
James Peterson
Judy Okenfuss
December 10, 2007
Page 3

### 2.    Compensatory Relief per Fed. R. Civ. P. 23(b)(3): Refund Costs

As we previously outlined for you, the settlement would include a full monetary refund of those toys covered by the original recall.  Individuals that received a replacement, including the tainted Toad toy, would still be eligible for full replacement value of their original toy.  Based on the information exchanged to date for purposes of these discussions, we submit an initial refund demand of $30,960,000, which is based on 80% of our estimation of full refund damages.[1]

### 3.    Injunctive Relief per Fed. R. Civ. P. 23(b)(2):

### a.    Costs of Blood Lead Testing

Based on our previous discussions and the current pleadings and discovery requests you have served on Plaintiffs, we believe that you may fundamentally misunderstand Plaintiffs' request for certain medical monitoring, namely the costs of blood lead testing.[2] We feel quite strongly that we will not face any causation issues with respect to recovery of medical testing and surveillance costs that result from the exposure of children to Defendants' toys tainted with lead paint.

For example, in the event that a mother sees the RC2 recall, identifies several subject toys in her possession and with which her child has played, and therefore calls her pediatrician with concerns, the pediatrician is bound by the standard of care to refer the exposed child to obtain a blood lead test.  It is irrelevant to that inquiry whether or to what extent there are other sources of lead paint to which the child was exposed.  Those questions, and thus the issue of causation, only become relevant in the event of a personal injury claim on behalf of an individual child who has elevated levels of lead in his blood.  We are not seeking remuneration for personal injury in this lawsuit.

In this District and under Illinois law, the costs of blood lead testing are a current compensable injury.  In fact, a far more extensive surveillance program for children exposed to lead paint was approved and certified under Fed. R. Civ. P. 23(b)(2) in *Elliott v. Chicago Housing Authority et al.*, 2000 U.S. Dist. LEXIS 2697 (N.D. Ill. 2000).  There is no reason to expect that Judge Leinenweber would differ in his analysis.

---

[1] These numbers are based on Bart's representations, for purposes of settlement discussions only, in his November 21, 2007 correspondence, and are subject to confirmatory discovery in the event that an agreement is reached.

[2] For purposes of this settlement demand, Plaintiffs are willing to limit their demand to the costs of blood lead testing. However, in the event that these settlement discussions are not successful, Plaintiffs do not waive their rights to seek an expanded medical surveillance program, including continued surveillance in the future, to accomplish the early detection of latent disease.

Bart Murphy
James Peterson
Judy Okenfuss
December 10, 2007
Page 4

That being said, we also realize your clients' desire to avoid a common fund for costs of blood lead testing. Accordingly, we propose that this portion of the settlement be on a formula basis, namely that claimants would be entitled to receive the greater of the unreimbursed costs for a child's blood test *or* actual out of pocket costs where there is no insurance coverage for the blood test.

### b.    Other Injunctive Relief

As we previously outlined, RC2 would agree to base individual western inspectors in the plants in China, who are paid directly by RC2, that would be responsible for periodic inspections and the maintenance of quality control over products from the Chinese manufacturers. RC2 would also agree to other safeguards to be implemented.

### 4.    Notice:

Defendant shall be responsible for the costs of notice with respect to the settlement of the claims against RC2.

We look forward to RC2's response, counter-proposal and/or scheduling a date for mediation.

Sincerely,

HAGENS BERMAN SOBOL SHAPIRO LLP

Beth

Elizabeth A. Fegan

BF:BF
cc:    Fred Fox
    Larry King
    Will Riley
    Joe Williams
    Steve W. Berman
    Ivy Arai

| Movants' Representation of the Settlement | State Plaintiffs' Actual Settlement | Movants' After-The-Fact Demand |
|---|---|---|
| Settlement "outright ignores that Class members are entitled to medical monitoring and the cost of lead testing" (MDL Pl.'s Br. 7.) | Settlement release does not extend to individual personal injury claims. (Settl. Agr. 8.) | Demand seeks co-pays for insured class members who received blood tests or actual out of pocket if no insurance. Demand expressly excludes compensation for medical monitoring. (Dmd Ltr. 12-10-07 3, n. 2.) |
| "Class Members who already returned their Recalled Toys to RC2 . . . are not entitled to any relief under the settlement." (MDL Pl.'s Br. 8.) | Settlement provides Class Members who returned their Recalled Toys to receive full cash refunds. (Settl. Agr. 15.) | Such persons would receive 80% cash refunds. (Dmd Ltr. 12-10-07, 3). |
| Class Members are entitled to full cash refunds if they still possess recalled toys or have proof of purchase. In the later case, relief is capped at two settlement toy products per household. (MDL Pl.'s Br. 9.) | Class members are entitled to choose between receiving full cash refunds or receiving replacement toys plus a free bonus toy. If a class member does not have the toys, but has proof of purchase, relief is capped at two settlement toy products per household. (Settl. Agr. 13-16.) | Class members may receive 80% cash refunds and have no option of choosing in-kind relief. No explanation of what standard of proof is required in order to obtain relief. (Dmd Ltr. 12-10-07, 3). |
| "Class members who no longer possess Recalled Toys due to destruction or disposal are entitled to a coupon or credit in the amount of $15.00[.]" (MDL Pl.'s Br. 10.) | Such class members are entitled to full cash refunds so long as they have proof of purchase. If not, they are eligible to receive coupons or credits. (Settl. Agr. 13-14.) | No explanation of what standard of proof is required in order to obtain relief. (Dmd Ltr. 12-10-07, 3.) |
| "Class Members who still possess Recalled Toys can return them and obtain replacement toys plus a bonus toy." (MDL Pl.'s Br. 11.) | Correct. (Settl. Agr. 15.) | Class members have no such option. (Dmd Ltr. 12-10-07.) |
| Cy Pres of $100,000 (MDL Pl.'s Br. 11.) | Correct. (Settl. Agr. 16.) | No Cy Pres. (Dmd Ltr. 12-10-07.) |
| Injunctive Relief is consistent with RC2's | Settlement secures a complete overhaul of | Demand seek only one specific remedial measure, |

| | | |
|---|---|---|
| representations to Congress (MDL Pl.'s Br. 11.) | Defendant's testing procedures, including enhanced auditing and testing procedures, requiring direct communication between U.S. and offshore RC2 representatives, establishing a program ensuring that Defendant can trace the source and location of any problematic toys, the purchase and use of state-of-the-art testing equipment, and the requirement that all contract manufacturers agree to comply with Defendants' testing and auditing procedures. (Settl. Agr. 12.) | i.e. that "individual western inspectors" perform periodic inspections of the Chinese Plants. (Dmd Ltr. 12-10-07, 4.) |
| Settlement releases business entities (MDL Pl.'s Br. 13.) | Settlement provides full cash refunds to business entities in exchange for release. (Settl. Agr. 15-16.) | Demand provides no compensation for business entities. (Dmd Ltr. 12-10-07.) |
| Designated Claims Administrator is RC2's COO and fails to "include any neutral third party oversight" (MDL Pl.'s Br. 14.) | Settlement provides that "the Parties shall agree on an independent third party firm to conduct an appropriate audit of the claims administration process. Any discretionary obligations under this Agreement (including but not limited to the Claim Administrator's right to allow class members to remedy deficient claim forms) shall be supervised, and approved, by this independent third party. Further, Plaintiff maintains the right to challenge the exercise of such discretionary obligations | No discussion of using an outside claims administrator. (Dmd Ltr. 12-10-07.) |

| | | |
|---|---|---|
| | before the Special Master." (Settl. Agr. 17-18.) | |
| Attorneys fees of $2.9 M "despite RC2's settlement valuation of a mere $4.5 M" (MDL Pl.'s Br. 14.) | Attorneys fees were negotiated after class relief was agreed upon. Settlement is valued at over $30M. RC2's "valuation" was, in fact, a report on the 2007 costs associated with the recalls and the resulting lawsuits. (Settl. Agr. 23); *see also* Form 8-K filed Jan. 22, 2008 | Total settlement demand for less money than secured by State Plaintiffs. (Dmd Ltr. 12-10-07.) |