# **Exhibit 17**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE THOMAS AND FRIENDS™ WOODEN RAILWAY TOYS LITIGATION | |
| This Document Relates To: | |
| *Hesse v. Learning Curve Brands, Inc., et al.*, No. 07 C 3514; | No. 07 C 3514 |
| *Deke v. RC2 Corp., et al.*, No. 07 CV 3609; | |
| *Walton v. RC2 Corp. et al.*, No. 07 CV 3614; | Judge Leinenweber |
| *O'Leary v. Learning Curve Brands, Inc.*, No. 07 C 3682; | |
| *Djurisic v. Apax Partners, Inc., et al.*, No. 07 C 3707; | |
| *Reddell v. Learning Curve Brands, Inc., et al.*, No. 07 C 3747; | |
| *Rhode v. Learning Curve Brands, Inc., et al.*, No. 07 C 4187; | |
| *Kreiner v. RC2 Corp., et al.*, No. 07 C4547; | |
| *Wilson v. RC2 Corp., et al.*, No. 07 CV 4642. | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS TO ADMIT TO DEFENDANTS PURSUANT TO FED. R. CIV. P. 36

Defendants' hereby provide the following responses to Plaintiffs' First Set of Requests to Admit to Defendants' Pursuant to Fed. R. Civ. P. 36.

1.    Admit that you distributed the Recalled Toys.

**RESPONSE:** Admit in part and deny in part. Defendants admit that for some time period they distributed the toys which were subsequently subject to the voluntary recalls

announced by RC2 Corporation on June 13, 2007 and September 26, 2007; however, Defendants deny that they distributed those toys for the entire time period set forth by Plaintiffs, of January 1, 2001 to the present.

2.    Admit that you sold the Recalled Toys.

**RESPONSE:**  Admit in part and deny in part.  Defendants admit that for some time period they sold the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007 and September 26, 2007; however, Defendants deny that they sold those toys for the entire time period set forth by Plaintiffs, of January 1, 2001 to the present.

3.    Admit that you placed the Recalled Toys on the market.

**RESPONSE:**  Admit in part and deny in part.  Defendants admit that for some time period they placed on the market the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007 and September 26, 2007; however, Defendants deny that they placed those toys on the market for the entire time period set forth by Plaintiffs, of January 1, 2001 to the present.

4.    Admit that the Plaintiffs were among the intended purchasers of the Recalled Toys.

**RESPONSE:**  Defendants admit that the Plaintiffs were among the intended purchasers of the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007 and September 26, 2007.

5.    Admit that parents were among the intended purchasers of the Recalled Toys.

**RESPONSE:**  Admit in part and deny in part. Defendants admit that parents of children within the appropriate age range were among the intended purchasers of the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007

I/2042222.1

and September 26, 2007. Defendants deny that all parents were intended purchasers of the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007 and September 26, 2007.

      6.    Admit that Plaintiffs' children were among the intended users of the Recalled Toys.

      **RESPONSE:** Admit in part and deny in part. Defendants admit that children within the appropriate age range were among the intended users of the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007 and September 26, 2007. Defendants deny that all of the children of the Plaintiffs were the intended users for all of the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007 and September 26, 2007.

      7.    Admit that children are among the intended users of the Recalled Toys.

      **RESPONSE:** Admit in part and deny in part. Defendants admit that children within the appropriate age range were among the intended users of the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007 and September 26, 2007. Defendants deny that all children were the intended users for all of the toys which were subsequently subject to the voluntary recalls announced by RC2 Corporation on June 13, 2007 and September 26, 2007.

      8.    Admit that you market the Thomas & Friends toys.

      **RESPONSE:** Defendants admit that they currently market Thomas & Friends™ Wooden Railway Toys and that, prior to March 2003, Learning Curve marketed Thomas & Friends™ Wooden Railway Toys.

      9.    Admit that one of your websites is located at www.learningcurve.com.

- 3 -

**RESPONSE:**    Defendants admit that Learning Curve's website has been at www.learningcurve.com from January 1, 2001 to the present.

10.    Admit that, on the website www.learningcurve.com, you assured parents that you wanted to help parents keep their children healthy, happy and safe.

**RESPONSE:**    Admit in part and deny in part.  Defendants admit that the website currently states:  "We understand that what matters most to parents is keeping their children healthy, happy and safe."  Defendants deny that the quote has been on the website for the entire period of January 1, 2001 to the present.  Defendants deny all remaining matters contained within Admission No. 10.

11.    Admit that the following representation appeared on the website www.learningcurve.com: "We understand that what matters most to parents is keeping their children healthy, happy and safe.  What matters most to us is helping parents do just that by offering products for every stage of your child's development...."

**RESPONSE:**    Admit in part and deny in part.  Defendants admit that the quoted statement currently appears on the website.  Defendants deny that the quote has been on the website for the entire period of January 1, 2001 to the present.  Defendants deny all remaining matters contained within Admission No. 11.

12.    Admit that the following representation appeared on the website www.learningcurve.com: "Learning Curve offers developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by safe and quality playthings."

**RESPONSE:**    Admit in part and deny in part. Defendants admit that the quoted statement currently appears on the website.  Defendants deny that the quote has been on the

- 4 -

website for the entire period of January 1, 2001 to the present. Defendants deny all remaining matters contained within Admission No. 12.

13.    Admit that lead is invisible to the naked eye.

**RESPONSE:** Defendants cannot admit or deny Admission No. 13 as it is vague and would require speculation. Whether or not lead is visible depends on the quantity and form of lead present, as well as the other materials present.

14.    Admit that lead has no smell.

**RESPONSE:** Defendants cannot admit or deny Admission No. 14 as it is vague and would require speculation. Defendants further object that this request is premature as Defendants need to consult with an expert in order to be able to respond and the time for expert discovery has not yet begun.

15.    Admit the CPSC banned paint containing lead in excess of 0.06% lead by weight intended for consumer use.

**RESPONSE:** Defendants admit that the CPSC banned, subject to certain restrictions and exemptions, paint intended for consumer use in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film. Defendants deny all remaining matters contained within this Admission.

16.    Admit that the CPSC banned toys and other articles intended for use by children that use paint with a lead content in excess of 0.06%.

**RESPONSE:** Defendants admit that the CPSC banned toys and other articles intended for use by children that bear paint in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film. Defendants deny all remaining matters contained within this Admission.

- 5 -

17.    Admit that the CPSC banned toys and other articles intended for use by children that use paint with a lead content in excess of 0.06% because they present a risk of lead poisoning to children.

**RESPONSE:**   Defendants admit that the CPSC banned, subject to certain restrictions and exemptions, paint intended for consumer use in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film, and toys and other articles intended for use by children that bear such paint. Defendants admit that the Commission stated that "the risk of injury which this regulation is designed to eliminate or reduce is lead poisoning in children." Defendants deny all remaining matters contained within Admission No. 17.

18.    Admit that lead paint can be poisonous to children if ingested.

**RESPONSE:**   Defendants cannot admit or deny Admission 18 as it is vague and would require speculation. This admission purports to set forth a hypothetical without providing the necessary critical information. Specifically, there is no information regarding the hypothetical level of lead in the paint; the quantity of lead paint ingested; the age of the child; the time period over which the lead paint is ingested or many other factors which are necessary to respond to the hypothetical set out in Admission 18.

19.    Admit that the U.S. Center for Disease Control has set a blood lead "level of concern" of 10 micrograms per deciliter of blood.

**RESPONSE:**   Admit in part and deny in part. Defendants deny that the CDC set a single level of concern for all persons. The CDC's "level of concern," *i.e.*, the level over which a substance warrants concern and may warrant protective action, for lead has changed over time. Defendants admit that the CDC website states that the current "level of concern" is 10

micrograms per deciliter of blood for children ages 6 months to 15 years, and 25 micrograms per deciliter of blood for persons older than 15 years. Defendants deny all remaining matters contained within Admission No. 19.

20.    Admit that, according to the National Safety Council, it only takes the lead dust equivalent of a single grain of salt for a child to register an elevated blood lead level.

**RESPONSE:** Defendants admit that the National Safety Council includes the above statement on it's website.    Defendants object to all remaining matters contained within Admission No. 20 as it is vague, would require speculation, and is subject to multiple interpretations. Defendants further object to the admission because it purports to set forth a hypothetical without providing the necessary critical information. Defendants also object that this request is premature as Defendants need to consult with an expert in order to be able to respond and the time for expert discovery has not yet begun.

21.    Admit that it only takes the lead dust equivalent of a single grain of salt for a child to register an elevated blood lead level.

**RESPONSE:** Defendants object to Admission 21 as it is vague, would require speculation, and is subject to multiple interpretations. Defendants further object to the admission because it purports to set forth a hypothetical without providing the necessary critical information. Defendants also object that this request is premature as Defendants need to consult with an expert in order to be able to respond and the time for expert discovery has not yet begun.

22.    Admit that a universally recognized method for testing lead levels in humans is a blood test.

**RESPONSE:** Defendants admit that an accepted method in the United States for testing lead levels in humans is a venous blood test. Defendants deny all remaining matters in Admission 22.

23.    Admit that blood lead test results can be compared to the published standard of 10 ug/dl, established by the CDC.

**RESPONSE:** Admit in part and deny in part. Defendants admit that blood lead test results can be compared to a variety of "standards." Defendants deny all remaining matters in Admission 23.

24.    Admit that you distributed Thomas & Friends Toys that were painted with red surface paint containing lead.

**RESPONSE:** Defendants admit that Learning Curve distributed Thomas & Friends™ Wooden Railway toys which were painted with "red" surface paint and that for some time period RC2 distributed Thomas & Friends™ Wooden Railway toys which were painted with "red" surface paint. Defendants deny that RC2 distributed Thomas & Friends™ Wooden Railway toys for the entire period of January 1, 2001 to the present. Defendants cannot admit or deny the remaining matters in Admission 24 as the phrase "surface paint containing lead" is vague and unclear. Many, if not all, paints contain some amount of lead. However, the CPSA contains definitions for "paint" and "lead-containing paint." The definition of "lead-containing paint" is "paint or other similar surface coating materials containing lead or lead compounds and in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film." Because the phrase "surface paint containing lead" is susceptible of multiple meanings, responding would force Defendants to speculate as to what they would be admitting.

- 8 -

25.    Admit that you sold Thomas & Friends Toys that were painted with red surface paint containing lead.

**RESPONSE:** Defendants admit that Learning Curve sold Thomas & Friends™ Wooden Railway toys which were painted with "red" surface paint and that for some time period RC2 sold Thomas & Friends™ Wooden Railway toys which were painted with "red" surface paint. Defendants deny that RC2 sold Thomas & Friends™ Wooden Railway toys for the entire period of January 1, 2001 to the present. Defendants cannot admit or deny the remaining matters in Admission 25 as the phrase "surface paint containing lead" is vague and unclear. Many, if not all, paints contain some amount of lead. However, the CPSA contains definitions for "paint" and "lead-containing paint." The definition of "lead-containing paint" is "paint or other similar surface coating materials containing lead or lead compounds and in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film." Because the phrase "surface paint containing lead" is susceptible of multiple meanings, responding would force Defendants to speculate as to what they would be admitting.

26.    Admit that you distributed Thomas & Friends Toys that were painted with yellow surface paint containing lead.

**RESPONSE:** Defendants admit that Learning Curve distributed Thomas & Friends™ Wooden Railway toys which were painted with "yellow" surface paint and that for some time period RC2 distributed Thomas & Friends™ Wooden Railway toys which were painted with "yellow" surface paint. Defendants deny that RC2 distributed Thomas & Friends™ Wooden Railway toys for the entire period of January 1, 2001 to the present. Defendants cannot admit or deny the remaining matters in Admission 26 as the phrase "surface paint containing lead" is

vague and unclear. Many, if not all, paints contain some amount of lead. However, the CPSA contains definitions for "paint" and "lead-containing paint." The definition of "lead-containing paint" is "paint or other similar surface coating materials containing lead or lead compounds and in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film." Because the phrase "surface paint containing lead" is susceptible of multiple meanings, responding would force Defendants to speculate as to what they would be admitting.

27.    Admit that you sold Thomas & Friends Toys that were painted with yellow surface paint containing lead.

**RESPONSE:** Defendants admit that Learning Curve sold Thomas & Friends™ Wooden Railway toys which were painted with "yellow" surface paint and that for some time period RC2 sold Thomas & Friends™ Wooden Railway toys which were painted with "yellow" surface paint. Defendants deny that RC2 sold Thomas & Friends™ Wooden Railway toys for the entire period of January 1, 2001 to the present. Defendants cannot admit or deny the remaining matters in Admission 27 as the phrase "surface paint containing lead" is vague and unclear. Many, if not all, paints contain some amount of lead. However, the CPSA contains definitions for "paint" and "lead-containing paint." The definition of "lead-containing paint" is "paint or other similar surface coating materials containing lead or lead compounds and in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film." Because the phrase "surface paint containing lead" is susceptible of multiple meanings, responding would force Defendants to speculate as to what they would be admitting.

- 10 -

28.    Admit that you distributed Knights of Sword toys that were painted with surface paint containing lead.

**RESPONSE:**    Admit in part and deny in part. Defendants admit that for some time period they distributed some Knights of Sword toys. However, Defendants deny that they distributed the Knights of the Sword toys for the entire time period set forth by Plaintiffs, of January 1, 2001 to the present. Defendants cannot admit or deny the remaining matters in Admission 28 as the phrase "surface paint containing lead" is vague and unclear. Many, if not all, paints contain some amount of lead. However, the CPSA contains definitions for "paint" and "lead-containing paint." The definition of "lead-containing paint" is "paint or other similar surface coating materials containing lead or lead compounds and in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film." Because the phrase "surface paint containing lead" is susceptible of multiple meanings, responding would force Defendants to speculate as to what they would be admitting.

29.    Admit that you sold Knights of Sword toys that were painted with surface paint containing lead.

**RESPONSE:**    Admit in part and deny in part. Defendants admit that for some time period they sold Knights of Sword toys. However, Defendants deny that they sold the Knights of the Sword toys for the entire time period set forth by Plaintiffs, of January 1, 2001 to the present. Defendants cannot admit or deny the remaining matters in Admission 29 as the phrase "surface paint containing lead" is vague and unclear. Many, if not all, paints contain some amount of lead. However, the CPSA contains definitions for "paint" and "lead-containing paint." The definition of "lead-containing paint" is "paint or other similar surface coating materials

- 11 -

I/2042222.1

containing lead or lead compounds and in which the lead content (calculated as lead metal) is in excess of 0.06 percent by weight of the total nonvolatile content of the paint or the weight of the dried paint film." Because the phrase "surface paint containing lead" is susceptible of multiple meanings, responding would force Defendants to speculate as to what they would be admitting.

30.    Admit that, on June 14, 2007, the CPSC announced a voluntary recall of the following Thomas & Friends Toys:  Red James Engine & Red James' #5 Coal Tender, Red Lights & Sounds James Engine & Red James' #5 Lights & Sounds Coal Tender, James with Team Colors Engine & James with Team Colors #5 Coal Tender, Red Skarloey Engine, Brown & Yellow Old Slow Coach, Red Hook & Ladder Truck & Red Water Tanker Truck, Red Musical Caboose, Red Sodor Line Caboose, Red Coal Care labeled "2006 Day Out With Thomas" on the Side, Red Baggage Car, Red Holiday Caboose, Red "Sodor Mail" Car, Red Fire Brigade Truck, Red Fire Brigade Train, Deluxe Sodor Fire Station, Red Coal Car, Yellow Box Car, Red Stop Sign, Yellow Railroad Crossing Sign, Yellow "Sodor Cargo Company" Cargo Piece, Smelting Yard, and the Ice Cream Factory (collectively, "First Thomas Recall Toys").

**RESPONSE:** Deny.

31.    Admit that a true and correct copy of one of Defendants' "Replacement Request" forms is attached as Exhibit A.

**RESPONSE:**    Admit in part and deny in part.  Defendants admit that the form attached as Exhibit A is a true and correct copy of a replacement request form that was used at some point during the recalls.  Defendants deny that the form was used during the entire period of June 13, 2007 to the present.  Defendants further deny that this is the replacement request form currently being used by Defendants.

- 12 -

32.    Admit that the First Thomas Recall Toys were sold throughout the United States from January 2005 through June 2007.

**RESPONSE:**  Defendants deny that there was a recall on June 14, 2007, which is definition of "First Thomas Recall Toys" and, as such, Defendants are unable to admit or deny this Admission.

33.    Admit that the First Thomas Recall Toys sold in retail stores for between $10.00 and $70.00.

**RESPONSE:**  Defendants deny that there was a recall on June 14, 2007, which is definition of "First Thomas Recall Toys" and, as such, Defendants are unable to admit or deny this Admission.

34.    Admit that you distributed at least 1.5 million units of First Thomas Recall Toys prior to the recall.

**RESPONSE:**  Defendants deny that there was a recall on June 14, 2007, which is definition of "First Thomas Recall Toys" and, as such, Defendants are unable to admit or deny this Admission.

35.    Admit that, on September 26, 2007, the CPSC announced a voluntary recall of Knights of Sword toys.

**RESPONSE:**  Defendants admit that the CPSC announced a voluntary recall of three toys from the Knights of Sword product line on September 26, 2007.

36.    Admit that you distributed at least 800 units of the Knights of Sword toys that were subject to a recall.

- 13 -

**RESPONSE:** Admit in part and deny in part. Defendants admit that approximately 800 Knights of the Sword toys were recalled by RC2. However, Defendants deny that these toys were distributed to retailers by RC2.

37.    Admit that, on September 26, 2007, the CPSC announced a voluntary recall of the following Thomas & Friends Toys: All Black Cargo Car, included in the Brendam Fishing Dock Set; "Toad" vehicle with brake lever; Olive Green Sodor Cargo Box included in the Deluxe Cranky the Crane; All Green Maple Tree Top included in the Conductor's Figure 8 Set; and Green Signal Base included in the Conductor's Figure 8 Set (collectively, "Second Thomas Recall Toys").

**RESPONSE:** Admit.

38.    Admit that you distributed at least 200,000 units of the Second Thomas Recall Toys prior to the recall.

**RESPONSE:** Defendants admit that they distributed at least 200,000 toys that were subsequently subject to the voluntary recall announced by RC2 Corporation on September 26, 2007.

39.    Admit that the Second Thomas Recall Toys were sold throughout the United States form March 2003 through September 2007.

**RESPONSE:** Admit in part and deny in part. Defendants admit that each of the toys that were subsequently subject to the voluntary recall announced by RC2 Corporation on September 26, 2007 were sold throughout the United States for some time period between March 2003 and September 2007. Defendants deny that all of those toys were sold throughout the United States for the entire time period set forth by Plaintiffs, of March 2003 and September 2007.

- 14 -

40.    Admit that the Second Thomas Recall Toys sold in retail stores for between $10.00 and $40.00.

**RESPONSE:**    Admit in part and deny in part.  Defendants admit that the toys that were subsequently subject to the voluntary recall announced by RC2 Corporation on September 26, 2007 were sold in retail stores in sets that sold for approximately $10.00 and $40.00.  Defendants deny that the Second Thomas Recalled Toys were sold individually for that amount.

41.    Admit that you distributed the "Toad" vehicle with brake lever that was subject to the September 26, 2007 voluntary recall to some owners of Recalled Toys that had returned Recalled Toys to you.

**RESPONSE:**    Admit in part and deny in part.  Defendants deny that the "Toad" vehicle was sent as a replacement toy to owners of Recalled Toys who returned their Recalled Toys. Defendants admit that the "Toad" vehicle was sent to some owners of Recalled Toys who returned their toys.

42.    Admit that you distributed replacement toys that were not in their original packaging to owners of Recalled Toys that had returned Recalled toys to you.

**RESPONSE:**  Deny.

43.    Admit that you distributed replacement toys without including the original packaging to owners of Recalled Toys that had returned Recalled Toys to you.

**RESPONSE:**  Deny.

44.    Admit that you distributed replacement toys with chipped paint to owners of Recalled Toys that had returned Recalled Toys to you.

**RESPONSE:**  Deny.

- 15 -

45.    Admit that you distributed replacement toys that had been repainted to owners of Recalled Toys that had returned Recalled Toys to you.

**RESPONSE:** Deny.

46.    Admit that you headquarters are in Illinois.

**RESPONSE:** Admit.

47.    Admit that You conduct the following business from or in your Illinois headquarters: all or part of the negotiation of your licenses for the Thomas & Friends name.

**RESPONSE:**  Admit in part and deny in part.  Defendants admit that some negotiations of licenses for the Thomas & Friends™ Wooden Railway toys name are conducted from or in RC2's Illinois headquarters.  Defendants deny that all negotiations of licenses for the Thomas & Friends™ Wooden Railway toys name are conducted from or in RC2's Illinois headquarters.

48.    Admit that You conduct the following business from or  in your Illinois headquarters:  all or part of the sale of your Thomas & Friends Toys to retail stores and other distributors.

**RESPONSE:**   Admit in part and deny in part.  Defendants admit that some business activities related to the sale of Thomas & Friends™ Wooden Railway toys to retail stores and distributors may be conducted from or in RC2's Illinois headquarters.  Defendants deny that all business activities related to the sale of Thomas & Friends™ Wooden Railway toys to retail stores and distributors are conducted from or in RC2's Illinois headquarters.

49.    Admit that You conduct the following business from or in your Illinois headquarters:  all or part of the marketing of your Thomas & Friends Toys.

**RESPONSE:**   Admit in part and deny in part.  Defendants admit that some of the marketing for Thomas & Friends™ Wooden Railway toys is conducted from or in RC2's Illinois

- 16 -

headquarters. Defendants deny that all of the marketing for Thomas & Friends™ Wooden Railway toys is conducted from or in RC2's Illinois headquarters.

50.    Admit that You conduct the following business from or in your Illinois headquarters:  all or part of the advertising of your Thomas & Friends Toys.

**RESPONSE:**  Admit in part and deny in part.  Defendants admit that some of the advertising for Thomas & Friends™ Wooden Railway toys is conducted from or in RC2's Illinois headquarters.  Defendants deny that all of the advertising for Thomas & Friends™ Wooden Railway toys is conducted from or in RC2's Illinois headquarters.

51.    Admit that You conduct following business from or in your Illinois headquarters: the oversight of some or all of your relationships with suppliers in China.

**RESPONSE:**  Defendants can neither admit or deny Admission No. 20 as it is vague, overbroad and ambiguous.  The term "suppliers" is undefined and could refer to wide variety of companies with different roles related to different products .

52.    Admit that You conduct the following business from or in your Illinois headquarters:  all or part of you communications with the CPSC.

**RESPONSE:**  Admit in part and deny in part.  Defendants admit that some of their communications with the CPSC are conducted from or in RC2's Illinois headquarters. Defendants deny that all of their communications with the CPSC are conducted from or in RC2's Illinois headquarters.

53.    Admit that you conduct the following business from or in your Illinois headquarters:  the development of your strategy surrounding the recall.

**RESPONSE:**  Admit in part and deny in part.  Defendants admit that some of their strategy for handling the recalls was developed from or in RC2's Illinois headquarters.

Defendants deny that all of their strategy for handling the recalls was developed from or in RC2's Illinois headquarters.

54.    Admit that, in 2003, RC2 acquired Learning Curve International, Inc, and certain of its affiliates.

**RESPONSE:** Admit.

55.    Admit that, in April 2003, Defendants and the CPSC announced a recall of two Lamaze-brand products due to their lead content.

**RESPONSE:** Admit.

56.    Admit that the 2003 recall included approximately 3,800 children's activity toys because the point on the metal wires of these toys contained excessive levels of lead.

**RESPONSE:** Admit.

57.    Admit that You anticipated that one or more children would put the Thomas & Friends Toys in their mouths.

**RESPONSE:** Admit in part and deny in part. Defendants admit that they anticipated that one or more children might briefly put a Thomas & Friends™ Wooden Railway toy in their mouths. Defendants deny all remaining allegations in Admission No. 57.

58.    Admit that a child who placed a Thomas & Friends toy painted with lead paint in their mouth was exposed to lead paint.

**RESPONSE:** Defendants object to Admission 58 as it is vague, would require speculation, and is susceptible to multiple meanings. Further, this admission purports to set forth a hypothetical without providing the necessary critical information. In addition, the phrase "exposed to lead paint" is vague and susceptible to multiple meanings, forcing Defendants to speculate as to what they would be admitting. Defendants further object that this request is

premature as Defendants need to consult with an expert in order to be able to respond and the time for expert discovery has not yet begun.

59.    Admit that you have refused to provide a refund to Plaintiffs for the cost of the First Thomas Recall toys.

**RESPONSE:** Defendants deny that there was a recall on June 14, 2007, which is the definition of "First Thomas Recall Toys" and, as such, Defendants are unable to admit or deny this Admission.

60.    Admit that you have refused to provide a refund to any owner for the cost of the First Thomas Recall Toys.

**RESPONSE:** Defendants deny that there was a recall on June 14, 2007, which is the definition of "First Thomas Recall Toys" and, as such, Defendants are unable to admit or deny this Admission.

61.    Admit that you have refused to provide a refund to Plaintiffs for the cost of the Second Thomas Recall Toys.

**RESPONSE:** Defendants admit that, pursuant to the recall approved by the CPSC, RC2 has offered to replace the toys included in the Second Thomas Recall and pay the shipping costs for the owner to return them, but has not agreed to provide a refund for those toys. Defendants deny the implication that any Plaintiff has requested a refund for toys they purchased that were included in the Second Thomas Recall.

62.    Admit that you have refused to provide a refund to any owner for the cost of the Second Thomas Recall Toys.

**RESPONSE:** Defendants admit that, pursuant to the recall approved by the CPSC, RC2 has offered to replace the toys included in the Second Thomas Recall and pay the shipping costs

I/2042222.1

for the owner to return them, but has not agreed to provide a refund for those toys. At this time, Defendants have not located any records indicating that an owner requested a refund for toys they purchased that were included in the Second Thomas Recall.

63.    Admit that you have refused to pay for the costs of lead testing for any person that owns a Recalled Toy.

**RESPONSE:** Defendants admit that they have not agreed to pay for the costs of lead testing for any person that owns a Recalled Toy. Defendants deny the implication that any adults have requested blood lead testing for themselves.

64.    Admit that you have refused to pay for the costs of lead testing for any child that has played with a Recalled Toy.

**RESPONSE:** Defendants admit that they have not agreed to pay for the costs of lead testing for any person that played with a Recalled Toy.

Dated: December 20, 2007

By: *Judy S. Okenfuss*

Judy S. Okenfuss
James L. Petersen
Katherine A. Winchester
ICE MILLER LLP
One American Square
Suite 3100
Indianapolis, IN  46282

Bart T. Murphy
ICE MILLER LLP
2300 Cabot Drive
Suite 455
Lisle, IL  60532

I/2042222.1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th day of December, 2007, copies of the foregoing were sent via certified U.S. mail to the following:

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
(206) 623-7292

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Boulevard Suite B
Oak Park, IL 60301
(708) 776-5600

Laurence D. King
KAPLAN FOX & KILSHEIMER LLP
555 Montgomery Street
Suite 1501
San Francisco, CA 94111

Frederic S. Fox
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 22nd Floor
New York, New York 10022
(212) 687-1980

William N. Riley
PRICE WAICUKAUSKI & RILEY
301 Massachusetts Avenue
Indianapolis, IN 46204
(317) 633-8787

Judy S. Okenfuss
ICE MILLER LLP
One American Square
Suite 3100
Indianapolis, IN 46282
(317) 236-2115

- 21 -