FILED
FEBRUARY 19, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Case 1:07-cv-07184    Document 38    Filed 02/19/2008    Page 1 of 38

COPY

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**IN RE RC2 CORP. TOY LEAD PAINT
PRODUCTS LIABILITY LITIGATION**

Case No. 07 cv 7184

MDL No. 1893

Judge Leinenweber

## REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR
## PRELIMINARY INJUNCTION PURSUANT TO THE ALL WRITS ACT

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................... 1

II.  DEFENDANTS' NARROW VIEW OF THE CHRONOLOGY SERVES
     ONLY TO HIDE THEIR GAMING OF THE SYSTEM .................................. 2

III. MDL PLAINTIFFS ARE ENTITLED TO AN INJUNCTION UNDER THE
     ALL WRITS ACT AND THE ANTI-INJUNCTION ACT ................................ 5

     A.   This Court Should Exercise Its Authority To Enjoin Defendants From
          Proceeding With a Grossly Inadequate Settlement that Appears To Be the
          Product of Collusion ........................................................................... 5

     B.   MDL Plaintiffs Do Not Seek "Impermissible Appellate Review" Of The
          Proposed State Court Settlement ......................................................... 10

     C.   RC2 Fails To Demonstrate The Presence Of "Exceptional Circumstances"
          Necessary For This Court To Abstain Pursuant To The *Colorado River* Doctrine.... 12

          1.   *Colorado River* Is Only to Be Applied in "Exceptional Circumstances"
               And Such Circumstances Are Not Present Before This Court ........................... 12

          2.   Despite RC2's Arguments to the Contrary, The *Colorado River* Factors
               Do Not Weigh In Favor of Abstention .................................. 14

               a.   RC2's "Claims-made" Settlement Means That There is No "*Res
                    or Property*" at Issue for the *Barrett* Court to Assume Jurisdiction Over....... 14

               b.   The Piecemeal Litigation Factor Does Not Weigh In Favor of Abstention ... 15

               c.   RC2 Cannot Rely On the "Progress" of *Barrett* to Request this Court's
                    Abstention ...................................................................... 17

               d.   The Order in Which Jurisdiction Was Obtained Is Inconsequential
                    Where This Court Obtained Its Jurisdiction Over All Federal Matters
                    Prior to the *Barrett* Court's Preliminary Approval ......................... 18

               e.   The Absence of Claims Under Federal Law Does Not Weigh In
                    Favor of Abstention ......................................................... 19

               f.   Whether The State Court Action Adequately Protects the MDL
                    Plaintiffs Is A Factor That is Neutral At Best................................. 20

               g.   Presence of Concurrent Jurisdiction Has No Bearing On The
                    Facts of This Case ........................................................... 20

  h. RC2 Cannot Meet the Vexatious Litigation Factor ....................................... 21

  i. Factors Deemed "Ambiguous" By RC2 ........................................................ 22

IV. THE CLASS ACTION FAIRNESS ACT ("CAFA") WAS MEANT TO PREVENT THE VERY TYPE OF SHAM SETTLEMENT RC2 ATTEMPTED WITH THE *BARRETT* PLAINTIFFS .................................................................. 23

 A. The Public Policy Reflected In CAFA Counsels In Favor Of An Injunction Here .... 23

 B. The Settlement Provides Nominal Value To The Class ............................................ 25

  1. The *Barrett* Settlement Releases Claims for Which No Consideration Was Received ....................................................................................... 25

   a. Defendants concede that there is no consideration for the release of the medical monitoring claims ................................................. 25

   b. The Toy Exchange Program Provides No Additional Benefits to Consumers and Is Just a Continuation of the Ongoing Recall Program ......... 26

  2. The Original Settlement Provides No Cash Reimbursement for Consumers Who Have Already Sent in the Recalled Toys as part of RC2's Recall Replacement Program ........................................................................... 26

  3. The Coupon Program Adds Little Value to the Settlement ................................. 27

  4. The Injunctive Relief Has No Dollar Value ....................................................... 28

  5. This "Claims-Made Settlement" Is To Be Administered by Defendants ............. 29

V. CONCLUSION ................................................................................................................ 29

## TABLE OF AUTHORITIES

## CASES

Page

*In re Am. Online Spin-Off Accounts Litig.*,
2005 U.S. Dist. Lexis 45625 (C.D. Cal. May 9, 2005)........................................................8

*Asbury v. People's Choice Home Loan, Inc.*,
2007 U.S. Dist. Lexis 17654 (N.D. Ill. Mar. 12, 2007) ....................................................10

*Black Sea Inv., Ltd. v. United Heritage Corp.*,
204 F.3d 647 (5th Cir. 2000) ...............................................................................15, 16, 23

*Calvert Fire Ins. Co. v. American Mut. Reinsurance Co.*,
600 F.2d 1228 (7th Cir. 1979) ........................................................................................22

*Carey v. Kerr-McGee Chem. Corp.*,
999 F. Supp. 1109 (N.D. Ill. 1998) .................................................................................25

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976).........................................................................................2, 12, 13, 17

*Day v. Union Mines, Inc.*,
862 F.2d 652 (7th Cir. 1988) ..........................................................................................20

*De Simas v. Big Lots Stores, Inc.,* ,
No. C 06-6614 SI, 2007 U.S. Dist. Lexis 19257 (N.D. Cal. Mar. 2, 2007)......................14

*In re Diet Drugs Prods. Liab. Litig.*,
282 F.3d 220 (3d Cir. 2002).....................................................................................6, 7, 11

*District of Columbia Court of Appeals v. Feldman*,
460 U.S. 462 (1983)...................................................................................................10, 11

*Elliott v. Chicago Hous. Auth.*,
No. 99 Civ. 10798, 2000 U.S. Dist. Lexis 2697 (N.D. Ill. Feb. 25, 2000) .......................26

*Evanston Ins. Co. v. Jimco, Inc.*,
844 F.2d 1185 (5th Cir. 1988) ...................................................................................19, 20

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005).................................................................................................1, 11, 12

*In re First Commodity Corp. Customer Accounts Litig.*,
89 B.R. 283 (D. Mass 1988) ...........................................................................................14

*Grider v. Keystone Health Plan Cent., Inc.*,
    500 F.3d 322 (3d Cir. 2007)..............................................................7, 8

*Growe v. Emison*,
    507 U.S. 25 (1993)..........................................................................21

*In re Inter-op Hip Prosthesis Prod. Liab. Litig.*,
    176 F. Supp. 2d 758 (N.D. Ohio 2001)...............................................6

*Interstate Material Corp. v. City of Chicago*,
    847 F.2d 1285 (7th Cir. 1988) ....................................................21, 22

*Kessler v. American Resorts Int'l's Holiday Network, Ltd.*,
    2007 U.S. Dist Lexis 84450 (N.D. Ill. Nov. 14, 2007)......................28

*In re Lease Oil Antitrust Litig. (No. II)*,
    48 F. Supp. 2d 699 (S.D. Tex. 1998) ............................................7, 10

*Maag v. Chicagoland Chamber of Commerce*,
    No. 05-CV-711-DRH, 2006 U.S. Dist. Lexis 8548 (S.D. Ill. Feb. 17, 2006)...................22

*In re Managed Care Litig.*,
    236 F. Supp. 2d 1336 (S.D. Fla. 2002) .........................................9, 10

*Midwest Dental Prods. Corp. v. Kinetic Instruments, Inc.*,
    No. 89 C 7289, 1990 U.S. Dist. Lexis 1956 (N.D. Ill. Feb. 23, 1990) .................15, 16, 22

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)...........................................................................13

*National Super Spuds, Inc. v. New York Mercantile Exch.*,
    660 F.2d 9 (2d Cir. 1981) ................................................................25

*P&G v. Alberto-Culver Co.*,
    No. 99 C 1158, 1999 U.S. Dist. Lexis 23140 (N.D. Ill. Apr. 27, 1999) ...........................18

*Parkland Envtl. Group, Inc. v. Laborers' Int'l Union, Laborers' Local 477*,
    No. 06-3238, 2007 U.S. Dist. Lexis 34638 (C.D. Ill. May 11, 2007)................................18

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) .................................................2, 10, 25

*Rooker v. Fidelity Trust Co.*,
    263 U.S. 413 (1923)........................................................................10

*Scheer v. City of Miami*,
    15 F. Supp. 2d 1338 (S.D. Fla. 1998) ..............................................................11

*Silomix, Inc. v. Didion Mfg. Co.*,
    No. 92 C 0132, 1993 U.S. Dist. Lexis 101 (N.D. Ill. Jan. 7, 1993) ....................18

*Spizzirri v. Mortgage Elec. Registration Sys.*,
    No. 03-C-2000, 2003 U.S. Dist. Lexis 11804 (N.D. Ill. July 10, 2003) .............20

*The Continental Ins. Co. v. Cumberland Trucking Co.*,
    670 F. Supp. 827 (N.D. Ill. 1987) ....................................................................17

*TruServ Corp. v. Flegles, Inc.*,
    419 F.3d 584 (7th Cir. 2005) ...........................................................................11

*Winkler v. Eli Lilly & Co.*,
    101 F.3d 1196 (7th Cir. 1996) .......................................................................6, 7

*In re Wireless Tel. Fed. Cost Recovery Fees Litig., MDL 1559*,
    2003 U.S. Dist. Lexis 26070 (W.D. Mo. Dec. 22, 2003).....................................7

## STATUTES

Class Action Fairness Act of 2005, Pub.L. 109-2, § 2(a)(4)(A), 119 Stat. 4 1992.......................23

## MISCELLANEOUS

*John C. Coffee Jr., "Class Wars: The Dilemma Of The Mass Tort Class Action,"* 95
    Colum. L. Rev. 1343, 1370 (Oct. 1995) .....................................................2, 3, 5

## I.    INTRODUCTION

Defendants and State Court Counsel claim that the MDL Plaintiffs are long on rhetoric and short on substance.  Yet Defendants cannot hide from the fact that they did not appear in, litigate or defend any action in *Barrett v. RC2 Corp.* until **after** preliminary approval of the settlement or that, to date, they have **not** appeared in any of the State Court Coordinated Actions that are purportedly supporting the settlement.  Defendants cannot change the fact that they started settlement discussions with State Court Counsel just six days after the *Barrett* action was filed, while the federal court actions were being heavily and aggressively litigated.  Despite their mischaracterizations, Defendants and State Court Counsel cannot change the written record demonstrating that they were conducting parallel settlement negotiations in the federal court actions and in the state court action.  Finally, despite their attempts to do so, Defendants and State Court Counsel cannot change the express language of the preliminarily-approved Settlement Agreement that provides no consideration for the release of medical monitoring claims and no consideration for persons that have already returned their lead-painted toys.

Under these circumstances, this Court has the power to enjoin Defendants under the All Writs Act and the exception to the Anti-Injunction Act as "necessary in aid of the court's jurisdiction," in order to ensure the orderly disposition of the MDL proceedings and prevent forum shopping and a collusive settlement that would eviscerate this Court's jurisdiction. Defendants' argument that the All Writs Act is properly used only to enjoin activities that threaten to undermine a pending settlement in the enjoining court is belied by the case law. Similarly, Defendants' position that the Rooker-Feldman doctrine prevents this Court's action is in direct contravention to the Supreme Court's decision in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 287 (2005), that confined the doctrine to particular types of cases not

applicable here.  Moreover, RC2's request that this Court abstain from issuing a preliminary

injunction pursuant to *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800

(1976), must be rejected because RC2 has wholly failed to demonstrate that this case fits within

the "exceptional circumstances" that ***must*** be present before this Court can waive its obligation

to exercise its jurisdiction, including the authority granted to it by the JPML.  Accordingly, as

will be further explained below, this Court should enjoin Defendants from pursuing or

consummating the settlement in *Barrett*.[1]

## II.     DEFENDANTS' NARROW VIEW OF THE CHRONOLOGY SERVES ONLY TO HIDE THEIR GAMING OF THE SYSTEM

Both the *Barrett* plaintiff and Defendants claim that the state court settlement is not the

product of a reverse auction, because Defendants did not share the MDL Plaintiffs' demands

with the State Court Counsel.  However, whether or not Defendants shared the MDL Plaintiffs'

demands is irrelevant.  The Seventh Circuit has defined a reverse auction by focusing solely on

the games played by defendants.  Specifically, the Seventh Circuit stated:

> [A] "reverse auction" [is] the practice whereby ***the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement*** with, in the hope that the district court will approve a weak settlement and that will preclude other claims against the defendant.

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (emphasis supplied).  *See*

*also* John C. Coffee Jr., "Class Wars: The Dilemma Of The Mass Tort Class Action," 95 Colum.

L. Rev. 1343, 1370 (Oct. 1995) ("One 'old' form of collusion is … a 'reverse auction' … ***A***

***recent recurring scenario involves an inactively litigated action in state court being brought***

***and settled so as to preclude a decision in a more aggressively litigated federal action.***")

---

[1] Plaintiffs' Reply responds to both State Plaintiffs' Response to "Emergency" Motion for Preliminary Injunction Pursuant to the All Writs Act, filed on January 30, 2008 (Dkt. No. 17) and Defendants' Response in Opposition to Plaintiffs' Emergency Motion for a Preliminary Injunction Pursuant to the All Writs Act, filed on February 8, 2008 (Dkt. No. 25).

(emphasis supplied).[2]  That is exactly what Defendants did here.  In order to illustrate Defendants' actions, Appendix A[3] attached hereto is a comprehensive chronology of litigation and settlement events, incorporating the Settlement Chronology set forth in Defendants' Response and expanding it to include all relevant MDL events.[4]

Here, Defendants met with State Court Counsel for the first time regarding settlement just six days after the *Barrett* case was filed (App., #23, 24), and after significant motion and hearing practice had already occurred in the MDL litigation (App., ##3-22).  In fact, once the *Barrett* Complaint was filed, the Appendix reflects that there was ***no*** prosecution or defense of the *Barrett* case outside the context of settlement negotiations.  *See* generally App.[5]  And in fact, Defendant did not even appear in the *Barrett* case until ***after*** preliminary approval of the settlement by the State Court (App., #115), a fact that Judge Maki found remarkable but did not realize until MDL Plaintiffs brought it to his attention.  *See* Fegan Decl., Ex. 30 at 7:13-8:5.

Like the *Barrett* action, the so-called "Coordinated State Court Actions" that have also purportedly agreed to the settlement are nothing more than settlement class actions.  Each of their dockets reveals that there has been not one iota of prosecution – except the filing of

---

[2] *See also id. at* 1378 ("Nothing better facilitates collusion than the ability on the part of the defendants to choose the counsel who will represent the plaintiff class").  In any case, Defendants' Opposing Papers belie their protestation that the settlement was not collusive or improper.  For example, Defendants first informal meeting with State Plaintiffs Counsel occurred only six days after the filing of the State Plaintiffs' Complaint.  *See* Def. Opp. at 9.

[3] Cites to Appendix A will refer to specific row numbers, *e.g.*, App., #1.

[4] The chronology is based on all facts available to the MDL Plaintiffs as of today's date.  Because State Court Counsel has claimed that the MDL Plaintiffs are not fully apprised, the MDL Plaintiffs sent a letter to Defendants and State Court Counsel on February 1, 2008 requesting certain documents.  *See* Ex. 22 to the Declaration of Elizabeth A. Fegan In Support of Plaintiffs' Reply In Support Of Their Motion For Preliminary Injunction ("Fegan Decl."), filed herewith.  State Court Counsel has refused to produce any of the requested information.  *Id.,* Ex. 23.  Defendants have not responded.

[5] Note that there are 80 orange entries in the Appendix reflecting the prosecution and defense of the MDL litigation and just 3 blue entries in the Appendix reflecting the relative lack of prosecution of the *Barrett* action (and clearly no defense).

Complaints.[6]  In fact, in the case filed by William Audet, Esq., who is defined as one of the

"Lead Class Counsel" in the *Barrett* Settlement Agreement (Agreement, at 4), the Superior Court

of California entered a January 15, 2008 "ORDER TO SHOW CAUSE SET FOR MAR-10-

2008…FOR FAILURE TO FILE PROOF OF SERVICE ON DEFENDANT(S) AND OBTAIN

ANSWER(S), OR ENTER DEFAULT(S)."  Fegan Decl., Ex. 18.  Based on the clear record,

there can be little doubt that Defendants were not incentivized to negotiate with any of the state

court lawyers because of the aggressive handling of their cases.

        Yet, while Defendants clearly had chosen *Barrett* as the case where the lawyers would

agree to a weak settlement with no litigation occurring at all, Defendants decided to play the

MDL Plaintiffs – just to make sure they could not get a better deal there.  So, while Defendants

were purportedly engaged in mediation with State Court Counsel (App., ##24, 45, 52, 59, 83),

Defendants were also discussing settlement with the Interim Lead Counsel for the Putative Class

in the MDL, including by:

- advising MDL Plaintiffs on October 12, 2007 that RC2 wanted settlement negotiations to take place in the context of "a mediation with conditions and a written proposal" from Plaintiffs (App., #50);

- encouraging MDL Plaintiffs' settlement demand and receiving the demand on October 17, 2007 (App., #54);

- advising MDL Plaintiffs on October 23, 2007 that defense counsel would be sending a "generic letter indicating that RC2 is interested in settlement" and that "the company is very interested in settlement sooner rather than later" (App., #55);

- advising MDL Plaintiffs on October 30, 2007 that they were going to provide certain data for discussion at mediation and that they were going to pick a mediator that afternoon (App., #60);

- acknowledging on November 2, 2007 receipt of MDL Plaintiffs' proposed dates for mediation based on mediator availability, stating that they were going to get back to

---

[6] The dockets in *Norem v. RC2 Corp.*, No. CGC-07-465859 (Sup. Ct. Cal., San Francisco Cty), *Wood v. RC2 Corp.*, No. 07-CA-002275 (Leon Cty, Fla.), *Lombana v. RC2 Corp.*, No. BER-L-7701-07 (Bergen Cty, NJ), and *Word v. RC2 Corp.*, No. CT-004360-07 (Shelby Cty, Tenn.), are attached as Exs. 18-21 to the Fegan Decl.

MDL Plaintiffs with dates, and that defense counsel was interested in the Chicago mediators proposed by MDL Plaintiffs (App., ##62-63);

- discussing settlement with MDL Plaintiffs during a meeting at the courthouse on November 7, 2007, soliciting a further, more detailed demand and agreeing to provide MDL Plaintiffs with data (App., #67);

- exchanging multiple correspondence with MDL Plaintiffs on November 8, November 13, November 17, and November 21 regarding data for purposes of settlement (App., ##68, 72-73, 77, 80-81);

- failing to advise MDL Plaintiffs that Defendants had already entered into an agreement in principal in November 2007 in *Barrett.* [7]

This is exactly the type of game play that should not be permitted.  As one commentator explained:

> The practical impact of this approach is that it allows the defendants to pick and choose the plaintiff team with which they will deal. Indeed, it signals to the unscrupulous plaintiffs' attorney that by filing a parallel, shadow action in state court, it can underbid the original plaintiffs' attorney team that researched, prepared and filed the action. The net result is that defendants can seek the lowest bidder from among these rival groups and negotiate with each simultaneously. Much in this scenario resembles game theory's classic "prisoner's dilemma," where the theoretical outcome is that the two prisoners, unable to agree upon a binding deal between themselves, will reach a suboptimal outcome.

Class Wars, 95 Colum. L. Rev. at 1371-72.  As set forth in section IV, *infra*, the Class Action Fairness Act was enacted to preclude this type of collusion.

### III.     MDL PLAINTIFFS ARE ENTITLED TO AN INJUNCTION UNDER THE ALL WRITS ACT AND THE ANTI-INJUNCTION ACT

**A.     This Court Should Exercise Its Authority To Enjoin Defendants From Proceeding With a Grossly Inadequate Settlement that Appears To Be the Product of Collusion**

In their opening brief, MDL Plaintiffs established that they meet the standards for enjoining Defendants in the state court action under the All Writs Act and the exception to the Anti-Injunction Act as "necessary in aid of the court's jurisdiction."  MDL Plaintiffs

---

[7] According to State Court Counsel Jay Edelson, he received repeated written and oral assurances from Defendants that they were not negotiating with anyone else.  Clearly those assurances are belied by reality.

demonstrated that an injunction is necessary because the pending settlement threatens to frustrate the MDL proceedings, prevent the orderly disposition of the MDL proceedings, and is a clear example of forum shopping and a collusive settlement.  RC2 contends that an injunction is inappropriate because the All Writs Act should be used only to enjoin activities that threaten to undermine a pending settlement in the enjoining court.  (Opp. at 13.)  RC2 is wrong.

As RC2 itself concedes (Opp. at 13), it is well-established, both in this Circuit and other Circuits, that in a complex action the "necessary in aid of jurisdiction" exception is "construed to 'empower the federal court to enjoin a concurrent state proceeding that might render the exercise of the federal court's jurisdiction nugatory.'"  *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 (7th Cir. 1996) (quoting M. H. Redish, *The Anti-Injunction Statute Reconsidered*, 44 U. Chi. L. Rev. 717, 754 (1977)); *see also In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 235 (3d Cir. 2002); *In re Inter-op Hip Prosthesis Prod. Liab. Litig.*, 176 F. Supp. 2d 758, 762 (N.D. Ohio 2001) (citing cases).  As the Third Circuit has stated, "[u]nder an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction."  *Diet Drugs*, 282 F.3d at 235.

While some courts have applied the All Writs Act and the exception to the Anti-Injunction Act where the pendency of a state case interferes with a settlement in a federal case, this posture is by no means a requirement for an injunction as RC2 wrongly asserts.  In *Winkler*, the Seventh Circuit specifically stated that:

> the Anti-Injunction Act does not bar courts with jurisdiction over complex multidistrict litigation from issuing injunctions to protect the integrity of their rulings, including pre-trial rulings like discovery orders, as long as the injunctions

are narrowly crafted to prevent specific abuses which threaten the court's ability
to manage the litigation effectively and responsibly.

101 F.3d at 1203.  Likewise, in *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, MDL 1559,

2003 U.S. Dist. Lexis 26070 (W.D. Mo. Dec. 22, 2003), the court emphasized that, even without

a pending settlement agreement in the multidistrict court, the court was empowered to enjoin the

state court action:

> **Second, *even in the absence of any conditional approval of the nationwide
> settlement agreement*** between the Plaintiffs and Defendants, this Court's status as a
> multidistrict forum charged with the coordination of all current and future MDL-
> 1559 cases challenging wireless telephone carrier federal cost recovery fees
> ***provides an independent basis for issuing the All Writs Act injunction requested***.

*Id.* at *13 (emphasis supplied).  In *In re Lease Oil Antitrust Litig. (No. II)*, 48 F. Supp. 2d 699,

705 (S.D. Tex. 1998), the court stated, "where jurisdiction over federal MDL class action

litigation is threatened by a potential settlement of the same claims in a state court, the federal

court can act pursuant to the All Writs Act even when the federal court has not already entered

an order that requires preservation."  Preserving the "flexibility and authority" of the federal

court to make decisions in "complex nationwide cases makes special demands on the court that

may justify an injunction otherwise prohibited by the Anti-Injunction Act."  *Diet Drugs*, 282

F.3d at 235.

    Defendants primarily rely on *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322

(3d Cir. 2007),[8] but, contrary to Defendants' spin, *Grider* supports MDL Plaintiffs' position.

The district court in *Grider* was the "MDL court charged with attempting to reach a global

settlement."  *Id.* at 331.  The movants, who were plaintiffs in a separate federal case that had not

been consolidated with the MDL, sought to enjoin the MDL settlement.  The Third Circuit

---

[8] Curiously, Defendants attack Plaintiffs as relying on "non-binding" case law.  *See* Opp. at 16.  But Defendants
likewise rely on the non-binding *Grider* case.

emphasized the status of the MDL court in vacating the injunction issued by the other district

court:

> Finally, our conclusion that the injunction issued by the District Court was an
> abuse of discretion is buttressed by the fact that the court it sought to enjoin is the
> site of a multidistrict consolidation on the matters at issue in *Grider.* The very
> purpose of such a consolidation is to conserve judicial resources by resolving as
> many claims as possible. *See In re Managed Care Litig.,* 236 F. Supp. 2d at
> 1342-43. Thus, although the *Grider* case itself is not part of the MDL, to the
> extent that the MDL court can achieve a global settlement that appropriately and
> fairly deals with a range of claims, other federal courts should be willing to let it
> do so absent some indication of collusion.
>
> *     *     *
>
> In addition, the injunction has had the effect of limiting the ability of an MDL
> court to comprehensively manage the matter before it, undermining the very
> purpose of such a consolidation. Accordingly, we conclude that the District Court
> abused its discretion by using the All Writs Act to enjoin the parties in this case.

*Id.* at 333-34.

Here, MDL Plaintiffs are seeking to enjoin the pending settlement of a state court action

that is not part of the MDL. Like *Grider,* this MDL Court has the power to orderly and globally

manage the consolidated cases. Thus, precedent supports enjoining state courts under the All

Writs Act to preserve the authority of the MDL court.

Indeed, *Grider* also supports MDL Plaintiffs' motion for preliminary injunction because

the *Barrett* proceeding "threatens to frustrate proceedings and disrupt the orderly resolution of

the federal litigation" and "interfere[s] with the federal court's own path to judgment." *Grider*,

500 F.3d at 329-30 (quoting *Diet Drugs*, 282 F.3d at 234). The purpose of an MDL proceeding

is to permit orderly resolution and centralization of cases filed nationwide. *Id.* at 333; s*ee also In

re Am. Online Spin-Off Accounts Litig.*, 2005 U.S. Dist. Lexis 45625, at *16 (C.D. Cal. May 9,

2005) ("The purpose of MDL litigation is to allow 'centralization' and to prevent the type of

forum-shopping that can occur from reverse auctions."). To this end, this Court appointed

interim co-lead counsel for the putative class with the specific responsibility for "conducting the litigation," including "conduct[ing] [] settlement negotiations on behalf of plaintiffs." *See* August 29, 2007 Order. Despite the orderly centralization of cases nationwide, Defendants and State Court Counsel undermine the MDL proceedings by filing a complaint in state court for purposes of immediate settlement. *See generally* App. The putative settlement in the State Case threatens to eviscerate this Court's jurisdiction and the Court's prior order appointing interim co-lead counsel and flies in the face of the very purpose of an MDL proceeding.

Indeed, courts have held that an injunction is especially necessary where the defendants have engaged in improper or collusive conduct, or where the settlement that the plaintiffs seek to enjoin is inadequate. *See Managed Care*, *In re Managed Care Litig.,* 236 F. Supp. 2d 1336, 1340 (S.D. Fla. 2002) ("Several district courts have determined that a federal court's inherent power under the All Writs Act allows it to enter an injunction which would have preclusive effect on a *state* court's action, where the possibility existed that the defendants would attempt to reach an inadequate or collusive settlement in the state court proceeding and 'settle on the cheap.'"). The Seventh Circuit in *Winkler* stated:

> [L]itigants who engage in forum shopping, or otherwise take advantage of our dual court system for the specific purpose of evading the authority of a federal court, have the potential 'to seriously impair the federal court's flexibility and authority to decide that case.' Indeed, although an injunction is extraordinary relief, where such abuses exist, failure to issue an injunction may create the very 'needless friction between state and federal courts' which the Anti-Injunction Act was designed to prevent.'

*Winkler*, 101 F.3d at 1203 (citations omitted).

Although *Grider* held that there was no basis for an injunction because there was no evidence of collusion or an attempt to "swindle the system" in the settlement in the MDL action, the facts are not comparable. *Grider*, 500 F.3d at 333; *see also id.* at 330-31 (discussing *In re*

*Lease Oil Antitrust Litig.,* 48 F. Supp. 2d 699 (S.D. Tex. 1998) and *In re Managed Care Litig.,*

236 F. Supp. 2d 1336 (S.D. Fla. 2002)).  Unlike in *Grinder*, here there is evidence of collusion.

As discussed *supra*, the State Court settlement was a "reverse auction" and an attempt to forum

shop.  In addition, the settlement terms are flatly inadequate.  (*See* Moving Papers at 7-14; and

Section IV, *infra*.)  *See also Reynolds*, 288 F.3d at 283 (disadvantageous settlement terms with

"such questionable antecedents and circumstances" required the judge to give "close[] scrutiny"

to determine collusion in the "reverse-auction sense").  Accordingly, *Grider* is not persuasive

authority here.

      Defendants erroneously argue that the circumstances of this case are not "extraordinary

circumstances" that merit an injunction under the All Writs Act.  (*Id.* at 20.)  Defendants'

attempts to distinguish the cases cited by MDL Plaintiffs are unavailing.  For example,

Defendants contend that the improper dealings in both *In re Managed Care* and *In re Lease Oil*

as situations were "a far cry" from the "*bona fide*" settlement here.  (Opp. at 18.)  However, like

in *Managed Case* and *Lease Oil*, the settlement is not *bona fide* but is the result of improper

collusive dealings between Defendants and State Court Plaintiffs that warrant an injunction.

**B.**    **MDL Plaintiffs Do Not Seek "Impermissible Appellate Review" Of The Proposed State Court Settlement**

      In a clear misrepresentation of the law,[9] RC2 argues that MDL Plaintiffs' request for relief

under the All-Writs Act is barred by the "Rooker-Feldman" doctrine.  The Rooker-Feldman

doctrine, as enunciated in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462

(1983) and *Rooker v. Fidelity Trust Co*., 263 U.S. 413 (1923), holds that lower federal courts

---

[9] This is not the first time that defense counsel presented misleading analyses of law to the Court. Judge Hibbler issued a show cause order against Bart Murphy (then at Wildman), stating "Defendant's arguments in opposition to class certification run so squarely against Seventh Circuit precedent as established by *Murray*, Defendant's counsel is directed to show cause … why they should not be sanctioned pursuant to Rule 11(b)(2)."  *Asbury v. People's Choice Home Loan, Inc*., 2007 U.S. Dist. Lexis 17654, at *6 (N.D. Ill. Mar. 12, 2007). Ultimately, the Court found "counsels' response unconvincing" and entered sanctions. 5/23/07 Minute entry, No. 05-cv-05483.

cannot engage in appellate review of state court decisions.  *Scheer v. City of Miami*, 15 F. Supp.

2d 1338, 1340-1341 (S.D. Fla. 1998).  The court in *Feldman* reasoned that once in the state court

system, litigants must exhaust all means of appeals in that system.  *Feldman*, 460 U.S. 462

(1983).  A single litigant may then appeal the final state court decision to the United States

Supreme Court.  *Id.*

       RC2 contends that Rooker-Feldman precludes this Court from engaging "in appellate-

type review" of the order entered in the *Barrett* state court proceeding.  Opp. at 32-33.  However,

Defendants ignore that ***the doctrine's applicability is limited to litigants who were parties to

both the state and federal proceedings at issue.***  In the unanimous decision of *Exxon Mobil

Corp.*., 544 U.S. at 287, a case upon which Defendants rely, the Supreme Court held that:

> [the Rooker-Feldman doctrine] is confined to cases of the kind from which the
> doctrine acquired its name: cases brought by ***state-court losers complaining of
> injuries caused by state-court judgments*** rendered before the district court
> proceedings commenced and inviting district court review and rejection of those
> judgments.

*Id.* at 284 (emphasis supplied); *see also Scheer,* 15 F. Supp. 2d at 1340-41 and cases cited therein

(Rooker-Feldman only applies to litigants who were parties of both the state court decision and

the federal claim); *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 590-91 (7th Cir. 2005)

(discussing Rooker-Feldman's "extremely limited applicability").

       Here, MDL Plaintiffs were not parties to the state court proceedings and only became

aware of the *Barrett* preliminary approval order through media reports.  This motion for

preliminary injunction justifiably seeks to bar RC2 from proceeding with a grossly inadequate

class action settlement of MDL Plaintiffs' and class members' claims that threatens to undermine

this Court's jurisdiction.  Simply put, MDL Plaintiffs ask this Court to exercise its jurisdiction to

manage the MDL proceedings.  *See, In re Diet Drugs,* 282 F.3d at 241-42 (where a federal

court's proper exercise of its jurisdiction to manage its cases has the secondary effect of voiding a state court determination, it is not a review of that order for purposes of Rooker-Feldman). Because MDL Plaintiffs were not parties to the *Barrett* action, no state court judgment exists and MDL Plaintiffs do not complain of an injury caused by a state court judgment, Defendants cannot use the Rooker-Feldman doctrine to deprive this Court of its jurisdiction. *See Exxon Mobil Corp.,* 544 U.S. at 291-92.

**C.     RC2 Fails To Demonstrate The Presence Of "Exceptional Circumstances" Necessary For This Court To Abstain Pursuant To The *Colorado River* Doctrine**

In addition to its arguments under the Anti-Injunction Act, RC2 requests this Court to abstain from issuing a preliminary injunction pursuant to the U.S. Supreme Court's decision in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), and its progeny. However, as will be described below, RC2 has wholly failed to demonstrate that this case fits within the "exceptional circumstances" that ***must*** be present before this Court can waive its obligation to exercise its jurisdiction, including the authority granted to it by the JPML.  Instead, RC2's argument reveals a rushed, incomplete (and at times misleading) analysis that is insufficient to justify an abdication of this MDL Court's jurisdiction.

**1.     *Colorado River* Is Only to Be Applied in "Exceptional Circumstances" And Such Circumstances Are Not Present Before This Court**

As recognized by the U.S. Supreme Court, "as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction" as federal courts have a "virtually unflagging obligation … to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817-18 (internal quotations and citations omitted).  While exceptions to this general rule exist, "the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state

proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention."  *Id.* at 818.  Moreover, for this exception to even apply, RC2 must clearly state and prove its case to this Court.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983) ("[W]e emphasize that our task in cases such as this is not to find some substantial reason for the exercise of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction.") (emphasis in original).

The exact application of *Colorado River*-type abstention, whether as an outright dismissal or as a stay, is inconsequential as "a stay is as much a refusal to exercise federal jurisdiction as a dismissal."  *Moses H. Cone*, 460 U.S. at 28.  As noted by the Supreme Court:

> When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all…. Thus, the decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses.

*Id.*  As will be outlined below, the factors proffered by RC2 fail to outweigh this Court's "virtually unflagging obligation" to exercise its jurisdiction, particularly when considering this Court's role as an MDL-transferee court in a post-CAFA jurisdictional landscape.  As a result, RC2's request for *Colorado River* abstention must be denied.

2.    **Despite RC2's Arguments to the Contrary, The *Colorado River* Factors Do Not Weigh In Favor of Abstention**

a.    **RC2's "Claims-made" Settlement Means That There is No "*Res* or Property" at Issue for the *Barrett* Court to Assume Jurisdiction Over**

At the outset of its inquiry into the *Colorado River* factors, RC2 argues that the *Barrett* court has assumed jurisdiction over the *res* or property at issue, arguing that "some courts" find that a preliminarily-approved class action settlement constitutes a *res,* thereby satisfying this factor. However, because the *Barrett* settlement is a "claims-made" settlement, rather than a "limited fund" or even a "common fund" settlement, no *res* or property exists over which the *Barrett* court could conceivably assume jurisdiction.

Tellingly, while RC2 references "courts" in support of its position, it relies on an opinion from only one, a readily distinguishable case that did not construe the *Colorado River* factors. *See In re First Commodity Corp. Customer Accounts Litig.*, 89 B.R. 283 (D. Mass 1988).[10]

Here, unlike the limited fund settlement at issue in *First Commodity,* the *Barrett* settlement is a "claims-made" settlement. Thus, there has been no set aside of a fund directly benefiting the proposed class for the damages they have suffered as the result of RC2's actions. To the extent that a set fund even exists, it is a *de minimis cy pres* provision of $100,000, payable to an as yet undetermined organization. And, as conceded by RC2 in its own footnote (*see* Opp., at 24 n.10), it is doubtful that a proposed settlement (whether claims-made or otherwise) constitutes "*res* or property," let alone sufficient to cause this factor to weigh in favor of abstention. *See De Simas v. Big Lots Stores, Inc*., No. C 06-6614 SI, 2007 U.S. Dist. Lexis

---

[10] In *First Commodity*, in connection with the preliminary approval of settlement, the defendant and its owners agreed to a "limited fund" settlement, pursuant to which they would deposit $5.3 million in escrow, which the court characterized "as a *res* to fund the settlement if it is finally approved." *Id.* at 288. In approving the limited fund as reasonable, the court was concerned with protecting that limited fund in order to "assure that the early recovery of punitive damages by a few claimants will not deplete the assets required to compensate many other customers for at least a portion of their actual damages." *Id*.

- 14 -

19257, at *16 (N.D. Cal. Mar. 2, 2007) (cited by RC2 wherein the court "note[d] that several of the factors are of little, if any relevance, to this dispute. As to the first factor, despite defendants' contention, the proposed settlement does not constitute 'res or property' over which the state court has asserted jurisdiction. The first factor is therefore wholly irrelevant."). Moreover, at least one court suggests that the absence of "*res* or property" in fact counsels against abstention. *See, e.g., Black Sea Inv., Ltd. v. United Heritage Corp*., 204 F.3d 647, 650 (5th Cir. 2000) ("The case does not involve any res or property over which any court, state or federal, has taken control…The absence of this factor weighs against abstention.") (internal quotation omitted). Accordingly, this factor cannot weigh in favor of abstention.

> **b.** **The Piecemeal Litigation Factor Does Not Weigh In Favor of Abstention**

Second, in calling for abstention under the piecemeal litigation factor, RC2's brief reflects a newly-found concern for duplicative litigation.[11]  *See* Opp. at 24.  However, where the MDL action is more comprehensive than the *Barrett* matter, and where there is no *res* or property that is threatened, RC2's argument as to this factor fails.

In *Midwest Dental Prods. Corp. v. Kinetic Instruments, Inc*., No. 89 C 7289, 1990 U.S. Dist. Lexis 1956, at *1 (N.D. Ill. Feb. 23, 1990), the district court provided a well-reasoned analysis of the *Colorado River* piecemeal litigation inquiry.  Specifically, the court observed that:

> Suits which are mere copies of each other do not trigger concerns of piecemeal litigation.  As stated previously, the Colorado River doctrine demands more than mere duplication.  The classic case where piecemeal litigation concerns arise are in those situations where the state court suit is more comprehensive than the federal court suit.  In such a case, the federal court will be able to resolve only a portion of the dispute whereas the state court will be able to decide the entire case,

---

[11] Again, this "concern" is unfounded where RC2 chose not to remove selected state court actions and pursue the MDL options available.

> including that portion duplicated in the federal court.  By staying its proceedings,
> the federal court avoids litigating a mere piece of the dispute and allows for a
> more economical and comprehensive administration of the law suit.

*Id.* at *17-18 (internal citations and quotations omitted).  *See also id.* at *23-24 (abstaining because the "inconvenience-of-the-federal-forum factor point[ed] clearly in favor of abstention," and also where "there was no suggestion that the state forum was inadequate to protect the federal plaintiff's interests").  Additionally, in *Black Sea*, 204 F.3d at 650, the Fifth Circuit considered a case where the "district court expressly granted a stay primarily to avoid wasteful, duplicative litigation."  In reviewing the district court, the Fifth Circuit stated:

> [T]he prevention of duplicative litigation is not a factor to be considered in an
> abstention determination.  Duplicative litigation, wasteful though it may be, is a
> necessary cost of our nation's maintenance of two separate and distinct judicial
> systems possessed of frequently overlapping jurisdiction.  The real concern at the
> heart of [this] Colorado River factor is the avoidance of piecemeal litigation, and
> the concomitant danger of inconsistent rulings with respect to a piece of property.
> When, as here, no court has assumed jurisdiction over a disputed res, there is no
> such danger.  This factor therefore weighs against abstention.

*Id.* at 650-51 (internal citations and quotations omitted).

In the case before this Court, it is the federal MDL matter, rather than the *Barrett* matter, that is the more comprehensive case.  Notwithstanding the challenged settlement (which releases medical monitoring claims without consideration), the *Barrett* court will only be able to resolve a portion of the dispute because the *Barrett* plaintiff does not seek relief for medical monitoring.  *See Barrett* Class Action Compl.  By contrast, the MDL Plaintiffs' complaint includes a count that enables them to seek relief in the form of a reimbursement for the costs of a diagnostic blood lead test, which is, in and of itself, a compensable injury.  *See* Second Am. Consolidated Compl. ¶¶ 131-35.  As a result, the "piecemeal litigation" factor cannot weigh in favor of abstention.

###     c.     RC2 Cannot Rely On the "Progress" of *Barrett* to Request this Court's Abstention

Third, RC2 contends that the "substantial progress" as the result of the settlement of the *Barrett* matter is cause for abstention, where the very propriety of that settlement is presently at issue.[12]  However, RC2's position is remarkable and contrary to even that discussed in *Colorado River.*  In reviewing the action in favor of abstention, the Supreme Court found "significant … the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss," observing that prior to the filing of a motion to dismiss "it does not appear the District Court dealt in any other manner with the suit pending before it."  *Colo. River*, 424 U.S. at 820.  Here, a review of the *Barrett* docket reveals the apparent absence of any proceedings prior to the date on which the state court approved the *Barrett* settlement.  *See Barrett* Docket.  *See also* App., ##23, 71.

Indeed, it does not appear that the *Barrett* court dealt with the suit in ***any*** manner before preliminarily approving the settlement. *See Barrett* Docket.  *See also* App., ##23-111.  Yet, the absence of dispositive motions is not surprising where counsel for RC2 did not file an appearance in the matter until ***after*** preliminary approval of the settlement agreement, let alone answer or otherwise respond to the *Barrett* complaint.[13]

---

[12] In *The Continental Ins. Co. v. Cumberland Trucking Co.,* 670 F. Supp. 827 (N.D. Ill. 1987), the court cited the fact of settlement negotiations as a basis for abstention, but appears to have done so on a limited basis.  In *Continental*, an insurance accounting action, Judge Duff was faced with a federal lawsuit brought by Continental, approximately sixteen days after Continental was sued in state court.  *Id.* at 828.  In considering the reasons favoring abstention, Judge Duff saw "no reason why Continental, thoroughly enmeshed in settlement negotiations, should precipitously file suit on issues before another tribunal," and could "only conclude that Continental acted in bad faith" in light of "the absence of any justification for such action."  *Id.* at 829.  Thus, *Continental* is distinguishable where the MDL Plaintiffs did not file their lawsuit during ongoing settlement negotiations with RC2 during the same time that they were litigating a parallel state action.  Moreover, this case is further distinguishable where the MDL Plaintiffs have questioned the propriety of the *Barrett* settlement.

[13] The lack of entries on the *Barrett* docket reveals a similar pattern of inaction when compared to the other "coordinated" state cases filed in California, Florida, New Jersey and Tennessee.  Just as in *Barrett*, in each of these cases, RC2 has not appeared, let alone litigated any issue.  Fegan Decl., Exs. 18-21.

By contrast, the parties to the MDL matter were before this Court on numerous occasions and litigated before the JPML, resulting in the coordination of all federal cases against RC2 and their ultimate consolidation before this Court. *See generally* App., ##3-111. Accordingly, RC2's argument celebrating the "substantial progress" of the *Barrett* matter must fail, and thus this factor cannot support abstention.

> **d.     The Order in Which Jurisdiction Was Obtained Is Inconsequential Where This Court Obtained Its Jurisdiction Over All Federal Matters Prior to the *Barrett* Court's Preliminary Approval**

Next, RC2 relies on the purported settlement in *Barrett* in attempting to advance the *Barrett* matter procedurally ahead of this matter, even though no activity took place in that matter prior to the settlement which is presently at issue. In any event, the case law interpreting this factor reveals that it is inconsequential or at least favors the exercise of this Court's MDL jurisdiction.

Notably, courts reviewing the jurisdictional order factor look not only to the time of filing, but also to whether the state matter is "well underway" when the federal matter is filed.[14] Here, a number of the federal cases, particularly those initially filed in the Northern District of Illinois, have been proceeding as a group before the *Barrett* matter was even filed. *See* App., ##3-10, 18-21. Indeed, the lead case, *Hesse v. Learning Curve Brands, Inc.*, has been pending before this Court since June 22, 2007. In fact, there were 11 federal actions on file before

---

[14] *See Parkland Envtl. Group, Inc. v. Laborers' Int'l Union, Laborers' Local 477*, No. 06-3238, 2007 U.S. Dist. Lexis 34638, at *12 (C.D. Ill. May 11, 2007) ("The fourth factor, the order-of-jurisdiction, is not of much significance here. This factor 'simply refers to the race to the courthouse.'") (quoting *Midwest Dental,* 1990 U.S. Dist. Lexis 1956 at *7); *P&G v. Alberto-Culver Co.*, No. 99 C 1158, 1999 U.S. Dist. Lexis 23140, at *23 (N.D. Ill. Apr. 27, 1999) ("This factor is based on the outcome of the race to the courthouse, and thus is not particularly important.") (citing *J.J.K. Realty Co., Inc. v. Steward*, No. 87 C 2389, 1989 WL 165114, at *6 (N.D. Ill. Dec. 28, 1994)). *Cf. Silomix, Inc. v. Didion Mfg. Co.*, No. 92 C 0132, 1993 U.S. Dist. Lexis 101, at *12 (N.D. Ill. Jan. 7, 1993) ("As stated by the Seventh Circuit, the purpose of this requirement is not to invite 'races' to the courthouse, but looks to the more typical situation where a state action is well underway before the federal case is filed.") (citing *Evans Transp. Co. v. Scullin Steel Co.*, 693 F.2d 715, 718-19 (7th Cir. 1982)).

*Barrett* was even filed.  App., ##3-10, 19-21.  Furthermore, the JPML consolidated all federal matters before this Court over a month before preliminary approval of the *Barrett* settlement. *See* Transfer Order, Ex. 6.[15]

While this Court was busy exercising its jurisdiction over the federal cases, issuing and approving various orders, the *Barrett* court exercised no jurisdiction over the *Barrett* parties prior to preliminary approval.  The *Barrett* plaintiff (like in the other "coordinated" state cases) did not file proof of service, RC2 did not file an appearance, RC2 did not answer the complaint, and the *Barrett* court did not hold any status conferences.  As a result, this factor does not weigh in favor of this Court declining to exercise its jurisdiction.

        e.     **The Absence of Claims Under Federal Law Does Not Weigh In Favor of Abstention**

As to the fifth *Colorado River* factor, *i.e.*, the source of governing law, RC2 has again misconstrued the strength of its position.  RC2 contends that because "there are no federal law issues, the fifth factor supports the Defendants' argument for abstention."  However, as an opinion from the Fifth Circuit demonstrates, RC2's conclusion is wrong.  *See Evanston Ins. Co. v. Jimco, Inc*., 844 F.2d 1185, 1193 (5th Cir. 1988) ("The absence of a federal-law issue *does not* counsel in favor of abstention, for as the Court stated in *Moses Cone*, 'our task … is not to find some substantial reason for the exercise of federal jurisdiction' [and t]he presence of a federal law issue 'must always be a major consideration weighing against surrender [of jurisdiction],' but the presence of state law issues weighs in favor of surrender only in rare circumstances.'" )

---

[15] Additionally, by removing the *Wilson v. RC2 Corp.* matter from state court in Arkansas, and by advocating for coordination and consolidation to the Northern District of Illinois and this Court, RC2 implied a desire for federal resolution of this matter (or realized the *Wilson* case was not a settlement-only class action).

(quoting *Moses H. Cone*, 460 U.S. at 25-26) (emphasis supplied).[16]  Thus, RC2 has hardly set

forth the "rare circumstances" justifying abstention.

> **f.    Whether The State Court Action Adequately Protects the MDL Plaintiffs Is A Factor That is Neutral At Best**

Next, while RC2 trumpets the ability of the state court to protect the rights of the MDL

Plaintiffs, citing the right to opt out and the option to pursue their claims separately – even

though the settlement releases their ability to protect the class and obtain medical monitoring

reimbursements on their behalf – this factor does not weigh in favor of abstention.  Instead, it

weighs against abstention or is, at most, indifferent to the analysis.  *See, e.g., Evanston Ins. Co.

v. Jimco, Inc*., 844 F.2d 1185, 1193 (5th Cir. 1988) ("*Moses Cone* introduced this factor, and it is

clear from its nature that it can ***only be a neutral factor or one that weighs against, not for,

abstention***.  A party who could find adequate protection in state court is not thereby deprived of

its right to the federal forum, and may still pursue the action there since there is no ban on

parallel proceedings.") (emphasis supplied).  As such, RC2's argument to the contrary, devoid of

case law, should be disregarded.  Thus, this factor does not weigh in support of abstention.

> **g.    Presence of Concurrent Jurisdiction Has No Bearing On The Facts of This Case**

This factor, examining the presence or absence of concurrent jurisdiction over the state

and federal matters, should not weigh in favor of abstention.  *See Spizzirri v. Mortgage Elec.

Registration Sys*., No. 03-C-2000, 2003 U.S. Dist. Lexis 11804, at *9 (N.D. Ill. July 10, 2003)

(observing "[t]he eighth factor, whether the state or federal court has jurisdiction over the suit,

---

[16] While "a state court's expertise in applying its own law favors a *Colorado River* stay," *Day v. Union Mines, Inc.*, 862 F.2d 652, 660 (7th Cir. 1988), the case before this Court is ***not*** limited to interpretations of Illinois law.  Rather, Plaintiffs' Second Amended Consolidated Complaint alleges alternative claims for relief under various state consumer protection acts and claims for unjust enrichment, *see, e.g.*, Pls.' Second Am. Consolidated Compl. ¶¶ 96-105, 136-51, in addition to allegations under Illinois law.  Under such circumstances, it is clear that these claims are properly before a federal court vested with jurisdiction via CAFA and chosen by the JPML as the most appropriate court for the resolution of these matters.

has no bearing on our decision because it is undisputed that both the state and federal courts have jurisdiction" and ultimately issuing stay where the "state action was filed five months before this federal action and a motion for summary judgment is currently pending" and where "the federal suit is still in the formative stages"). *Cf. Growe v. Emison*, 507 U.S. 25, 32 (1993) ("Of course federal courts and state courts often find themselves exercising concurrent jurisdiction over the same subject matter, and when that happens a federal court generally need neither abstain (i.e., dismiss the case before it) nor defer to the state proceedings (i.e., withhold action until the state proceedings have concluded).") (citing *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).  Yet, despite the existence of concurrent jurisdiction, by enacting CAFA, Congress has clearly spoken that the resolution of nationwide class actions should take place in federal court.[17]  Hence, this factor should not weigh in favor of abstention.

### h.    RC2 Cannot Meet the Vexatious Litigation Factor

Finally, RC2 ludicrously contends that the "vexatious" litigation factor of the *Colorado River* inquiry is somehow met in this case.  In reaching its conclusion, RC2 relies on one case, *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285 (7th Cir. 1988).  Unlike the facts of the present case, *Interstate Material* involved the presence of multiple, similar lawsuits filed in both state and federal court *by a single, identical plaintiff*.  Not surprisingly, the Seventh Circuit reasonably observed that "the federal suit could be considered both vexatious and contrived" where the same plaintiff "filed both suits within seven months of each other seeking substantially the same relief from substantially the same parties" where the court saw "no reason why all claims and all parties could not have been, and still could not be, part of one suit." *Id.* at 1289.

---

[17] *See also* Plaintiffs' Memorandum in Support of Emergency Motion for Preliminary Injunction Pursuant to the All Writs Act at 22-24 (discussing the purpose of CAFA to prevent backroom sham settlements).

Indeed, "32 of the 39 key paragraphs in plaintiff's state court complaint appeared verbatim in its federal court complaint." *Id.* at 1288.[18]

Here, unlike the case relied upon by RC2, this matter does not involve multiple lawsuits filed by a single named plaintiff where that plaintiff had the choice of filing all claims against a defendant in one suit. Instead, this proceeding involves multiple lawsuits filed by multiple named plaintiffs in multiple court systems where *RC2* had the ability to coordinate such suits and defend them in a single forum. While RC2 voices its concern about a "flood of identical lawsuits" seeking "substantially similar damages for identical alleged acts by Defendants," *see* Opp. at 28, it is clear that RC2 overwhelmingly chose to disregard the options available to it to coordinate all state and federal actions in one forum.[19] Thus, because class litigation in this Court cannot be considered "vexatious" litigation, this factor does not weigh in favor of a stay.

### i. Factors Deemed "Ambiguous" By RC2

In finishing its *Colorado River* analysis, RC2 considers two factors to be ambiguous. However, the factor relating to the convenience of the federal forum weighs against this Court

---

[18] Moreover, an examination of other cases involving allegations of vexatious litigation reveals the non-vexatious nature of the present MDL litigation, where the litigation has been instituted for a good cause as the result of Defendant's introduction of lead-tainted toys into the marketplace. *See Calvert Fire Ins. Co. v. American Mut. Reinsurance Co.*, 600 F.2d 1228, 1233 n.14 (7th Cir. 1979) (accepting the district court's characterization of a lawsuit as vexatious where "[t]here was ample evidence to support [the district judge's] finding that Calvert sought to delay a final decision on its liability under the participation agreement, and also that it sought to employ the federal suit as part of its delaying strategy"); *Maag v. Chicagoland Chamber of Commerce*, No. 05-CV-711-DRH, 2006 U.S. Dist. Lexis 8548, at *22-23 (S.D. Ill. Feb. 17, 2006) (observing that "it is certainly questionable as to whether Plaintiff's federal claims are 'vexatious or contrived in nature'" where "Defendants argue that Plaintiffs filing of his federal suit after his initial state suit had been dismissed amounts to mere forum shopping" and where "Plaintiff has recently become an Alabama resident, when he has been a long-time Illinois resident -- which conveniently created diversity, allowing him a basis for filing his federal suit"); *Midwest Dental*, 1990 U.S. Dist Lexis 1956, at *23 (observing that this factor "asks whether the federal proceeding is really just a procedural sword being used to badger" a party). *See also* BLACK'S LAW DICTIONARY at 1559 (7th ed. 1999) (defining a "vexatious suit" as "[a] lawsuit instituted maliciously and without good cause").

[19] As noted in their Memorandum in Support of Emergency Motion for Preliminary Injunction Pursuant to the All Writs Act, RC2 removed the *Wilson v. RC2 Corp.* matter from the Circuit Court of Lee County Arkansas to federal court, where the case was consolidated with the MDL proceedings by the JPML. *Id.* at 19 n.10. This option was also available to RC2 to consolidate the *Barrett* matter, the "coordinated" state court cases filed in California, Florida, New Jersey and Tennessee, with the cases proceeding in federal court.

declining its jurisdiction.  *See Black Sea*, 204 F.3d at 650 ("The federal and state courts are in approximately the same geographic location within the state.  This factor therefore weighs against abstention.").  While RC2 again complains about defending multiple suits in multiple locations, that self-created problem should be of no consequence, particularly where each state docket reveals that RC2 took no steps to defend itself before the respective state courts.

Additionally, as to the issue of removal of the action to federal court, RC2 attempts to downplay this issue by again touting the putative settlement.  But, where this Court finds that Plaintiffs' injunctive relief is appropriate and necessary to protect this Court's jurisdiction as a MDL-transferee court, RC2's gameplay must fail.  Again, having not even appeared in the *Barrett* matter prior to settlement, RC2 has no basis for its new-found concern about productivity and sacrificing of effort.  *See* Opp. at 29.  Accordingly, these "ambiguous" factors, like the others, instead counsel against this Court's abdication of jurisdiction.

Because RC2 has not shown that this case fits within the "exceptional circumstances" necessary for this Court to waive its obligation to exercise its MDL jurisdiction, RC2's request for this Court to abstain pursuant to the *Colorado River* doctrine should be denied.

## IV.    THE CLASS ACTION FAIRNESS ACT ("CAFA") WAS MEANT TO PREVENT THE VERY TYPE OF SHAM SETTLEMENT RC2 ATTEMPTED WITH THE *BARRETT* PLAINTIFFS

### A.    The Public Policy Reflected In CAFA Counsels In Favor Of An Injunction Here

Rather than meet head on one of the overarching purposes of CAFA – to end class action abuses such as the reverse auction – RC2 engages in an argument by *non-sequitor* by merely reciting the text of the statute.  Opp., at 29-30 (citing 28 U.S.C. §§ 1453(b), 1446).  Plaintiffs never disputed, and do not now dispute that CAFA's removal provisions are discretionary.  What Plaintiffs did explain, and what RC2 chose to ignore, is that Congress intended CAFA to protect

both defendants *and* putative class members from abuses of the class action process, such as the reverse auction RC2 engaged in with the *Barrett* plaintiffs.

The facts underlying the proposed *Barrett* settlement speak for themselves: RC2 engaged in a reverse auction settlement in order to evade the jurisdiction of this MDL Court. Despite that the *Barrett* action had been on file since August, 2007, RC2 did not even appear in the *Barrett* action until *after* the state court had preliminarily approved the settlement. RC2's "straw man" misses the point. MDL Plaintiffs never argue that CAFA *requires* all class actions to be litigated in federal court; MDL Plaintiffs merely explained that by passing CAFA, Congress intended to prevent the very misconduct RC2 is attempting in *Barrett*. *See* Class Action Fairness Act of 2005, Pub.L. 109-2, § 2(a)(4)(A), 119 Stat. 4 1992 (Congress enacted CAFA to put an end to "[a]buses in class actions," which "undermine the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution, in that State and local courts are – (A) keeping cases of national importance out of Federal court."). It is clear that RC2 intended on running parallel litigations in order to determine which group of attorneys would be willing to sell out the Class in order to receive a substantial attorneys' fee. While CAFA was intended to provide defendants with the option to remove state court class actions, it was never intended to facilitate the type of sham settlement RC2 attempts here.

**B.    The Settlement Provides Nominal Value To The Class**

    **1.    The *Barrett* Settlement Releases Claims for Which No Consideration Was Received**

        **a.    Defendants concede that there is no consideration for the release of the medical monitoring claims**

In the MDL, Plaintiffs allege claims for, among other things, medical monitoring and reimbursement of blood lead tests.  As MDL Plaintiffs explained in their opposition papers to Defendants' Motion to Dismiss, in Illinois, medical monitoring has conditionally been found to be equitable relief.  *See, e.g., Carey v. Kerr-McGee Chem. Corp.*, 999 F. Supp. 1109, 1117, 1119 (N.D. Ill. 1998) (recognizing a claim for medical monitoring without requiring plaintiffs to plead and prove either a present physical injury or a reasonable certainty of contracting a disease in the future).  Yet, the proposed Settlement releases these claims even though no consideration was received.[20]  *See, e.g., Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) (reversing judgment approving the class action settlement where the settlement class received no consideration for the release of any claims against defendant); *National Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981) (disapproving of the release of claims not included in the class complaint) (citing Haudek, *The Settlement and Dismissal of Stockholders' Action Part II: The Settlement*, 23 Sw.L.J. 765, 773 (1969) (noting that "[t]he protection afforded the defendants by the judgment rests on its res judicata effect and ***is, therefore, limited to the claims alleged in the pleadings***.") (emphasis supplied)).

Defendants erroneously claim, without any supporting authority, that "the nature of the exposure created by RC2's recalled toys does not warrant this type of relief on a class basis" and that "there are insurmountable causation and individual questions."  Opp., at 5-6.  Indeed, Illinois

---

[20] Considering that many parents will not be receiving reimbursement for blood lead testing, it is odd that the Settlement includes a provision for a cy-pres donation of $100,000 for an unspecified charity.

courts have rejected the argument that given the broad range of plaintiffs' exposure or lack of exposure to lead-based paint, potential causes of exposure, and injuries or lack of injuries, it is impossible for plaintiffs to be typical of the class as a whole. *Elliott v. Chicago Hous. Auth.*, No. 99 Civ. 10798, 2000 U.S. Dist. Lexis 2697 (N.D. Ill. Feb. 25, 2000). In *Elliott*, the court held that "individual variations among plaintiffs and class members concerning magnitude of exposure and extent of injuries does not defeat typicality, especially here where damages for personal injuries are not sought." *Id.*, at *37-38. Accordingly, Defendants should not be permitted to settle claims over which this Court has jurisdiction for no consideration.

> **b.      The Toy Exchange Program Provides No Additional Benefits to Consumers and Is Just a Continuation of the Ongoing Recall Program**

Defendants contend that the "Toy Exchange Program" provided for in the Settlement Agreement "is merely one option available to class members." Opp. at 7. However, that "option" provides no additional benefits to consumers above and beyond what RC2 has already been providing to consumers as part of its Recall Replacement Program. Moreover, consumers who have already tendered their Recalled Toys to Defendants as part of RC2's Recall program also are not eligible to participate in the "Toy Exchange Program" under both the original Settlement and the Amended Settlement.[21]

> **2.      The Original Settlement Provides No Cash Reimbursement for Consumers Who Have Already Sent in the Recalled Toys as part of RC2's Recall Replacement Program**

In arguing the Settlement is fair and reasonable, Defendants disingenuously discount that the original January 22 Settlement Agreement expressly provided ***no*** cash reimbursement for consumers who have already sent in the recalled toy as part of RC2's Recall Replacement

---

[21] Indeed, only consumers who participated in the Recall Program and received the leaded Toad with Break Lever as a bonus toy are entitled to exchange their replacement toy for another Thomas toy as part of the settlement.

Program.  Based upon the express terms of the original Agreement, only "Class Member(s) *in current possession, custody or control* of any Settlement Toy Product shall be entitled to compensation for either the actual price paid upon submission of proof of purchase or the listed price of the product as set forth in Exhibit 1 …."  *See* Settlement Agreement, at 13.  According to Defendants' own estimates, more than 60% of the Class had already returned their toys. Stoelting Letter to Congress. Therefore, 60% of the Class was *not* eligible for the "Cash Reimbursement Program" as they are no longer in "*in current possession, custody or control* of any Settlement Toy Product."[22]

### 3.    The Coupon Program Adds Little Value to the Settlement

As part of the Settlement, consumers without receipts and no longer in possession of their Recalled Toys may complete a claim form to obtain a $15 coupon valid toward the purchase of a Thomas product in the Learning Curve online store.  Defendants assert that this coupon program "carves out relief for what is likely a small subset of the class."  Opp. at 6-7.  However, this coupon program is simply a guise for Defendants to make more money from Class members. The coupon program does not provide for free shipping and the coupon cannot be used in retail establishments.  Therefore, between 46% and 100% of the coupon "value" will be spent on shipping – which ranges from $5.95 to $17.95 for a single item.  Moreover, many of the Thomas

---

[22] Defendants twist the record in claiming they rectified any inadequacies in the original settlement before they were aware of any objection.  Defs' Response at 6, fn 4.  Defendants argue that the Motion To Amend the Settlement Agreement filed on January 28, an alleged hour before Plaintiffs filed their Motion to Intervene, renders Plaintiffs' objection moot because the amendment adequately compensates consumers who already returned recalled toys. However, the pleadings preceding January 28 reveal that Defendants and State Plaintiffs' Counsel were acutely aware of Plaintiffs' objections to the settlement within 24 hours after the original settlement was preliminarily approved on January 22.  Indeed, State Plaintiffs' Counsel went so far as to file an Emergency Motion for Rule to Show Cause Against Hagens Berman Sobol Shapiro LLP before Judge Maki for filing, "[l]ess than 24 hours after the Court's preliminary approval of the settlement," an "unauthorized Press Release directly urging the class members to object to the settlement." Emergency Mtn. to Show Cause at 1.  That Emergency Motion was filed on January 25, well in advance of Plaintiffs' Motion to Intervene and the parties' Agreed Motion to Amend the Settlement Agreement on January 28.  Defendants' distortion of the record is without merit.  Defendants' scramble to amend the Agreement represents a concession of one of many deficiencies of the Settlement.

& Friends Wooden Railway products retail for in excess of $30 before tax and shipping costs.
*See*, *e.g.*, Declaration of Elizabeth A. Fegan in Support of Plaintiffs' Emergency Motion for a
Preliminary Injunction Pursuant to the All Writs Act ("Orig. Fegan Decl."), ¶¶ 4-5.  Thus, courts
routinely disfavor coupon settlements as they typically provide little real value to consumers.
*See Kessler v. American Resorts Int'l's Holiday Network, Ltd.*, 2007 U.S. Dist Lexis 84450, at
*21-22 (N.D. Ill. Nov. 14, 2007).[23]

### 4.      The Injunctive Relief Has No Dollar Value

The "injunctive relief" does not appear to provide any new value to the Class injured by
Defendants' conduct.  In fact, RC2 represented to Congress that the requirements under the
"Quality Assurance Program" (supposedly required by this Settlement) had been implemented
since at least June 2007 (two months before the *Barrett* case was filed).  *See* Ex. 16 to Pltfs'
Memo.  Defendants claim that XRF testing is a new procedure under the Settlement that allows
for quick non-destructive testing of heavy metals, but RC2's Multi-Check Toy Safety System,
implemented since June also requires increased scope and frequency of testing.  *Id*.  Moreover,
the vague injunctive relief provision under the Settlement does not include independent
oversight.  After several recalls, there is nothing to hold Defendants accountable.

---

[23] In rejecting a coupon settlement, the Court in *Kessler*, 2007 U.S. Dist Lexis 84450, at *21-22, found that:

> "[C]ompensation in kind is worth less than cash of the same nominal value, since, as is typical
> with coupons, some percentage of the [in-kind consideration] claimed by class members will never
> be used and, as a result, will not constitute a cost to [defendants]."  *Synfuel Techs., Inc. v. DHL
> Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (citing *In re Mexico Money Transfer Litig.*,
> 267 F.3d 743, 748 (7th Cir. 2001)) (internal quotation marks omitted). The risk that some class
> members will not benefit from the settlement is acute . . .  For these reasons, the Court vacates its
> preliminary certification of the proposed settlement.  On the present record, the proposed
> settlement is unreasonably low in value to the class members as compared with the potential value
> of the claims the class members would be giving up.  [Internal quotation marks in original.]

**5.      This "Claims-Made Settlement" Is To Be Administered by Defendants**

Moreover, the Settlement Agreement states that Defendants will act as Claims Administrator, determining which claims are valid and not valid. Defendants argue that any conflict of interest is rectified because an independent third party will audit the claims administration process. Opp. at 8. However, it is highly unusual, if not unprecedented, that a settling defendant in a claims-made settlement would act as Claims Administrator. Regardless of a third-party audit, it poses a huge conflict of interest if Defendants, who are funding the claims-made settlement, are determining which claims to accept or reject.

## V.      CONCLUSION

The facts demonstrate that this Court properly focused on management of the consolidated cases and ultimately the MDL cases coordinated before it. The facts also demonstrate that the MDL Plaintiffs aggressively litigated the federal cases, while also responding to Defendants' inquiries regarding settlement. The facts only now show that Defendants were playing this Court with no intention to apprise it that Defendants *had* settled a state court case in November 2007 that would result in the waste of significant claims brought by the MDL Plaintiffs as well as this Court's investment of time. Without even an appearance on file in the state court action until after preliminary approval of a collusive settlement, Defendants cannot defend the reasons for ignoring this Court's jurisdiction as the MDL Court nor the substance (or lack thereof) of the settlement.

For the foregoing reasons, MDL Plaintiffs respectfully request this Court to enjoin Defendants, and all those acting in conjunction with Defendants, from pursuing, entering, negotiating, executing, or enforcing any settlement of any claims presented in this action without the express approval of this Court.

Dated: February 13, 2008                    Respectfully submitted


By:   /s/ Elizabeth A. Fegan
Elizabeth A. Fegan
Timothy P. Mahoney
Daniel J. Kurowski
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Boulevard, Suite B
Oak Park, IL 60301
Telephone: (708) 776-5600
Facsimile: (708) 775-5601
E-mail: beth@hbsslaw.com
E-mail: timm@hbsslaw.com
E-mail: dank@hbsslaw.com

Steve W. Berman
Ivy Arai
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com
E-mail: ivy@hbsslaw.com

Laurence D. King
Linda M. Fong
KAPLAN FOX & KILSHEIMER LLP
555 Montgomery Street
Suite 1501
San Francisco, CA  94111

Frederic S. Fox
Donald R. Hall
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue
New York, NY  10022

William N. Riley
Joseph Williams
Jamie Kendall
PRICE WAICUKAUSKI & RILEY, LLC
301 Massachusetts Avenue
Indianapolis, IN  46204

*Interim Co-Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Elizabeth A. Fegan, an attorney, hereby certify that a true and correct copy of the foregoing PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO THE ALL WRITS ACT was served on counsel via CM/ECF and counsel on the following Service List via e-mail on February 13, 2008:

Bart Thomas Murphy, Esq.
ICE MILLER LLP
2300 Cabot Drive
Suite 455
Lisle, IL  60532
Bart.murphy@icemiller.com

James Petersen, Esq.
Katherine A. Winchester, Esq.
Judy S. Okenfuss, Esq.
ICE MILLER LLP
One American Square
Suite 3100
Indianapolis, IN  46282-0200
James.peterson@icemiller.com
Katherine.winchester@icemiller.com
Judy.okenfuss@icemiller.com

*Counsel for Defendants in MDL 1893 and Barrett*

__/s/ Elizabeth A. Fegan_____
Elizabeth A. Fegan

- 32 -